# EXHIBIT 1


Certified Copy

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BAIRD, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )Case No.: |
| | )22CV60-LL-RBB |
| LEIDOS, INC., a Delaware | ) |
| corporation; and DOES 1-99, | ) |
| inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

VIDEOTAPED ZOOM DEPOSITION OF STEVEN BAIRD
VOLUME I, PAGES 1 THROUGH 127
CONDUCTED REMOTELY
NOVEMBER 16, 2022

REPORTED BY BRIDGET L. MASTROBATTISTA, CSR NO. 7715,
REGISTERED PROFESSIONAL REPORTER
REGISTERED MERIT REPORTER
CERTIFIED REALTIME REPORTER
CALIFORNIA CERTIFIED REALTIME REPORTER

Steven Baird, 11/16/2022

Leidos was November 26, 2018, correct?  09:46

A    I don't recall the exact date.

Q    Okay.  So, I'm going to mark the next exhibit.  This is the offer letter that you received.  09:46

(Exhibit 3 was marked.)

BY MR. DEDDEH:

Q    Take a minute and look through it and -- and let me know when you're ready.  Let me -- after you've reviewed it.  09:47

A    Yes, that is the offer letter I received.

Q    And it says on the offer letter in the second paragraph your supervisor will be Dave M. Rose, and your anticipated date -- start date will be November 26, 2018.  09:47

Do you see that?

A    I don't have the document up again, but I could pull it up again to verify that date.

Q    Okay.

A    So, I do see the date November 26, 2018.  09:48

Q    Okay.  So, based off of this -- this offer letter, your start date was November 26, 2018, correct?

A    To the best of my knowledge, that was --

Q    Okay.  09:48

**38**

Steven Baird, 11/16/2022

with Leidos -- working at Leidos?                    09:50

A    Yes.  Absolutely.

Q    Okay.  And did you get along with your colleagues?

A    Yes.                                            09:50

Q    Did you have any disputes with any colleagues?

MS. FLORES:  Objection.  Vague.

THE WITNESS:  Yes.

BY MR. DEDDEH:                                       09:50

Q    You can answer.

A    Yes.

Q    And, generally, which colleagues did you have disputes with?

A    Probably --                                     09:51

MS. FLORES:  Same objection.  You can respond.

THE WITNESS:  We were a prototype engineering company, and so we -- just disputes on different ways to produce things or simplify ways.    09:51
You know, I'm more of a hands-on, and the engineers are more technical.

So, we had disputes -- you know, professional disputes over different ways to proceed on a certain project.                       09:51

**40**

Steven Baird, 11/16/2022

BY MR. DEDDEH:                                                09:51

Q   I see.  Okay.  So, maybe you can give me a background about your general job duties and how you would interact within the Leidos community or in the Leidos mechanical department team.                09:51

A   So, I --

MS. FLORES:  Objection.  Overbroad.  You can respond.

THE WITNESS:  By trade, I'm a machinist.

BY MR. DEDDEH:                                                09:51

Q   Uh-huh.

A   And then Leidos builds a lot of prototype projects.  And, so, I would, you know, initially make the prototype pieces, whether by machining or assembly --                                                  09:51

Q   Okay.

A   -- with instructions from the engineering department and guidance from the engineering department.  And I was responsible for a lot of the vehicles out there.  We had a lot of test vehicles     09:52
and different things like that.  I was responsible for the maintenance and the overall safety and working conditions of the test vehicles.

Q   Okay.  And so if you could summarize what your job duties were.  What would that be; your       09:52

**41**

Peterson Reporting Video & Litigation Services

Steven Baird, 11/16/2022

specific job duties as a machinist, mechanical technician?
09:52

A   So, machining prototype parts for the engineering department.

Q   Okay.  And how would you -- explain to me the process of, you know, when you would get the prototypes and then have to machine it.  Like, did you use any software?  Was there any computer involved?  Or how does -- how does that interplay?
09:52

A   So, there could be a lot of different software involved.  SolidWorks.  A lot of just the basic form.
09:53

The way this would take place is that engineers would design a part, create a drawing, and they would pass that drawing on to me to make the different pieces that go into this assembly.
09:53

Q   Okay.  And, so, when you say they pass it on to you, I imagine this is all done electronically, correct?

A   Not necessarily.  You know, it could be a drawing, a paper drawing.  You know?  I might use a CAD model to create a program or something like that, that the engineers have created.
09:53

Q   Okay.

A   But, for the most part, it was a paper
09:53

**42**

Steven Baird, 11/16/2022

drawing.

Q    Okay.  So they give you a paper drawing, and if you're going to create a CAD model, I imagine there is a computer that you're using.  Is that computer solely yours, or is that a community computer that the mechanical department uses?

A    So, the only computers I had were just a -- a computer at my desk.  The engineers created all the CAD programs.

Q    I see.  And what would you -- what would you do with -- like, on that particular computer, then, if the CAD -- if the CAD program was somewhere else?  Or did you also have access to that?

A    So, they might send me the CAD program, and I might create a tool path using that CAD -- that CAD program.  So, I can machine the part with a CNC machine.

Q    And when -- when you would log into that computer, did you have, like, your own specific log-in, or was it just open to everyone?

A    I had a specific log-in.

Q    Okay.  And -- so if they send you a CAD mock-up, would you need to, I guess, print that out in any way, or do you just work off of it directly from the computer?

**43**

Steven Baird, 11/16/2022

A    I work directly off it from the computer.    09:55

Q    Okay.  But from -- but from that computer you had the ability to print, correct?

A    Yes.

Q    All right.  And, so, I understand that -- that the engineering department would send you -- would you send you items that they needed to get prototyped.    09:55

Once that's done, would you primarily work alone, or did you work with others?    09:55

A    Both.

Q    Okay.

A    Both.  I would work alone and with other people.

Q    Can you kind of explain the general process of once you get that -- that request for the prototype, how you would go about it and -- and what -- what you would need to do.    09:56

A    So, when I got the drawing of a prototype part, I would -- maybe the first thing I would do is check in-house and see if we had the material to create the part.  If we didn't have the material, I would order the material.    09:56

And then from there, once I have the material, then I would start using various pieces of    09:56

**44**

Steven Baird, 11/16/2022

equipment to produce the part.                                    09:56

Q    Okay.  And how would you identify whether there -- whether you had the material?

A    I would go look in the material storage rack to see if we had the material that would be    09:56 sufficient for this prototype piece.

Q    I see.  And where is that located with respect to, like, your particular workstation?

A    Well, they have a machine shop, and the material rack was in the machine shop or engineering    09:57 department.

Q    Okay.  And is there any, like, divider between the two?  Like, is there an obvious location where you know you're no longer in the machine shop versus the -- the racks?    09:57

A    Yeah, I don't understand your question.

Q    Is it a completely open space, or is there any kind of -- is there like a wall or is there a gate that separates the two?

A    So, the machine shop is in a room.  And,    09:57 also, the material is kept in that room as well, and it is -- it is an enclosed room.

Q    Okay.  So, there's -- there's nothing really separating your area from -- from that.

A    Well, I'm not sure, again, what you mean.    09:57

**45**

Steven Baird, 11/16/2022

So, I have a desk, and I -- where I have my computer in the office.   And then, obviously, you know, there's a warehouse and a factory and a production floor.   And so the machine shop was in within that warehouse.

Q    Okay.   So, you've told me generally what your job duties were at Leidos.   Is there anything else that you were responsible for?

A    I was responsible for once a week the gardeners would come and do basic landscape around the property.   And I would have to escort the -- the landscapers because of a lot of technical equipment out there, a lot of -- could be dangerous things going on out in the test lane, as they called it.

So, I would accompany the gardeners inside the test lane.

Q    Okay.

A    That was part of my job.

Q    And so with -- now have you told me all of your job duties that you were responsible for?

A    Yes.

Q    Okay.   So, do you agree that -- that Leidos provided you with safe working conditions throughout your employment?

A    No.

**46**

Steven Baird, 11/16/2022

Q    And in what way did you think that there was no -- there wasn't any safe working conditions?                    09:59

A    There was a couple things that they did that weren't the safest things to do.  You know, the way they handled material or cut material or    09:59 different things like that.  It wasn't the safest things to do.

Q    And did you -- did you raise this issue with anyone at Leidos?

A    I have raised the safety issue before with    10:00 Leidos.

Q    And what was the -- what was that safety issue?

A    The safety issue was over a CNC machine, a computerized numerical control machine that is an    10:00 automated machine.  And they were instructing me that I had to stand and -- and watch the machine and -- and not multitask at the time.  They were inciting a safety issue.  These machines are designed and they're an automated machine to run on    10:00 their own.

Q    And that was the only safety issue that you raised with Leidos?

A    The best of my recollection, yes.

Q    Okay.  You were authorized to use all of    10:00

47

Steven Baird, 11/16/2022

the machines within the machine shop, correct?

A   Yes.

Q   So, I don't know if I'm pronouncing this right.  The lathe machine?  Is that correct?

A   Yes.

Q   The mill machine?

A   Yes.

Q   The shear notcher break?

A   Yes.

Q   The welder?

A   Yes.

Q   The bandsaw?

A   Yes.

Q   The drill press?

A   Yes.

Q   The belt grind -- or the belt sander?

A   Yes.

Q   The grinder?

A   Yes.

Q   Okay.  And not only were you authorized to use all of these machines, you also trained individuals on the safety precautions of those machines, correct?

A   Yes, that is correct.

Q   Okay.

**48**

Steven Baird, 11/16/2022

(Exhibit 5 was marked.)                                    10:17

THE WITNESS:  So, yes, this document does seem familiar.

You know, Jeff King was in charge of -- of safety.  And so, yes, this document does seem    10:17 familiar.  This is a document that I would give the potential people that are, you know, wanting to be qualified for the machine shop.

BY MR. DEDDEH:

Q    And you're aware that Jeff King was the    10:17 Leidos corporate -- corporate safety officer, correct?

A    Yes, I am.  Yes.

Q    And it's your understanding that -- that Mr. King was responsible for the implementation of    10:17 these policies?

A    It is my understanding, yes.

Q    Okay.  And if you can scroll down to the end of this document.  It's Bates-labeled Leidos 437.                                                         10:18

A    I'm sorry; what would you like me to look at?

Q    So -- so this -- this matrix lists the names of the employees on the left and the various machines within the machine shop on the -- on the    10:18

**53**

Steven Baird, 11/16/2022

top, correct?

A    Let me just try to get to that document.
At the end of this?

Q    Yeah, the very last page.

A    Very last page.  Okay, here we go.

So, yes, this -- this document is on
the -- the front door of the machine shop, and it
lists, you know, who is qualified to work on various
different machines.  So, not everybody was qualified
to work on every piece of equipment.

Q    Understood.  And the way they identify
whether someone was qualified is they would use one
of three letters next to that person's name for
that -- for that particular machine, correct?

A    That is correct, yes.

Q    And the three letters are "A" for
authorized, "S" for supervised, and "M" for master
machinist, correct?

A    That is correct, yes.

Q    Okay.  And, so, by your name it lists "A"
next to your name for every machine that is listed,
correct?

A    Yes.

Q    So, that -- so, that means you were
authorized to use each of those machines.

**54**

Steven Baird, 11/16/2022

A    That is correct, yes.                          10:19

Q    And being authorized -- how would you become authorized to use each -- each of those machines?  What was required?

A    I guess -- I don't believe I -- nobody         10:19
qualified me as far as when I came to work there.
You know, I was based off of my experience and prior
knowledge that I, you know, was able to operate
those machines.  So, I -- I did not do a safety test
when I came to work there.                          10:20

Q    Understood.  But -- but having the name --
or having the designation as authorized for each of
those machines meant that you went through both of
the modules of this -- this machine shop
certification, correct?                            10:20

A    I don't know that's correct, no.

Q    No?

A    Because, like I said, nobody -- I did not
do a safety test.  You know, nobody qualified me to
work on specific machines to give me that           10:20
authorization.

Q    Okay.

A    I was given that authorization based on my
experience and prior job knowledge.

Q    Yeah.  So if you -- if you scroll up        10:20

55

Steven Baird, 11/16/2022

one -- one page to Leidos 3 -- 436.  10:20

A    Let me look at that.

Q    Do you see where it says, "Machine Shop Acknowledgment of Module 2 - Operating Lathe, Mill, Welder, & Sheet Metal Equipment?"  10:21

A    I do see that form, yes.

Q    And you were required to complete this form to -- for them to designate you as authorized of those machines, correct?

A    I don't know that to be correct, no.  10:21

Q    No?  So, you don't remember completing this form or renewing the machine shop certification manual?

A    Not as far as me personally is concerned and when I went to work there.  No, I do not remember that.  10:21

Q    But you know -- you knew the contents of this manual, correct?

A    Yes, after some time, you know, when I became in charge of the machine shop --  10:21

Q    Okay.

A    -- I was familiar with these documents. And I would have various people that I was trying to certify, I would have them complete those documents.

Q    So, you were -- you were well aware of  10:22

**56**

Steven Baird, 11/16/2022

what were the contents of this document.

A    Yes, I have seen those documents.

Q    Okay.  So if you can go to Leidos 420, which is the sixth page of the document.

A    Sixth page of the document.  Let's see here.  Yeah, the sixth page.  Yes, I have that sixth page pulled up.

Q    Actually, if you can go to the fourth page first.  I apologize.

A    Yeah, I see the four -- the fourth page; general machine shop safety rules.

Q    So this says:  Module 1 Basic Machine Shop Rules.  General Machine Shop Safety Rules.  So these are the general rules of the safety rules for the machine shop, correct?

A    Yes, that is correct.

Q    Okay.  Now, if you scroll back down to -- to the sixth page, which is Leidos 420, and look at Bullet Point 29.  And it says, "Never leave a running machine unattended."

A    Yes, that -- yes, that is correct.

Q    And that was -- that was your -- that's your understanding that that was the -- the rule at the time, correct?

A    Yes, that is correct.

10:22

10:22

10:23

10:23

10:23

10:23

**57**

Steven Baird, 11/16/2022

Q    Okay.  And if you look at the -- on page 19, which is Leidos 433.  Do you see that?    10:24

A    I do see.

Q    You're on that page?

A    Yes.    10:24

Q    So if you look at the fourth bullet point from the bottom, it says, "Do not leave running machine unattended."  Correct?

A    Yes.

Q    And that -- and that was your understanding, that that --    10:24

A    At -- at the time, yes, when we had just the manual equipment.  Yes, that was my understanding.

Q    Okay.  And these policies -- these policies were discussed with you on September 8th, 2022 -- or, I'm sorry.  Excuse me -- September 8th, 2020, because you left the mill machine unattended, correct?    10:24

A    I believe so, yes.    10:25

Q    Okay.  And let's see.  And this was the -- the safety issue that you -- you said you raised with Leidos, correct?  This was the only safety issue?

A    So, yes.  So, obviously, when this -- when    10:25

**58**

Steven Baird, 11/16/2022

these policies were written, there was different equipment in that shop and more of manual equipment. And so, yes, it's very, very dangerous to leave any manual machine running unattended.

Q    But --

A    So we had --

Q    But -- I'm sorry.  The -- what I was asking was:  This was -- this was a safety issue that you initially raised with Leidos, correct?

MS. FLORES:  Objection.  Vague.  You can respond.

THE WITNESS:  It was -- it was over a safety issue and an attendance issue, yes.  It was that, yes.

BY MR. DEDDEH:

Q    And you -- you had a meeting with both John Sim and Jeff King to discuss this.  And to -- to discuss your concerns about it, correct?

A    Well, I don't know if John -- or if Jeff King was involved.  I got him involved, but initially it was with John Sim, the supervisor.

Q    So, I'm going to provide you with Exhibit 6.

(Exhibit 6 was marked.)

///

**59**

Steven Baird, 11/16/2022

BY MR. DEDDEH:

10:26

Q    If you can open that and take a look at it.  And let me know after -- when you've reviewed it.

Does this -- do these appointments look familiar?

10:27

A    They do, yes.

Q    Okay.  So if you can start -- if you can focus on the second page of the -- of the appointment.  These were -- these are appointments that were sent to you through Outlook, right, scheduling specific appointments with you and other individuals, correct?

10:27

A    Appointments?

Q    So -- so, the second page, which is Leidos 1258, at the very top it says "Appointment," correct?  Do you see that?

10:28

A    I do, yes.

Q    And it's from John Sim, correct?

A    Yes.

10:28

Q    And it's to John Sim, you, and Jeffrey King.  Do you see that?

A    I see my name, and I see Jeffrey's name.  Yes, that is correct.

Q    Okay.  And the subject was, "Review

10:28

**60**

Peterson Reporting Video & Litigation Services

Steven Baird, 11/16/2022

Machine Shop Safety Requirements."

A    Yes.

Q    Okay.  And at the bottom it says, "Meet in person to review machine shop safety requirements?"

A    Yes.

Q    And this was sent on September 3rd, 2020.  And this was -- this was an appointment that was made based off of this unattended mill machine, correct?

A    That is correct, yes.

Q    Okay.  So -- so, it seems that there was a 30-minute meeting between the three of you on September 8th, from -- let's see.  Yeah, from September 8th for about 30 minutes.  Do you remember the discussions of that meeting?

A    I do, yes.

Q    And can you explain to me what you guys discussed.

A    So, what we discussed was, you know, the safety of the machine.  And the new piece of equipment that we had was a CNC machine designed to be, you know, operated independently, without supervision.  And so we -- we -- we discussed that, you know, that we have a new machine; you know, this is a new piece of equipment that we purchased since

**61**

Steven Baird, 11/16/2022

I became an employee.

Q   Sure.

A   This was not a piece of equipment that was originally there.  So this is an automated machine.

And so, yes, I was explaining to Jeff and John about this machine and, you know, its ability to run on its own, unattended.  And that's the way the machines are designed to run.

Q   So, your -- your position to them was more of that you should be allowed to walk around because this machine can be automated, and you're not required to attend -- to stand there and watch it throughout, correct?

A   That is correct, yes.

Q   There was no other particular reason for that -- for stepping away from the machine.

A   No, there -- no.  There was -- that was the reason.  You know, to multitask.  And, like I said, there is an automated machine that doesn't -- you don't need to stand there and watch the machine.

Q   So, you didn't -- you didn't need -- like, there wasn't any health reason or safety reason for objecting to -- to that rule.

A   No, there was not.

MS. FLORES:  Objection to the extent it

**62**

Steven Baird, 11/16/2022

calls for a legal conclusion.

BY MR. DEDDEH:

Q    So, the rule requiring someone to stay there, to just stand by the machine, is a safe rule, correct?  Like, it is a -- it is a good safety policy.

A    It is for the manual machines; the manual machines that are turned on manually, and they operate manually, yes.  You would never want to leave those attended for somebody to come up and, you know, assume the machine was off or something of that nature.

Q    Yeah.

A    And yet -- but, like I said, this is a computerized numerical control machine, and they are designed to run automated by themselves.

Q    I understand.  Yeah.  But requiring someone to be present does not create a safety issue.

A    No.

MS. FLORES:  Objection to the extent it calls for a legal conclusion.

BY MR. DEDDEH:

Q    You can answer.

A    No.

**63**

Steven Baird, 11/16/2022

Q    Okay.  And if you scroll up to the -- the first page, it seemed like there was another appointment that was set for September 10th, 2020.

Do you see that?

A    Let me look here real quick.  And this is on which page that we're looking at?

Q    The first page.

A    The first page.

Q    Right above it.

A    Okay, yeah.  So, I do see "Training on Stopping Mill in Steve's Absence."  I do see that, yes.

Q    So -- so, based off your discussions with Jeff King and -- and John Sim, this email is explaining that they've agreed to have phone numbers posted in the shop in case anyone wants to step away from a machine, correct?

A    That is correct.  That was the conclusion that they came to; that they wanted me to call these people, and for them to come stand there and watch the machine if I had to leave or do something.  Yeah, they wanted me to call some of these different people, these different names that are on here.

Q    Yeah.

A    They wanted me to -- them to call them.

**64**

Steven Baird, 11/16/2022

These are engineers.  They wanted me to call them and have them come there and stand and watch the machine.

Q    So, there was a separate meeting that was -- that was taking place to make sure that everyone provided their phone numbers in case you or someone else wanted to step away from a machine.

A    That is correct, yes.

Q    And the conclusion of the meeting with -- between you, Jeff King, and John Sim is that the safety policies requiring someone to -- to never leave a machine unattended was valid and that it was a violation for anyone to leave a machine unattended, correct?

A    No.  No.

Q    No?

A    No.

Q    How is that inaccurate?

A    So, the -- yeah, I think you'd have to restate the question.

Q    That's fine.

So, ultimately, the decision was that the safety policies requiring -- or prohibiting someone from leaving the machine unattended, that was valid. They weren't -- they were not changing that,

10:33
10:33
10:33
10:34
10:34
10:34

**65**

Steven Baird, 11/16/2022

correct?
10:34

A    That is correct.  They wanted me to go and get somebody to stand there and watch the machine, and that's the way we did it going forward.

Q    Correct.  And did you -- did you ever call someone to come and watch the machine?
10:34

A    I did, yes.

Q    Okay.  And who did you call, if you remember?

A    I do not recall who I called.
10:35

Q    Okay.  So, I'm going to provide you with the next exhibit.

(Exhibit 7 was marked.)

BY MR. DEDDEH:

Q    Does this email chain look familiar?  Take a second to review it.  Let me know when you've had a chance to review it.
10:35

Have you seen this email?

A    Yeah, it does not look familiar, no.

Q    Doesn't look familiar, okay.
10:36

If you can scroll to -- let's see -- the -- really, the third and fourth page, which is Leidos 408 and 409.

A    Okay.

Q    So this is a John Sim's summary of that
10:36

**66**

Steven Baird, 11/16/2022

where the machine shop safety manual stated that no
machine should be left unattended, they kept -- they
required that; that that was still valid.  And that
if -- the action items below kind of go over what we
just talked about; that you were -- you were
required to call someone else to relieve you if you
needed to step away from the machine.  Correct?

A    That is correct.  And that's the way we --
we did it going forward.

Q    Okay.  So, I'm going to turn to
approximately four months after that.  In
January 18, 2021, you were involved in -- in some
kind of accident.  Can you kind of explain the --
the facts surrounding that.

A    I don't --

MS. FLORES:  Objection.  Private.  But you
can -- overbroad.

MR. DEDDEH:  Jessica, it's in your
Complaint.

BY MR. DEDDEH:

Q    So, in your Complaint, you state that you
were involved in a car -- in an accident around
January 18th, 2021.

A    That I was personally involved?

Q    Well, that's -- the Complaint says

10:38
10:38
10:38
10:39
10:39
10:39

**68**

Steven Baird, 11/16/2022

something to that effect.  And that you were injured in some aspect.

        Can you provide an explanation about that?

    A    I can, yes.

        MS. FLORES:  Same objection.  You can respond.

        THE WITNESS:  So, this is an accident that did not occur at work.  This was a personal accident.

BY MR. DEDDEH:

    Q    Uh-huh.

    A    Is that what you wanted to know?

    Q    Yes.  Yeah.  Yeah.  I'm just trying to understand the facts regarding that, because that was based off of your -- the disability leave that you were granted.  So, I'm just trying to understand the background of it.

    A    Correct.  So, what happened is I was on -- traveling on the freeway on my motorcycle, and somebody had a medical emergency in front of me and crashed their car.  And being a retired firefighter and a medic, I stopped to aid -- render aid for this person.  And -- and, basically, I went into assist -- medical assist them, and the car took off and hit a wall, and I -- my arm was broken.

**69**

Steven Baird, 11/16/2022

Q    Okay.  And approximately what time did that happen on January 18th?

A    In the afternoon.

Q    It was in the afternoon.  So, were you, like, leaving work, you were going to work, or what?

A    I don't recall.

Q    You don't recall.  Okay.  And so -- so what was the next step?  Did you -- did you -- did an ambulance come to take you?  Did a family member come take you to the hospital?  Or what was that process?

A    So, I was taken by ambulance to the hospital.

Q    Okay.  And how did you inform Leidos of the -- the injury and the request for disability?

A    So, whether I called them or emailed them --

Q    Uh-huh.

A    -- I don't recall.  But, obviously, I did one form or the other; called them, emailed them, text them.

Q    Yeah.  Okay.  But whatever process that you did, you understood that that was the process, and eventually you were provided that disability, correct?

**70**

Steven Baird, 11/16/2022

A    Yes, that is correct.

Q    All right.  And you were -- you were approved for disability leave from January 19th, 2021 through February 22nd, 2021; is that correct?

A    I believe that is -- I don't know the exact dates, but, I mean, I believe that sounds about right for that particular accident that I was involved in, yes.

Q    Okay. I'm going to provide you with the next exhibit.

(Exhibit 8 was marked.)

BY MR. DEDDEH:

Q    Take a look at that.  And it's an excerpt from a dashboard.  And let me know if that looks familiar to you.

A    So, I have seen these before.  This particular one, do I remember seeing that?  It looks to be old, so I can't say that I've ever seen this, but I have seen them in the past.

Q    Yeah.  Okay.  And so -- so, where it says "Leave of Absence," and it says, "Medical Disability, Short-Term Disability," do you see that?

A    I do see that, yes.

Q    Okay.  And then it says last day of work was January 18th, 2021.

**71**

Steven Baird, 11/16/2022

A    Yes.                                                    10:43

Q    And then the first day of leave was January 19th, 2021.  Correct?

A    That is correct.

Q    And then it says actual last day of leave    10:43
was February 20 -- 21, 2021.  Do you see that?

A    I do, yes.

Q    And it says estimated last day of leave was February 22nd, 2021, correct?

A    I do see that, yes.                                    10:43

Q    So, based off of this, it appears that your leave was through February 22nd, but you came back a day early; is that correct?  On February 21st.

A    I don't know the exact date.  But prior to    10:44
this accident --

Q    Uh-huh.

A    -- I was scheduled to have heart surgery.

Q    Hold on.  Hold on.

So, I'm specifically asking about this    10:44
particular disability leave that was granted.  It's saying that the first date back of work was February 22nd -- or the estimated last day of work -- last day of leave was February 22nd, but the actual last day was February 21st.    10:44

72

Steven Baird, 11/16/2022

Do you see that?

A    I do, yes.

Q    So, you were approved for leave through February 22nd.  Do you agree with that?

A    Yes.

Q    And then you came back -- or you left -- the last day of leave was actually the 21st, because you came back on the 22nd.  So, you came a day early, based -- based off of the allowed disability.

A    I don't remember the exact date.  But I do see that in the documents.

Q    Okay.  All right.  And when you -- when you decided to return on -- the first day back of work was February 22nd.  You provided an accommodation request, right?  Work -- some work restrictions regarding coming back to work, correct?

A    Yes.  Like I said, prior to the accident --

Q    Hold on.  I just need a "yes" or "no" answer.

A    So, what was the question?

Q    The question was:  When you came back on February 22nd, you provided some work restrictions and requested some reasonable accommodations; is that correct?

73

Steven Baird, 11/16/2022

A    Yes.  Yes.                                          10:45

Q    Okay.  And then one of the -- let me know if -- I'm going to provide you with the next exhibit.

(Exhibit 9 was marked.)                                 10:46

THE WITNESS:  Yeah, I do see this document.

BY MR. DEDDEH:

Q    Okay.  And this is the Reasonable Accommodation Request Form that you were made aware   10:46 at the -- at the beginning of your employment, correct?

A    I don't recall that document, no.

Q    You don't recall it.

If you scroll to the bottom, where it   10:46 says, "ADA Accommodation Request Form," it says that you acknowledged receiving this -- this document on November 14th, 2018.

Do you have any reason to believe that that's not accurate?                                       10:47

A    So, this just looks like a blank document to me.  And, like I said, it does not look familiar.

Q    Yeah.  This is just the sample of the Reasonable Accommodation Request Form that Leidos provided to you at the beginning of your employment   10:47

**74**

Steven Baird, 11/16/2022

for the policies and procedures of how to request                        10:47
it, correct?

    A    I would say incorrect.

    Q    Okay.

    A    No.                                                             10:47

    Q    So, you don't -- you don't remember this
document -- seeing this document ever.

    A    No.  Never.

    Q    Okay.  But you still submitted an
accommodation request, correct?                                          10:47

    A    I asked for work restrictions, you know,
per my doctor's orders, yes.

    Q    And --

    A    And they were provided to the company.

    Q    Yeah.  And do you generally remember what                       10:47
those work restrictions were?

    A    I do.  I do.

    Q    And can you -- can you tell -- do you
remember -- can you explain what those work
restrictions were?                                                       10:48

    A    So, I can.  So, like I said, prior to this
accident --

    Q    Uh-huh.

    A    -- I was scheduled to have heart surgery.
And when I was off work after having the heart                           10:48

75

Steven Baird, 11/16/2022

surgery in February -- or, excuse me.  After having the accident in January, breaking my arm, I was already scheduled to have the heart surgery, so I went ahead and had the heart surgery while I was off work.  And when I came back, there were several restrictions, you know, with my broken arm and regarding the heart surgery.

Q    Okay.  And do you remember what those work restrictions were that you submitted to Leidos?

A    The only thing that I can remember was, obviously, not lifting anything, you know, because of the broken arm.  And just, you know, not being involved in any stressful situations; you know, that being the -- of the heart surgery.

Q    And tell me if this refreshes your recollection; that you were limited to not lifting anything over your right shoulder and not lifting anything above 20 pounds.  Does that sound correct?

A    That does sound correct, yes.

Q    Okay.  And you were granted that accommodation.  That accommodation was approved, correct?

A    To best of my knowledge --

MS. FLORES:  Objection to the extent it calls for a legal conclusion.  You can respond.

10:48

10:48

10:48

10:49

10:49

10:49

**76**

Steven Baird, 11/16/2022

THE WITNESS:  To the best of my knowledge, it was approved, yes.

BY MR. DEDDEH:

Q    Okay.  So, was there any work restriction or accommodation that you believe was not approved, or denied?

MS. FLORES:  Objection.  Calls for a legal conclusion.

BY MR. DEDDEH:

Q    You can answer.

MS. FLORES:  Can you rephrase the question?

MR. DEDDEH:  Jessica, he --

BY MR. DEDDEH:

Q    Mr. Baird, did you understand my question, or no?

A    I'm not sure of the question, no.  It's a little confusing.

Q    I'll repeat it.

Was there any accommodation that was denied by Leidos, that you're aware of?

A    Not that I'm aware of.

MS. FLORES:  Same objection.

BY MR. DEDDEH:

Q    Okay.  I'm sorry; could you repeat that?

77

Steven Baird, 11/16/2022

I couldn't hear.

A   No.

Q   No.

MS. FLORES:  I said, "Same objection."

I'd like to request a 15-minute break.

MR. DEDDEH:  That's fine.  We can go off the record.

MS. FLORES:  Okay.

THE VIDEOGRAPHER:  Off the record.  The time is 10:51 a.m.

(A recess was taken.)

THE VIDEOGRAPHER:  This begins Media No. 2, and the time on the record is 11:07 a.m.

BY MR. DEDDEH:

Q   Good morning, Mr. Baird.  We just took about a 15-minute break.  Can you tell me who spoke with?  Or if you spoke with anyone?

A   I did speak with my attorney, yes.

Q   Okay.  And -- so, going on -- so, on March 10th, 2021, there is an incident between you and a couple of your colleagues, correct?

A   I don't recall the exact date, but it does sound familiar, yes.

Q   Okay.  Can you please describe in your own words what happened.

**78**

Steven Baird, 11/16/2022

A    Well, I mean, it's kind of a, you know, more involved story.  I can kind of give you a nutshell part of it, or I can give you every detail of it.

Q    Yeah, you can give me in as much detail as -- as you think is necessary to understand your point -- your point of view of what happened.

A    So --

MS. FLORES:  And I will object to the extent that it calls for a narrative.  You can respond.

THE WITNESS:  So, what happened on that particular day is I have coworkers that work in a -- a shipping/receiving area.

That particular morning, like a lot of mornings, I would see these colleagues of mine, and I would say good morning to them somehow, and I might say it in a sarcastic way; good morning, sunshine.  One -- one of the gentlemen was a Denver Bronco fan.  I might say, "Good morning, Denver Bronco guy," or something of that nature.  But it was kind of like a -- a sarcastic "good morning."

And so this particular morning, there was a temporary employee there, and it was kind of a cold morning, and he was wearing an old knit dark

11:07
11:07
11:08
11:08
11:08
11:08

**79**

Steven Baird, 11/16/2022

beanie, and he looked like Joe Pesci in the movie    11:08
"Home Alone."

Q    Okay.

A    And I --

Q    Who are you referring to?    11:09

A    I'm referring to Cooper Garner.

Q    Okay.

A    That particular morning, I said to him, "Good morning, Home Alone bandit."

Q    Okay.    11:09

A    And that was it.  It was just as simple and innocent as that.  And, you know, everything was normal, and, you know, just as I had done many mornings in the prior -- you know, saying good morning to these guys.    11:09

And, so, this happened early in the morning, so 7:00 a.m., approximately, in the morning.

Later in that afternoon, probably around noon time, maybe before noon time, Cooper Garner    11:09 confronted me inside the warehouse.  And he approached me in a very aggressive manner, and he kind of went on about -- about that statement that I made to him, "Good morning, Home Alone bandit."  And he misunderstood it somehow, and that I was making    11:09

80

Steven Baird, 11/16/2022

fun of him, and then I was going to other colleagues of mine, and -- and, you know, laughing about it and making jokes about it.  You know.  And he confronted me in a very aggressive manner.

And, you know, at this time I had a broken arm and had just returned from heart surgery.  And so, like I said, he -- the way he approached me and was aggressive --

Q    Wait.  Where did this confrontation take place?

A    Like I said, it took place in the warehouse.

Q    In -- was this in -- by your desk or in the shipping area?

A    So, this was in the warehouse.  So, the machine shop, shipping area, production floor.  All those different things are all inside this warehouse.

Q    Okay.

A    So, that's where it took place.  And, like I said --

Q    And it seems like they're all, like, adjacent to each other.  Correct?

A    They are, yes.

Q    And so which -- were you closer to your

**81**

Steven Baird, 11/16/2022

location, your desk, or was it within that shipping    11:11
area/inventory section?

    A    So, obviously, the offices and my desk and
stuff like that are in the front of the building and
stuff like that.  And, you know, from -- from that    11:11
point on, it's a warehouse.  So, there's -- there's
production, there's a machine shop, there's shipping
and receiving.  There's various different things
going on in a large warehouse.

    Q    Okay.    11:11

    A    So, that's where it took place, not in the
office area.

    Q    I see.  Okay.  And can you identify the
witnesses that were there that day?

    A    There was nobody that witnessed what took    11:11
place.

    Q    No one that witnessed that.

    A    No.

    Q    And -- but James -- my understanding is
James Wilson witnessed it and separated you two; is    11:11
that correct?

    A    No.  James Wilson did not witness it.

    Q    Okay.  But he separated you two, correct?

    A    No.  That's not correct.

    Q    Then -- then can you -- who was the first    11:12

**82**

Peterson Reporting Video & Litigation Services

Steven Baird, 11/16/2022

person that, I guess, encountered you and Mr. Garner, and how did that happen?

A    The first person was James Wilson.

Q    Okay.  And how did he approach you?  Did he approach you guys, or what did he do?

A    He did.  So, this Cooper Garner was very animated and, you know, essentially got violent with me.  So, it was his voice and his demeanor that was, you know, completely agitated, and it was his loud voice, you know, attacking me, basically.  And that's what drew James Wilson to the area.

Q    Okay.  And so he came and then essentially told you guys to go to different locations?  Or -- or what did he say?  Did he --

A    He --

Q    -- say anything?

A    No.  So, what happened was the assault had already taken place, and I was on my way to report it to my supervisor, John Sim.  And that's when --

Q    Okay.

A    -- we encountered James Wilson.

Q    Okay.  And, so, you were -- you were allowed to finish that day of work, correct?

A    Yes, that is correct.

Q    But -- so -- but March 11th, the next day,

11:12

11:12

11:12

11:12

11:13

11:13

**83**

Steven Baird, 11/16/2022

you were instructed not -- to not come back until after the investigation; is that correct?

A     That is incorrect.

Q     Okay.   Then -- then -- and explain to me when you were notified that you were going to be placed on administrative leave.

A     So, it was the day after that.   So, like I said, I finished work that day.   I believe it was a Wednesday.   I came to work Thursday.   And that Thursday evening I was notified not to come back to work; that there was going to be an investigation.

Q     But so Thursday you come back, worked the full day, you go home, and then you receive an email or a notification or something like -- to that effect about the investigation and not to return. Correct?

A     Yes.

Q     Okay.   So, I'm going to provide the next exhibit.   Open that and take a look at it and let me know if you recognize this document.

          (Exhibit 10 was marked.)

          THE WITNESS:   I do recognize that document.   It is a document that I received from Adam Jones from HR.

///

**84**

Steven Baird, 11/16/2022

BY MR. DEDDEH:                                          11:14

Q    Okay.  So --

A    I believe I received that on Monday,
maybe.  The following Monday.

Q    You -- you received, what, the email or   11:14
the document or both?

A    I believe it was a letter he sent to me,
if I'm not mistaken.

Q    Okay.  So -- but you said you were
notified the day after to not return to work.  Was   11:14
that notification by phone or did you -- or did you
receive some other communication about not -- not
coming back to Leidos?

A    So, to the best of my recollection, it was
by -- by telephone.                                    11:15

Q    Okay.

A    Voicemail.  He left me a voicemail.  And,
also, I believe he wrote that onto my personal
email.

Q    I see.  Okay.  And so the first page of   11:15
this document, is that the email that you're
referring to?

A    Let me look on here.  For the voicemail
that I left on your phone -- yes, that is correct.
That is the document that was emailed to me and I   11:15

**85**

Steven Baird, 11/16/2022

believe mailed to me as well.

Q    I see.  And he's -- he's reflecting that he left you a voicemail kind of explaining this, correct?

A    Yes, that is correct.

Q    Okay.  And so you were placed on this administrative leave pending the investigation being conducted by Bob Athing, correct?

A    Yes.

Q    Okay.  And you were jointly interviewed about this incident by Bob Athing and Katie Reis on March 16th, 2021; is that correct?

A    I know Bob Athing for sure.  The other woman, now that you mention her name or whatever -- but these were, you know, not employees that I worked with.  They were, like, employees from an east coast location.

Q    I see.  But you remember being interviewed by two individuals; a man and a woman, correct?

A    Yes, that is correct.

Q    Okay.  And during -- during that interview, you stated you crossed paths with Cooper Garner and remarked, "You look upset; you look red in the face; what's going on."  Do you remember saying that?

**86**

Steven Baird, 11/16/2022

those should have been produced, and I would request that they are produced; you look for them and you provide them to your counsel for production.

MS. FLORES:  And I'm just going to object. I mean, we'll -- we're not stating at this time if we're going to produce those records or not.  I don't -- I'm not quite sure what -- what document request that would have fallen under.

MR. DEDDEH:  It's with regards to any mitigation efforts.

MS. FLORES:  So, yeah, I mean -- I mean, we're just not going to state at this time that any further documents are going to be produced.

MR. DEDDEH:  Okay.

BY MR. DEDDEH:

Q    Mr. Baird, what's your understanding about your claims in this lawsuit?  Do you know why you're suing Leidos?

MS. FLORES:  I'm going to object as vague and calls for a legal conclusion and violates Rifkind.  So, to the extent that you -- also overbroad.  So to the extent that you can reword your question.

BY MR. DEDDEH:

Q    Mr. Baird, did you understand my question?

**98**

Steven Baird, 11/16/2022

A    Not really, no.  If you could restate it.

Q    Do you know what -- do you know why you're suing Leidos?

MS. FLORES:  Same objection.

THE WITNESS:  Yes.

BY MR. DEDDEH:

Q    And what are the reasons that you're suing Leidos?

A    Because I was --

MS. FLORES:  Same objection.

THE WITNESS:  Because I was terminated for workplace violence.  And I wasn't -- didn't partake in any violence.  I was assaulted at work.  And I did not fight anybody at work, I did not threaten anybody at work.  I did not make, you know, extreme political statements at work.  I did not do any of that.

I was assaulted at work.  And while having a broken arm and recovering from heart surgery, I was assaulted by a 21-year-old temporary employee.  And I was terminated for workplace violence.

BY MR. DEDDEH:

Q    So, your lawsuit is primarily based off of only your termination; that you feel that you were wrongfully terminated.  That's what you're --

**99**

Steven Baird, 11/16/2022

MS. FLORES: I'm going to -- same objection. I'm going to instruct not to answer, in violation of Rifkind.

MR. DEDDEH: I'm asking about his Complaint. What are you objecting about?

MS. FLORES: That it violates Rifkind, to the extent that it calls for a legal conclusion.

MR. DEDDEH: I'm not calling for a legal conclusion. I'm asking him what his understanding of his -- of his lawsuit is.

So, let me rephrase, Mr. Baird.

BY MR. DEDDEH:

Q  So, my understanding is that the reason that you are suing Leidos is because you feel you were wrongfully terminated; is that correct?

A  Yes.

Q  And that's the only reason that you're suing Leidos. That's the -- the only allegation that you have made --

MS. FLORES: Objection -- objection to the extent that it calls for a legal conclusion. Instruct not to answer.

MR. DEDDEH: Okay.

BY MR. DEDDEH:

Q  So, why are you suing Leidos?

**100**

Peterson Reporting Video & Litigation Services

Steven Baird, 11/16/2022

MS. FLORES:  Same objection.  Overbroad. Instruct not to answer.

MR. DEDDEH:  Counsel, are you instructing him to not answer why he's suing -- why this lawsuit exists?

MS. FLORES:  If you can rephrase as to why he feels that he wasn't treated fairly, then you can ask that.  To the extent it's asking a question requiring legal knowledge, then I'm instructing him not to answer.

MR. DEDDEH:  There is -- there is no legal knowledge.

BY MR. DEDDEH:

Q    Why are you suing Leidos?

MS. FLORES:  I'm asking for a rephrasing of the question.

BY MR. DEDDEH:

Q    What's -- on what basis -- do you -- Mr. Baird, do you understand the question?

A    Yes.

Q    Do you believe you can respond?

A    Yes.

Q    Then please respond.

MS. FLORES:  And I will state the same objection.  You can respond.

**101**

Steven Baird, 11/16/2022

THE WITNESS:  So, please go ahead and ask the question again.

BY MR. DEDDEH:

Q    Why are you suing Leidos?

MS. FLORES:  Same objection.  You can respond.

THE WITNESS:  Because I was assaulted at work, terminated for workplace violence, and -- and just it was -- what's the word I'm looking for? I -- I was being retaliated against for bringing up safety issues with the company and things like this. They -- they -- you know, they figured it was -- you know, that I'm bringing up these safety issues and that I was leaving machines unattended and not following company policies.

And so, like I said, this incident took place.  They did a very poor investigation.  And they came to the conclusion that I partaked in workplace violence and terminated me for that.

So, that's why I'm suing the company, for wrongfully terminating me.  I was not involved in any workplace violence.  I was assaulted at work.

BY MR. DEDDEH:

Q    And the health and safety issue that you were talking about, that was leaving the mill

**102**

Steven Baird, 11/16/2022

machine unattended, that you spoke with John King and -- or John Sim and Jeffrey King about, correct?

A    It's more of them --

MS. FLORES:  Objection.

THE WITNESS:  It's more of me bringing up the -- the -- going around my supervisor and going to the head of safety and bringing up this -- this incident about the machine being unattended.  You know --

BY MR. DEDDEH:

Q    That's not what you stated previously. Are you changing your response?

A    I'm not changing the response.  I'm just telling you, you know, that this is all part of it. You know, for me going around the supervisor, going to the head of -- of the safety and bringing up this issue of this machine being unattended, I'm being retaliated against because of this.  This is all a part of --

MS. FLORES:  Belated -- and belated objection that it calls for a legal conclusion.

BY MR. DEDDEH:

Q    But you admit you left the machine unattended, correct?

A    No.

**103**

Steven Baird, 11/16/2022

accept?                                                           12:13

    A    There was other employers.

    Q    And do you -- do you remember those

employees?

    A    I don't recall their name, no.          12:13

    Q    Okay.

        MR. DEDDEH:  All right.  I'm going to take

a five-minute break.  I think I'm almost done.  I

probably only have, like, a handful of questions

left.  So, we'll be done shortly.               12:13

        THE WITNESS:  Okay.

        THE VIDEOGRAPHER:  We're off the record.

The time is 12:13 p.m.

        (A recess was taken.)

        THE VIDEOGRAPHER:  We're back on the       12:23

record.  The time is 12:23 p.m.

BY MR. DEDDEH:

    Q    And, Mr. Baird, when we were off the

record, did you speak with anyone?

    A    No.                                       12:23

    Q    No.  Okay.  So, I just wanted to clarify

that the only complaint you submitted to Leidos was

that the milling machine didn't need to be attended

100 percent of the time; is that correct?

        MS. FLORES:  Objection.  Vague.  Vague as  12:23

**120**

Steven Baird, 11/16/2022

to the definition of "submitted."                                    12:23

BY MR. DEDDEH:

    Q    You can answer.

    A    No.  I believe there was some other                          12:24
thing -- another incident that I complained about to
management.  It was about big, heavy pieces of
material that they were ordering and wanting us to
cut up into pieces, so --

    Q    And when did you submit this complaint?

    A    So, it was just a complaint, and I don't      12:24
remember the date of the complaint.

    Q    Do you remember who you reported it to?

    A    John Sim.

    Q    You reported it to John Sim.  And can you
explain what you -- what the complaint was about.     12:24

    A    The complaint was about the size of the
material that they're ordering and how big and heavy
it was.  I knew of a much better and safer way to do
it.  So, I expressed that to him, and that was the
complaint.                                             12:24

    Q    So, it wasn't that it was unsafe.  It's
that you -- you proposed a better method to -- to do
it.

    A    No, that's incorrect.

        MS. FLORES:  Objection to the extent it        12:25

**121**

Peterson Reporting Video & Litigation Services

Steven Baird, 11/16/2022

calls for a legal conclusion.  You can respond.    12:25

THE WITNESS:  No, it was very much a safety issue between, you know -- you know, hands or fingers being severed or backs being injured.  There was a much safer, more economical way to do it.    12:25

BY MR. DEDDEH:

Q    And what did you base your reasoning on for -- that that was a -- that it was dangerous?

A    My 35 years --

MS. FLORES:  Same objection.  You can respond.    12:25

THE WITNESS:  My 35 years of experience doing this type of work.

BY MR. DEDDEH:

Q    And did you report it to anyone else?    12:25

A    I'm not positive if Jeff King was involved or not.

Q    Okay.  And did you -- do you remember when you submitted that complaint?

A    I do not remember the exact date, no.    12:25

Q    You don't remember the date.  So, I'm still a little confused of what the actual complaint was about.  And you're saying that they were just big materials?

A    So, it was like eight-foot pieces of a --    12:26

**122**

Steven Baird, 11/16/2022

of inch-and-a-half aluminum plate.  And instead of buying it in the 12-by-12 pieces that we actually need, they were buying it in eight-foot lengths. So, it was very heavy, very cumbersome to -- to deal with.  There was much better and safer way to purchase this material.

Q   So -- so, your complaint is that they're buying large sheets and having to cut out the size that you need; is that -- is that correct?

A   Yes.

Q   And so your suggestion was that they should -- well, actually, what was your suggestion?

A   Suggestion was for the material house, that we order the exact size that we need and have them cut it, because it's -- they have the proper equipment to cut it.  We did not have necessarily the proper equipment to do it.  But yet they wanted me to go ahead and do that.

Q   Okay.  But you don't remember when -- like, you don't have any estimate of when you submitted this complaint?

A   So, I know it was when John Sim was the manager so, I believe he became supervisor in -- you know, sometime in 2020.  So, you know, it was -- you know, the complaint was John Sim, because it was his

**123**

Steven Baird, 11/16/2022

decision to order the material this way.

Q    Yeah.  Okay.  So, the complaint was that we need -- what Leidos should have done is ordered smaller pieces, is what you're saying.

A    Yes.

Q    Okay.

MR. DEDDEH:  I'm leaving this deposition open pending our motion to compel.  But for now I don't have any further questions.

Jessica, did you have any questions, or can we end this for now?

MS. FLORES:  We can end this.

MR. DEDDEH:  Okay.

THE COURT REPORTER:  Ready to go off the record?

MR. DEDDEH:  Yes.

THE VIDEOGRAPHER:  This ends the Zoom-recorded deposition of Steven Baird, and the time off record is 12:28 p.m.

Thank you, everyone.

MR. DEDDEH:  Thank you.

THE WITNESS:  Thank you.

MR. DEDDEH:  Can we get a rough draft of the deposition?

THE COURT REPORTER:  Sure.

**124**

Steven Baird, 11/16/2022

(Whereupon, the deposition was adjourned        12:28

at 12:28 p.m.)

**125**

Steven Baird, 11/16/2022

State of California        )

                           )         ss

County of San Diego        )


          I, BRIDGET L. MASTROBATTISTA, CSR No. 7715, RPR, RMR, CRR, duly licensed and qualified in and for the State of California, do hereby certify that there came before me via Zoom technology on the 16th day of November, 2022, at 9:07 a.m., the following named person, to-wit STEVEN BAIRD, who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this case; and that he was thereupon examined under oath and his examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness.

          I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:

          ( ) Was requested by the deponent or a party before the completion of the deposition;

          (X) was not requested by the deponent of a party before the completion of the deposition.

          I further certify that I am neither attorney or counsel for, nor related to or employed

**126**

Steven Baird, 11/16/2022

by any of the parties to the action in which this deposition is taken, and further that I am not a relative, employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

CERTIFIED TO BY ME on this 30TH day of November, 2022.

BRIDGET L. MASTROBATTISTA
CSR No. 7715, RMR, CRR, CCRR

127