# EXHIBIT 2

 Certified Copy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD, an individual;               )
                                           )
            Plaintiff,                     )
                                           )
     v.                                    )
                                           )Case No.:
                                           )22CV60-LL-BGS
LEIDOS, INC., a Delaware                   )
corporation; and DOES 1-99, inclusive;    )
                                           )
            Defendant.                     )
_____)


VIDEOTAPED ZOOM DEPOSITION OF

STEVEN BAIRD, VOLUME II

CONDUCTED REMOTELY

FEBRUARY 17, 2023


REPORTED BY KRISTY A. MONTALBAN, CSR NO. 13551, CCR,

REGISTERED PROFESSIONAL REPORTER

Steven Baird, Volume II, 2/17/2023

or reached any settlement with any of your private employers -- prior employers?

MS. FLORES: Objection. Private.

BY MR. DEDDEH:

Q. You can answer.

A. No, I have not.

Q. So you did not reach any settlement with Cymer?

A. No, I did not, no.

Q. Okay. Were you written up at Cymer for any -- for any issue?

MS. FLORES: Same objection. You can --

THE WITNESS: Not that I recall, no.

BY MR. DEDDEH:

Q. So the last time that we were at your last deposition, I just want to make sure I understand some of the statements that you made. During our last deposition, you said that you submitted two complaints to Leidos, one was regarding the milling machine and then the second was the size of the material being ordered. Were there any other complaints that you submitted to Leidos?

A. The only thing -- other thing I can think of was an incident where there was a mice infestation and we had to clean it up, and so it was a pretty toxic thing. We were all worried about it. And so did I

Steven Baird, Volume II, 2/17/2023

submit a complaint?  I'm not positive.  But like I said, 09:10
we all were involved in it.  And -- and when I say 09:11
"all," I mean the supervisor John Sim and several of the 09:11
other engineers -- 09:11

Q.   Okay. 09:11

A.   -- were involved in this task.  So did I 09:11
complain about it, yes. 09:11

Q.   **A second ago you just said you're not sure if** 09:11
**you submitted a formal complaint.** 09:11

A.   Yeah, I don't believe it was a formal 09:11
complaint. 09:11

Q.   **Okay.** 09:11

A.   I don't believe it was a formal complaint. 09:11

Q.   **So how did you -- how did you submit a** 09:11
**complaint, or who did you say -- tell and what did you** 09:11
**tell them?** 09:11

A.   This was through John Sim, this was John Sim. 09:11
You know, he was the one that directed me to clean up 09:11
this infestation, and so obviously, I complained about 09:11
it to him. 09:11

Q.   **So he asked -- you're saying that John Sim** 09:11
**asked you to clean up a rat infestation?** 09:11

A.   Correct. 09:12

Q.   **And do you remember approximately when that** 09:12
**was?** 09:12

**138**

Steven Baird, Volume II, 2/17/2023

A. It was probably in mid 2020, so maybe the summertime, June of 2020.

Q. Mm-hmm, okay. So were you the individual that notified John Sim about the infestation, or was it just that John Sim asked you to clean it up?

A. No, this was out in a vehicle that I'm responsible for, out in the test lane. This infestation was inside a vehicle, it was a box van where they sometimes store food and things like that to go through the X-ray machines, and that's where this infestation was.

Q. I'm not -- I don't quite understand. Can you explain that a little further, what vehicle is this and how are you responsible for it?

A. So these are company vehicles that they use in a test lane, so some of the products we build and test are in the test lane. So we have these box vans that they use to run through X-ray machines. So sometimes food is inside these vehicles, and that's what attracted the infestation, mice and the rats. So they were inside the vehicle and I was responsible for it. I have about ten vehicles that I'm responsible for.

Q. And, I guess, what exactly are your responsibilities with regard to these vehicles?

A. So my responsibilities are to keep them

**139**

Steven Baird, Volume II, 2/17/2023

maintained and make sure they operate properly with fuel and tires and just overall safety, and just general maintenance of the vehicles.

Q.   Okay.   And you're saying sometimes rats might get into the vehicles because someone might have left food?

A.   This one time, yes, that's exactly what happened.

Q.   So it only happened once?

A.   Yes.

Q.   Okay.   And so how are you informed about this infestation?

A.   I discovered it.

Q.   Okay.   And then what was your next step?

A.   Excuse me.   My next step was to notify my supervisor John Sim.

Q.   Okay.   And what came up of that discussion -- what was said during that discussion?

A.   What was said during that discussion was for me to clean it up and my reluctancy to get involved in it, you know, because it's about the -- of the dangers of it and things like that, so yeah, I was not happy with it and I made it known to John --

Q.   Uh-huh.

A.   -- about having to clean this up.

**140**

Steven Baird, Volume II, 2/17/2023

Q.   And what did you use to clean it up?                    09:15

A.   So we used a lot of different products, you             09:15
know, a lot of bleach, things like that, you know,           09:15
different brooms.  Like I said, it was in the back of a      09:15
box truck.                                                   09:15

Q.   Okay.                                                   09:15

A.   So different things like that, brooms,                  09:15
different buckets and shovels to clean up the waste.         09:15

Q.   Okay.  And were there -- were there, like, live         09:15
rats living in there or was it just the waste of the         09:15
rats?                                                        09:15

A.   There -- we did see some live rats, could see           09:15
some, yes, there was a lot.                                  09:15

Q.   Approximately how many?                                 09:15

A.   So what I saw -- I mean, we saw, like -- you            09:15
know, we saw a rat and then, like, families and babies,     09:15
and things like that, but I mean, at one time probably,     09:15
you know, I physically saw, you know, maybe it was a        09:16
dozen, but there --                                          09:16
(Technical difficulties; reporter clarification.)            09:16

THE WITNESS:  At that time, I said, probably          09:16
the first time we saw them, it was probably a couple         09:16
dozen mice.                                                  09:16

BY MR. DEDDEH:                                                09:16

Q.   Okay.  And you said this was approximately              09:16

Steven Baird, Volume II, 2/17/2023

August 20 -- or summer of 2020, is that what you -- is that correct?

A.   I did, I said approximately around June of 2020.

Q.   Okay.   And did you write -- did you write an e-mail to anyone complaining about having been -- having to clean this up?

A.   There was e-mails going back and forth, you know, through company e-mails, exactly what I wrote, I don't know.

Q.   But you're saying that there were e-mails, that you submitted an e-mail to someone?

A.   I believe there was e-mails going back between John Sim and I and Biff.   You know, Biff was probably the senior person in charge.

Q.   And who was the second person, you said Biff?

A.   Yeah, I -- I can only think of his first name right now.   Maybe his last name will come to me.   So Biff was John Sim's boss.

Q.   Okay.   And can you -- can you spell his first name, if you recall?

A.   So the only -- I know him by is Biff, B-i-f-f, and I believe his last name is Hindle, H-i-n-d-l-e.

Q.   Okay.   And so you're saying that you had e-mails between John Sim and this Biff Hindle

**142**

Steven Baird, Volume II, 2/17/2023

regarding -- regarding the clean up of this infestation?    09:18

A.    Yes, that is correct.    09:18

Q.    Okay.  And so were you provided with any personal protective equipment?    09:18

A.    I believe we wore, you know, the generic, you know, gloves, you know, generic type of face covering, but I can't remember if I had, you know, possibly like a disposable, you know, overalls and things like that.    09:18

Q.    Okay.  Did you ask for any additional personal protective equipment?    09:18

A.    Not sure if a respirator -- well, I know we discussed it, a respirator.  You know, we also talked about having it professionally done.  There was a lot of different discussions going on.    09:19

Q.    And who did you have those discussions with, was it just with John Sim and Mr. Biff Hindle?    09:19

A.    Most of the conversations were between those two, yes, that is correct.    09:19

Q.    Okay.  And do you recall anyone else?    09:19

A.    No, I do not.    09:19

Q.    Okay.  And how did you dispose of everything, or what were your steps for cleaning it?  I know you said you used -- you used some of the cleaners.  So can you kind of walk me through the process.    09:19

A.    So like I said, there was food that's stored in    09:20

**143**

Steven Baird, Volume II, 2/17/2023

this vehicle, so obviously, you know, it was, you know, disposed of via the, you know, the trash system. And so that's kind of what we did, too, using different types of shovels, cleaning up the waste, putting it in different trash containers and disposing of it that way.

Q. Got it, okay. So it sounds like there were -- you submitted three general complaints. Is there any other complaints that you recall submitting to Leidos?

A. Not that I recall, no.

Q. Okay. And let me see if I can share my screen. So in your complaints, you mentioned that you reported an employee health or safety issue to Leidos. Do you remember -- do you know what -- what health and safety issue you reported?

A. Well, I mean, this could be the rat -- rat infestation. This could be -- you know, what we are talking about there. I also -- as I mentioned to you before, as far as the unsupervised milling machine went, I reported it to Jeff King, you know, the person that's in charge of health and safety for Leidos.

Q. So you think it's one of those that you meant to be an employee health or safety issue?

A. That is correct, yes.

Q. And approximately when did -- you said in June of 2020 is when this rat infestation happened?

144

Steven Baird, Volume II, 2/17/2023

Leidos accommodated that request, correct?    09:24

A.   Well, I don't know, I guess maybe I didn't, you know, state my case properly, as they -- you know, I gave them this note, and you know, quickly I was back at my regular duties.  So there was really -- you know, my job is not the typical sit-down desk job.  So quickly I was back to my duties.  So, in essence, to properly answer your question, I would say no, they didn't accommodate me.  I was basically expected to go back and perform my regular duties.

Q.   Wasn't the discussion with Mr. Sim that they can of course accommodate, and if you ever needed to lift anything more than you felt uncomfortable with, to ask someone else in the warehouse?

A.   Absolutely, that's definitely a general rule throughout the company as day-to-day operations.

Q.   Mm-hmm.

A.   But as far as, you know, this -- you know, as far as my work limitations go, I'm sure those things were discussed, yes.

Q.   So were you saying at that time you weren't able to lift 2 pounds?

A.   I can't say that I was able -- not able to lift 2 pounds, you know, that's what the doctor's note said. I wasn't in excruciating pain or anything like that.  I

**147**

Steven Baird, Volume II, 2/17/2023

had mobility of my arm and different things, you know.

Q.    And did you ever ask for help for something that you couldn't lift or move?

A.    Yes, absolutely, absolutely.  If there was anything that I couldn't lift, I absolutely asked for help, yes.

Q.    And did you receive that help?

A.    At different times, absolutely, you know, if I had to do something heavy, you know, you know, yes.

Q.    And so was there ever a time where you asked for help and it wasn't provided?

A.    You know, there might be different times where it wasn't available or something like that, you know, nobody was available to help.  So did it, you know, get -- temporarily, you know, standby, yes, things like that happened for sure.

Q.    But ultimately, you still received that help, if it wasn't -- well, it might not have been immediate, you waited until someone was there to provide assistance; is that correct?

A.    Yes, that's standard company procedure.

Q.    Understood.  So you never felt like you were required to do something that you couldn't do?

A.    Well, like I told you, I was quickly expected to go back to my regular duties, and so my regular

**148**

Steven Baird, Volume II, 2/17/2023

duties are handling, you know, heavier materials, not necessarily hundreds of pounds but on a regular, you know, 20- to 50-pound objects and different things like that that I would use on my day-to-day operations.  So was I back to that?  Yes, I was.  Was there certain things that weigh hundreds of pounds, hundreds of pounds or thousands of pounds that we had to move and do different things with?  Yes, there was.  And did I ask for help for those things?  Yes, I did.

Q.    And you received that help, correct?

A.    On things like the big heavy object, yes, I reserve -- I received help or we waited, I waited.

Q.    And so did you ever -- were you ever put in a position where you were not able to perform your duties?

A.    Yes, as I explained to you, you know, whether help wasn't available or I simply couldn't do it because of my injury, you know, that it was just beyond my capabilities, I was kind of doing things that I shouldn't have been doing.  I was clearly above my 2 pounds, doing my day-to-day operations.  But as far as large objects and things like that, I didn't go against company policy and risk injury or anything like that to try to move these objects, no, I did not.

Q.    Understood, okay.  So let's see, and you specifically you spoke -- when you provided the

**149**

Steven Baird, Volume II, 2/17/2023

returned back to work like on -- on February 20 -- 21st, 2021?

A.   Well, as I said, you know, looking back at my notes, I believe the date is more like March 7th of 2021.

Q.   So you're saying March 7 of 2021 is when you were on disability?

A.   No, I believe that's when I returned back to work.

Q.   Okay.  How many disability leave requests did you submit?

A.   How many disability work did I submit -- I believe there is two here.

Q.   Isn't it true that you were only on disability for approximately one month after you came back from -- after the motorcycle incident?

A.   No, I believe it was longer, because we had the motorcycle incident on January 18th, and I was off work for that.  That's when I had the heart procedure and I didn't come back until March 7th, like it says.

Q.   Okay.  But that was the only time -- that was the only disability leave that you remember?

A.   Yes.

Q.   Okay.  And so every disability -- every leave request that you submitted, that was approved, correct?

**151**

Steven Baird, Volume II, 2/17/2023

A.   Yes.

Q.   Okay.  Let's see, and can you give me an explanation, in your words, of the reasons that you're suing Leidos?

A.   I guess in my words the reason I am suing Leidos is for wrongful termination.  I believe I was terminated wrongfully.  I was -- I was assaulted at work by a temporary employee.  I reported it immediately.  I was not involved in any physical altercation with anybody at work at any time.  I believe this is -- that is the main root of the termination.

I think other things led up to it, what they used to base their decision on by me making health and safety complaints or different things like that or complaining about different projects that I had to do, whether they were unsafe or whatever.  But I believe all this led up to my being terminated and being terminated for workplace violence from which I participated in no violence at all, I think is -- that's why I'm suing for my job.

Q.   Okay.  And can you explain how you believe you've been harmed?

A.   Well, I mean, getting terminated by a company like Leidos, you know, a world leader and technology and what the company is involved in, and getting terminated

**152**

Steven Baird, Volume II, 2/17/2023

                          CERTIFICATE
                              OF
                 CERTIFIED SHORTHAND REPORTER
                          *   *   *   *
              I, Kristy A. Montalban, Certified Shorthand
Reporter, in and for the State of California,
Certificate No. 13551, CCR, RPR, do hereby certify:
              That the witness in the foregoing deposition
was by me first duly sworn to testify to the truth, the
whole truth, and nothing but the truth in the foregoing
cause; that the deposition was then reported by me in
shorthand and transcribed, through computer-aided
transcription, under my direction; and that the above
and foregoing transcript is a true record of the
testimony elicited and all objections made at said
deposition.
              I do further certify that I am a
disinterested person and am in no way interested in the
outcome of this action or connection with or related to
any of the parties in this action or to their respective
counsel.
              The dismantling, unsealing or unbinding of
the original transcript will render the reporter's
certificate null and void.
              In witness whereof, I have hereunto set my
hand this 21st day of February 2023.


_Kristy A. Montalban_

KRISTY A. MONTALBAN
CSR No. 13551, CCR, RPR

**157**