# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
-------------------------------------------x
STEVEN BAIRD, an individual,

                    Plaintiff,


          Case No: 3:22-cv-00060-LL-BGS

          -against-

LEIDOS, INC., a Delaware Corporation;
and DOES 1-99, inclusive

                    Defendants.

-------------------------------------------x

                    February 23, 2023
                    11:00 a.m.


     DEPOSITION of the Defendant, LEIDOS,

 INC., by ROBERT ATHING, by Plaintiff,

 before Christine Cutrone, a Shorthand

 Reporter and Notary Public.

A.    No.

Q.    Who is your current employer?

A.    Leidos Corporation.

Q.    When did you begin working with them?

A.    2008.

Q.    What is your current position?

A.    Corporate investigator, insider threat team.

Q.    How long have you held that position?

A.    Since 2008.

Q.    So you had the same position since 2008?

A.    Yes.

Q.    What are your job responsibilities?

A.    Insider threat, workplace violence issues, inappropriate behavior issues in the workplace.

Q.    So other than investigating these issues, do you have any other responsibilities?

A.    Sometimes I investigate the exfiltration cases.  Whatever the corporation deems that they need me to look at, I'll look at.

Q.    Do you supervise any employees?

A.    No, I do not at this time.

Q.    Who do you report to?

A.    My direct supervisor is Laura, L-A-U-R-A, Morgan, M-O-R-G-A-N.

Q.    And what is her position title?

A.    Manager of insider threat investigations.

Q.    Would you say that you are part of the insider threat department?

A.    Team.  We have a hierarchy, the team.

Q.    How many people are on the insider threat team?

A.    I could think of six.

Q.    And you said that you have a hierarchy; what do you mean?

A.    I have a manager who has a manager, who has a manager, who has a

Q.    And who is his manager?

A.    His manager is the corporate chief security officer.

Q.    Who is that?

A.    Terry, T-E-R-R-Y.  His last name escapes me, I'm embarrassed, but his last name escapes me.  I can get that for you real quick.

Q.    That's fine.  What is your highest level of education?

A.    High school.

Q.    Do you have any certifications?

A.    I hold no current certifications.

Q.    Did you previously have certifications?

A.    I have held certifications in the past.

Q.    And what certifications are those?

A.    Certified fraud specialist.

Q.    Sorry, that was certified fraud specialist?

A.    Correct.

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

Q.    When did you hold that certification?

A.    Maybe up until 2010 and some years prior to that.

Q.    How long did you have that certification for?

A.    I'd say five-years prior to 2010.

Q.    Have you had any other certifications?

A.    I have no other certifications.

Q.    Do you have an estimate as to approximately how many investigations you've conducted at Leidos?

A.    At Leidos?  In excess of 500.

Q.    What kind of training did you receive from Leidos regarding conducting investigations?

A.    Well, I received extensive training in 2000 -- since 2008.  I have been -- I participated in telephone interviewing techniques, I participated in basic interview techniques, advance

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

basic interview techniques.  I have received training through Lockheed Martin and Leidos in workplace violence prevention, how to address workplace violence, difficult former employees training.

Q.    You said, I'm sorry, difficult former employee training?

A.    Yes.

Q.    And you said you received training through Lockheed Martin.

A.    I can tell you Lockheed Martin merged with Leidos in 2016, but I've held the same position.  A business unit of Lockheed Martin merged, not the whole corporation.  The business unit merged.

Q.    How often do you receive this training?

A.    The last couple of years I received refresher training.  I have over 40 years of investigative experience.

Q.    What investigative experience did you have prior to joining Leidos?

A.    I'll speak slowly so your reporter can keep up, okay?

I was employed with Fairfax County Police, Fairfax, Virginia; I began my career in 1982.  I retired in 2008, after 26 and a half years of service.  I supported numerous Washington Metropolitan Air Task Force -- task forces, FBI, secret services, United States postal service, was deputized as a special U.S. marshal to conduct fraud investigations across the country.  I received training in Reid interview techniques, advance and basic.

Q.    Sorry, you said in what kind of interview techniques?

A.    Reid interview.  Well-known organization across the United States for interviews.  It's Reid, R-E-I-D.  Basic as well as advanced I've completed.  I received numerous awards from the eastern district of Virginia, United States Attorney's office for my work and my accomplishments.  I was recognized as detective of the year by the

international association of financial crimes investigators.  That's the international association of financial crimes investigators, detective of the year, recognized for my exemplary skills in combatting fraud and interviews with a significant amount of convictions for a particular case.  I also served in the capacity of on-call hostage negotiator while employed with Fairfax County Police.

Q.    Was there anything else?

A.    Not that I can think of at this moment, but I'm sure there is.

Q.    At Leidos, do you participate in ethics training?

A.    Annually.

Q.    What other training do you receive annually at Leidos?

A.    Insider threats, mischarging, travel reporting requirements.  I'm not at liberty to discuss, but there's other training as a cleared employee I have to take.

Q.    Do you receive code of

others.

Q.   Is this training in person or through a computer?

A.   It's a computer course that you must complete, every employee must complete annually.

Q.   Approximately, how long does it take to complete the course?

A.   I would estimate about an hour.

Q.   Are you a member of any associations?

A.   I am.

Q.   What would that be?

A.   The international association of financial crimes investigators.

Q.   Any other associations?

A.   None that I can recall.

Q.   Do you recall the first time that you heard Steven Baird's name?

A.   Are you looking for the date?

Q.   Approximately, if you know.

A.   About two years ago.

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

Q.    Do you recall how it was that you learned his name?

A.    I believe it was through HR business partner.

Q.    What is HR business partner?

A.    It's an individual.

Q.    Which individual?

A.    Her name is Ajlana, A-J-L-A-N-A, Ramic R-A-M-I-C.

Q.    What does she say or communicate?

A.    That there was an incident at the worksite in Vista, California. And the allegation was that there was a scuffle involving Mr. Baird, which I saw as a potential workplace violence issue.

Q.    How did she communicate this to you; was that by e-mail or over the phone or in person?

A.    I believe it would have been e-mail.

Q.    Do you know who provided her with this information?

A.    Not off the top of my head I don't.

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

Q.    So prior to her communicating this to you, had you ever interacted with Steven Baird?

A.    Never.  And I also like to add something, I believe there was an HR business partner Adam Johns involved in the notification.  Adam, last name Johns, J-O-H-N-S.  I believe he was also involved in notification to me of this situation.  He's also an HR business partner.

Q.    Do you believe that both Aljana Ramic and Adam Johns were on this e-mail to you regarding the scuffle?

A.    I believe they were.

Q.    What was the next step after you received this e-mail?

A.    Notify my managers that I'm working an ongoing potential workplace violence situation in Vista, California at SDNA product line.

Q.    What is SDNA product line?

A.    That is where Mr. Baird -- the program Mr. Baird supported while he was employed with Leidos.

Q.    What is your understanding of Steven Baird's job duties?

A.    I think he was involved in a --

MR. DEDDEH:  Speculation.

You can answer.

A.    I believe he was involved in the manufacturing of our product.  The manufacturing process of our product.  He worked in a particular area within his key area.  Kind of like -- I wouldn't say restricted area, but like a work zone.

Q.    And you said in a work zone?

A.    Yeah.  Kind of segregated where people have certain responsibilities to perform their tasks that they're assigned, and others have a particular area they worked in to perform their tasks, if that make sense to you.

Q.    So what happened after you notified your managers that you were going to be working?

A.    I began to investigate.

Q.    Is there a Leidos investigation policy that you work under?

A.     I wouldn't say there's a policy, but I know what to do from my 40 years experience where to start.

Q.     So what did you do next?

A.     I tried to identify witnesses that may have information to be helpful towards my investigation.

Q.     How did you do that?

A.     Talked to people onsite; such as, the manager, as well as the reporting source that reported this to HR.

Q.     Did you go to Vista, California?

A.     No, I did not.

Q.     How did you communicate with the people onsite?

A.     By telephone, which was beneficial, because I received extensive training in telephone interviewing.

Q.     How long did it take you to identify witnesses?

A.     I couldn't give you a fair estimate on that.  I just know that I did.

Q.    Were you taking any other action at the same time as you were looking for witnesses?

A.    What does that mean?

Q.    Were you working another part of the investigation concurrently with investigating for witnesses?

A.    I still don't understand your question.

Q.    Were you working on other job responsibilities while you were looking for witnesses?

A.    I probably was.  I probably was, yeah.

Q.    Do you recall what those responsibilities were?

A.    No.

Q.    Okay.  So what was the next step after you identified witnesses?

A.    I began to interview witnesses.

Q.    And you interviewed the witnesses by phone?

A.    I did.

Q.    And not through any kind of

video technology or anything?  It was by phone?

A.    Correct, by telephone.

Q.    And you also sent some forms for some witnesses to fill out; is that correct?

A.    It was some forms that were executed by employees, they're called observe workplace behavior check sheet. And we ask employees that are involved in the situation to complete those forms, so we can get an understanding of what has or what has not been observed in the past of a particular person.

Q.    And was anyone else involved in managing the investigation other than you?

A.    I don't recall.

Q.    When you were identifying witnesses, witnesses to what exactly?

A.    Witnesses to an allegation that Mr. Baird was engaged in a situation that was concerning to my purview for a potential workplace violence where he was in somebody else's personal space and

there was an all physical altercation had taken place.

Q.    Were you also investigating Cooper Garner?

A.    Tell me what you mean by investigating Cooper Garner?

Q.    You said that you were looking for witnesses that Mr. Baird was engaged in a situation that was concerning potential workplace violence in someone else's personal space.

Is that the same for Cooper Garner?

MR. DEDDEH:  Objection. Vague.  You can answer if you understand.

A.    I don't understand the question to be frank.  I don't even know if there's a question there.  I'm trying to understand what you mean or asking.

Q.    Was the allegation that Mr. Baird was engaged in the situation as you phrased it or that Mr. Baird and Mr. Garner were both engaged in a situation?

A.    I believe that they were both engaged in a situation.

Q.    Were you looking for witnesses regarding Mr. Baird's actions in the workplace outside of the incident between him and Cooper Garner?

A.    I don't understand that question either.

Q.    Were you looking for witnesses to -- could have not see what happened on March 10, 2021 between Steven Baird and Cooper Garner, but who were familiar with Steven Baird prior to that time?

MR. DEDDEH:   Objection. Vague.  To the extent that you understand the question, you can answer.

A.    I looked at everybody.  I'm fair and unbiased.  I looked at anybody who may have been in that area that their name was provided to me to interview.  If they had something that was germane to the allegation, that was important.  If they had nothing to contribute, that was

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

also important, but it was very important that I at least ask those questions; did you see something?  If they did, I followed up on it.  If they didn't, I documented that they didn't see anything.

Q.  Do you recall approximately how many witnesses you identified?

A.  I want to say maybe five or six people involved to include Mr. Baird and Mr. -- what was his name -- Cooper Garner.  A total, I think, of six.

Q.  So do you recall who you interviewed first?

A.  I do not recall who I interviewed first.

Q.  Do you recall interviewing Mr. Baird?

A.  Yes.  Now, he would be my last.

Q.  What do you recall from your interview of Mr. Baird?

A.  I already -- I believe I already had my assessment of Mr. Baird as provided by some of the employees who he was described as a bully.  He used vulgar

language in the workplace. When you want to interview somebody, you get a little bit of background on them first, which is best. In reading it, employees described him as a bully, foul mouth, antagonistic, confrontational. So when I interviewed him, I was very, I'd say, guarded. I was listening. You always want to listen. So I was listening of his version of event.

Q. Do you recall what his version of events were?

A. For the most part, he told me that he greeted one of the co-workers, Cooper Garner. He has a habit of greeting people -- gives them nicknames and such, and I believe that he called him Home Alone guy. Like Joe Pesci wore the hat. I don't know if you know that movie, but there's -- Joe Pesci played a part in Home Alone.

Q. Yes.

A. And Cooper is a young kid, probably 21 years of age. That's how he would greet -- how Mr. Baird would greet

people.  Other people I think I recall somebody else was a fan of the Denver Broncos, so he would come in the morning and say hello Denver Bronco.

Q.    Yes.

A.    And Mr. Baird then told me that he was in Cooper's work area and Cooper assaulted him, pushed him.  He did not sustain any injuries.  I asked that question, if he sustained any injuries.  He said he had not.

Q.    Do you recall anything else from interviewing him?

A.    No, I don't recall anything that was relevant to the workplace violence concern.  I didn't -- those are the highlights.  He did provide me a statement, too, of the situation.

Q.    You said the employees described him as a bully who used vulgar language in the workplace.

Do you recall which employees said that?

A.    I want to say all of them.

Q.    You believe that all of the

employees who you interviewed described Mr. Baird as a bully?

A.   Yeah.  He was very political minded.  He spoke poorly of immigrants coming across the United States, southern border.  He was counseled on that a matter of fact not -- to refrain from that type of conversation.  He was counseled by his manager, Mr. Johnson.  He talked about illegal aliens -- illegal immigrants in the country.  Talked about politics.  He talked about wanting -- the allegation was he talked about shooting the President of the United States in the head.

Q.   Did you speak with him about his views on illegal aliens in the country?

A.   Later on in the investigation I did have an opportunity to sit on as a witness in a conversation.

Q.   What do you mean?

A.   Katie Ries, also an investigator from workplace relations.  That's Katie, K-A-T-I-E, Ries, R-I-E-S.

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

She's a workplace relations investigator. She had -- we kind of segregated what we do here, the investigations.  And I sat in as a witness where she -- where Katie interviewed Mr. Baird about his inappropriate -- allegation of inappropriate comments in the workplace, about politics, and wanting to shoot the President, and illegal aliens across the border, immigration, things along those lines.

Q.    When was this?

A.    Close in proximity to following my investigation, interview of Mr. Baird.

Q.    A few days --

A.    I can't --

Q.    -- after --

A.    It was a day or two weeks, but it was shortly thereafter.

Q.    Before he was terminated?

A.    Oh, yes, it was definitely before he was terminated.

Q.    What did he say in your presence regarding illegal aliens in the

country?

A.    Well, he denied -- well, first off he denied saying he was going to shoot the President of the United States in the head.  As far as conversation or comments about political point of view, I don't recall what he said to Katie about that.  It wasn't my task or responsibility to document those things.

Q.    What was the difference between your responsibility and the responsibility of Katie Ries?

A.    Well, mine's workplace relations and her's is workplace performance and such.

Q.    And you said she was investigating the comments?

A.    Yeah, the comments shooting the President of the United States in the head.  About his -- Mr. Baird's comments about illegal immigrants coming across the border and politics in general.

Q.    What do you mean that you sat in on the interview between Katie --

A.     It was a conference call between myself, Katie and Mr. Baird.

Q.     How long was that conference call approximately?

A.     I'd say an hour.

Q.     Who alleged that Mr. Baird made a comment about wanting to shoot the President?

A.     I believe it was a guy named Ian.

Q.     Anyone else?

A.     Not that I recall.

Q.     What was the investigation finding regarding the allegation that Mr. Baird made a comment that he wanted to shoot the President?

A.     I don't think that was substantiated.  I know that my immediate manager has an obligation as well as I do, from her former career as a United States secret service agent, that she notify the secret service of the comment, whether it's innocent or not, is still an obligation to report that to the United States secret service, which she did.  I

don't know if they followed up on that. I just know it was reported, and I don't believe it was substantiated here.

Q.    Who made the determination that it was not substantiated?

A.    Well, I didn't say it was not substantiated.  I said I don't believe.

Q.    Who would have made the determination as to whether it would have been substantiated?

A.    Katie Ries.

Q.    And you said that he talked about politics on a conference call with the three of you?

A.    No.  The allegation was that he talked politics in the workplace, which annoyed others.  He held his political reviews in the open, which is not conducive to a positive work environment.

Q.    What was the allegation against him with regards to talking politics in the workplace?

A.    I think that's just it, he

talks politics in the workplace.

Q. The allegation was that it disrupted a positive work environment?

A. It does. Not everybody is of the same opinion.

Q. What was his response on this issue during the conference call?

A. I don't recall.

Q. Was he accused of making inappropriate comments in the workplace?

A. No, he was accused of being involved in an assault.

Q. Right. But separate from that, was he accused of making inappropriate comments in the workplace?

A. I think there was -- he wasn't accused. Those came out during the course of an investigation. As we mentioned -- sorry, my screen just went -- let me unlock. Hold on. I have to unlock. Wasn't moving the mouse. Sorry. Difficult to pay attention to you and having to move the mouse every once in a while. I want to give you my undivided attention.

Q.    Is the matter resolved?

A.    Yes.

Q.    When did Katie Ries begin her investigation?  Did she begin it after you did?

MR. DEDDEH:  Asked and answered.  You can answer.

A.    I can't give you a definitive date.

Q.    But is it your understanding that she began investigating the comments after you began your investigation of the incident?

A.    That seems reasonable.

Q.    Did she begin her investigation based on information that you obtained during your investigation?

A.    I can't tell you how she became involved.  I just know she was.

Q.    After interviewing Steven Baird, did you find that anything that he said was untrue?

MR. DEDDEH:  Objection. Vague.

A.    The question is, do I

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

believe anything that Mr. Baird told me was untrue, is that the question?

Q.    Yes.

A.    Yeah.  I believe that he was the aggressor.  He wanted to paint the picture that a much younger kid, Cooper Garner, initiated -- you know, initiated the whole situation, which I found to be false.

Q.    And why do you believe that?

A.    Because of Mr. Baird not being in his immediate area.  He had no justification or job responsibilities in the area where he engaged Mr. Cooper Garner in an altercation.  Tells me that Cooper Garner rolled up his fists and rolled up his sleeves, rolled up his fists and wanted to fight.  I just don't think that's reasonable.  Young kid is probably not a hundred pounds soak and wet.  Mr. Baird is a big guy.  I don't think Mr. Cooper engaged in that way.  Also, I was able to, the course of an interview, identify a witness that could see that Mr. Baird was up in Mr. Cooper

Garner's personal space, very close to him, yelling at him.

Q.   Who was that?

A.   That witness was James Wilson.  He held a managerial role there.

Q.   Do you recall your interview of Cooper Garner?

A.   I do.

Q.   What do you recall from that interview?

A.   I recall the day of the incident that Mr. Baird greeted him with good morning Home Alone.  And Cooper told me that he told Mr. Baird to cease calling him that.  Doesn't like it.  Then he told me that Mr. Baird called him a pussy and asked him if he wanted to fight.  Got up in his face.  I recall that he got up in his face and said, do you want to fight.  Called him a pussy.  And repeatedly Mr. Garner told me that he's asked Mr. Baird to stop berating him and treating him as such, calling him Home Alone.  I just thought Mr. Baird was pushing the envelope, trying to

antagonize him, which is typical of a bully.

Q.    Did you speak with Cooper Garner about what time period he and Steven Baird interacted?

A.    I don't recall off the top of my head, but it would have documented.

Q.    Did Cooper Garner state that there were previous incidents between him and Steven Baird before the incident on March 10th?

A.    I don't recall it.

Q.    For previous interactions?

A.    As I said, previous interactions where he's -- Cooper asked Mr. Baird to cease and desist calling him Home Alone.  So he's just getting under his skin.  Typical of a bully.

Q.    Do you know approximately how many times Cooper Garner had stated that he had asked Mr. Baird to stop calling him home alone?

A.    No, not off the top of my head.  I just recall that he told him to cease.

MS. FLORES:  Okay.  Let's go off the record.

(Discussion is held off the record.)

(Whereupon, a short break was taken).

MS. FLORES:  Back on the record.

Q.  Mr. Athing, you understand that you are still under oath?

A.  I do.

Q.  So in your interview of Cooper Garner, did Cooper Garner make any comments regarding the kinds of political statements that Steven Baird made?

A.  I don't recall that.

Q.  Did Cooper Garner say anything in his interview with regards to his belief about Mr. Baird's views on race?

A.  I don't recall who said it, but somebody said in that group that I interviewed, somebody said that Mr. Baird was a racist.

Q.  You say you don't recall who

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

And I didn't go in to interview him.  I called him on the telephone.

Q.    Before you spoke with Steven Baird on the telephone, what was your understanding about what comments he made about politics?

A.    I don't recall even thinking about that, so it wouldn't have been germane to my interview with him.  I'm looking at workplace violence.

Q.    Before you spoke with him, were you aware of any allegations of inappropriate comments by him?

A.    Yes.

Q.    What were those alleged inappropriate comments?

A.    That he wanted to shoot the President of the United States in the head.  Dislike for people coming across the broader or I think he characterized them as illegal aliens.  Those are what I can recall.

Q.    Are you aware as to whether there's a Leidos workplace policy regarding the expression of political

beliefs?

A.    I don't know if there's a specific policy, but I know it frowns upon that conversation of political point of view.  But my focus was on workplace violence.

Q.    Prior to speaking with him on the phone, with Steven Baird, were you aware of any complaints about Steven Baird?

A.    I was not, but during the course of my interviews, I learned that there was a complaint lodged against him concerning his conversations about berating immigrants and he was counselled by manager John Sims about that.  But, yes, I was aware.

Q.    Were you aware that shortly before the incident involving him and Cooper Garner he had been on medical leave?

A.    Yes, I explored that, because he said look at the allegation of him possibly -- I don't recall who it was, but somebody said that he was

ROBERT ATHING                                          JOB NO. 529017
FEBRUARY 23, 2023

A.    I did not talk to the credibility.  Although, personally I believed everybody was credible here except for Mr. Baird.

Q.    What is your understanding of the altercation that occurred?

MR. DEDDEH:  Objection.  Asked and answered.  You can answer.

A.    My understanding is that Mr. Baird was not at his work area, immediate work area.  He was in an area where he does not perform the normal duties.  I believe he had no expectation to even be there.  And I just think he was instigating Mr. Cooper Garner.  There was a witness that had a direct line of sight albeit from the waist down, and that witness would have been James Wilson.  James Wilson was seated having a lunch break, and it was earlier -- not a typical lunchtime.  My typical lunchtime is like 12.  I think it was a little earlier, but he might have started earlier in the day, but he had a direct

line of sight where he could see waist down.  His vision was -- line of vision was obstructed by some shelving area, but he heard the disturbance.  He got up to check on that and he saw Mr. Baird up in Cooper Garner's face.  And then he saw Mr. Garner push --

(Court reporter asked for a repeat.)

A.    Mr. Baird up in Cooper Garner's face, in his personal space, very close proximity, as if they were bumping chest.  And Mr. Wilson interpreted the push from Cooper Garner to push Mr. Baird back from his personal zone.

Q.    Is it your understanding that Cooper Garner and Steven Baird bumped chests?

A.    Yes.

Q.    What do you base that on?

A.    With Mr. Baird being the aggressor, because Mr. Wilson, when he saw -- although his line of sight was obstructed initially, when he stood up

and saw that Mr. Baird was in Mr. Cooper Garner's personal space bumping chests, up in Mr. Garner's chest, as if to provoke an incident.

Q.   You're saying that James Wilson testified that he saw the two of them bump chests?

A.   He didn't testify.  He told me.  Mr. Wilson told me that he saw Mr. Garner -- I'm mean, Mr. Baird bump chest with Cooper Garner, and Baird being the aggressor.

Q.   So what is your understanding of the number of times that Cooper Garner and Steven Baird made physical contact on that incident?

A.   Let's go backwards.  For sure it was observed that Cooper Garner himself admitted, by Mr. Cooper Garner, that he pushed back on Mr. Baird because he was in his personal zone challenging him to a fight, and evidenced by the fact that Mr. Wilson saw them in close proximity with Mr. Baird being the aggressor, bumping Mr. Garner's chest

with his chest.

Q.    Is it your understanding that there were two points of physical contact between Mr. Garner and Mr. Baird?

MR. DEDDEH:  Objection. Vague.  You can answer if you understand the question.

A.    Can you ask that question again, please, in a different context maybe, so I can understand it or rephrase it.

Q.    Sure. I'm just trying to get an understanding of how many times you believe that there was actually some kind of physical contact, touching, between Mr. Garner and Mr. Baird on March 10th? So -- sorry, go ahead.

A.    I would say two; one is evidenced by the fact and observed by a witness that Mr. Cooper Garner pushed, so there was contact there.  And then Mr. Baird buffed his chest and fist bumped with Mr. Garner.  So I would say two times there was contact.

Q.    And did the chest bumping

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

happen before Cooper Garner pushed Steven Baird or after?

A.    No, it would have to happen before per the witness.  And I also uncovered the comment made by Mr. Baird that said don't be a pussy.  Do you want to fight?  So that escalated the issue, too, which gave credibility to the witness that what he saw.

MS. FLORES:  Let's go off the record.

(Discussion is held off the record.)

MS. FLORES:  Back on the record.

Q.    Mr. Athing, you understand that you are still under oath?

A.    Yes, I do.

Q.    So you said there was a meeting of the corrective action review committee.

Now, was this a special meeting that you convened or was this part of a regular meeting?

A.    It follows the conclusion of

recall or seeing the allegations that she investigated were substantiated.

Q.    Sorry, can you say that again?

A.    If I recall correctly, when she presented her facts, they were substantiated -- there was a substantiated finding regarding his comments about the illegal aliens coming across the border, and there was something else that was an inappropriate comment, maybe politics.  Can't be certain on that part though.

Q.    Do you recall anything else about the findings that she presented or the facts that she presented?

A.    No.

Q.    What happened after both of you presented facts?

A.    The committee elected termination for Mr. Baird, and elected to remove Cooper Garner from our workplace as a subcontractor to us.

Q.    Did the committee give a reason for termination?

ROBERT ATHING                                           JOB NO. 529017
FEBRUARY 23, 2023

A.     Yes, for clear violation of our workplace violence policy.

Q.     Did they provide a further basis for how the workplace violence policy was violated?

A.     No.

Q.     Did anything else happen after that?

A.     What do you mean?

Q.     In that meeting after there was a decision to terminate Mr. Baird and to remove Mr. Garner as a subcontractor, was there any other conversation during that meeting?

A.     I believe what happened following the determination for termination removal for both termination for Baird and removal for Garner, would have been up to the HR business partner, and we always speak up in the meeting to -- who has that task, and get clarification that they're going to complete that task promptly.  And we also discuss security measures for this type of situation to ensure that Mr. Garner

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

does not come back into the workplace. That he clearly understands that he's prohibited from being in our workplace, otherwise the police will be called. Termination of the badge and collection of assets, he hadn't any assets assigned to him to the best of my recollection. So that's how I recall followup on that meeting. Everybody knows what their actions will be. So the environment that cleared all -- who's got -- who needs to do what.

(Court reporter asked for the ending.)

A.    There's no systematic failures. Everybody is clear what their responsibilities are at hand.

Q.    How was a decision made; was there a vote?

A.    I don't think it was an actual vote. I think it's an opinion or legal representation talks to us about risk or not or workplace relations and HR and program get to weigh in. If you want to call it a vote, so be it, but that's

me scrolling or somebody else?

Q.    I'm scrolling at the moment.

A.    I'm not going to download --
I don't know where this comes from.  You
know, if it's sanitized or not.  I see
it.  It looks familiar, but I don't know
where it's been since you have it I
believe.

THE COURT REPORTER: If you
need to make it bigger, I can get
the tech on.

THE WITNESS:  No, I can go.
Ask the questions.

Q.    Have you seen this document
before?

A.    Not in that format, but I
know what it is.

Q.    What is it?

A.    It's a copy of the
investigation, the final report as we
loaded it into ECMS or enterprise case
management system, also known as Osprey.

Q.    Is this the case summary
that you put together regarding the
investigation that you did?

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

A.    Well, I'm not seeing it. All I see is case information with some case number, Baird's name, workplace violence.  I'm not seeing -- you need to -- all I'm seeing -- those are people who have access to --

(Court reporter asked for a repeat of the end.)

A.    Well, to the case.  People have access to the case, visual case. It's the robust audit trail.

Q.    Do you need time to review the document?

A.    Well, I don't know what you want me to review.  It keeps on scrolling around.  You're on Page 5 right now on my screen.

MS. FLORES:  Just go back to one here.

Q.    So you're not sure if this is the summary that you put together?

A.    Oh, I know.  If you scroll down to it, I can tell you.  This is -- right now -- you're -- it's not the summary.  If you scroll down, you'll be

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

able to see the summary, and the investigation.  Those are the witnesses.  If you slow down, I could tell you, walk you through it, those are the witnesses.

Q.    Okay.

A.    Those are the witnesses.  As well as the subjects of the investigation.  You see where Mr. Baird as well as Mr. Cooper are subjects of the investigation because of their behaviors.  Witness -- Ian is a witness.  Katie Ries is a workplace relations investigator.  Mikey Angelo is a witness and John Sim is a witness.  Those are the witnesses that participated in this investigation.

Q.    So just scrolling to the top for a second.

So looking at the bottom of Page 1, it says linked cases.

A.    Yep.

Q.    So there's the current case, 2021-00276.  And then there is what appears to be a linked case.

A.    260, yep.

Q.    Which case is that?

A.    Well, security ran this case and I fall under the auspices of security.  And workplace relations ran their case.  Everybody has to get, we'll call it the baying, okay, so credit for their case to document their involvement to justify their role and their obligation to report.  Katie has a case, which is there also, that's why they're linked to address Mr. Baird's comments in the workplace.  You'll see there's two cases.

Q.    Okay.

A.    I don't want to combine and I don't want to impune hers, that's why we keep them separate.

Q.    Okay.  So you indicated that where it says inclusions, these are all people who have access to this document?

A.    They would have access. They hold positions within the organization that they're on our team. They're also investigators.  There's leadership.  We have the gatekeeper for ECMS, Chris Killian, identified there as

C E R T I F I C A T E

I, CHRISTINE CUTRONE, Shorthand Reporter and a Notary Public, do hereby state:

That the witness whose examination is herein before set forth has duly acknowledged that such an examination is a true record of the testimony given by such a witness.

I further state that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of March, 2022.

*Christine Cutrone*

CHRISTINE CUTRONE

```
                    ERRATA SHEET
                    CHANGES IN TESTIMONY
                    STEVEN BAIRD v LEIDOS
                    ROBERT ATHING
                    February 23, 2023
        Page  Line   From                    To
```

Page 69, Line 25 should read, "BAIRD" not "GARNER".

SIGNATURE:_____DATE:____03/21/2023____

                    ROBERT ATHING