# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD, an individual,      )
                                  )
                 Plaintiff,       )
                                  )
        vs.                       )   Case No.
                                  )   3:22-cv-00060-LL-BGS
LEIDOS, INC., a Delaware          )
corporation; and DOES 1-99,       )
inclusive,                        )
                                  )
                 Defendants.      )
                                  )

VIDEOCONFERENCE DEPOSITION OF

JOHN SIM

WEDNESDAY, FEBRUARY 15, 2023

REPORTED BY:  SHIRLEY Q. CASILAN
CSR NO. 12361
JOB NO. 529013

Any documents that we discussed between us, I'm going to instruct you not to answer, but outside of that, feel free to answer.

THE WITNESS:  Understood.

BY MS. FLORES:

Q    And, of course, I don't want to inquire about anything under attorney-client privilege, but if you did review other documents, then I do request that you provide me with identification of what those documents were.

Did you review other documents outside of your conversation with your attorney prior to this deposition?

A    No.

Q    And aside from counsel, did you discuss this deposition with anyone?

A    No.

Q    And who is your current employer?

A    Leidos.

Q    And what is your current position?

A    I'm a senior mechanical engineer.

Q    And how long have you held this position?

A    This current position I've held for two years.

Q    So would that be since 2021?

A    Yes.

Q    Do you recall when, approximately, in 2021?

A    I believe May of 2021.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

Q    And what are your responsibilities as senior mechanical engineer?

A    The design and prototype fabrication of industrial X-ray systems.

Q    And who do you report to?

A    I report to John Seeger.

Q    How do you spell the last name?

A    S-E-E-G-E-R.

Q    And what is his position?

A    He's the mechanical engineering manager.

Q    And do you supervise other employees?

A    I do not.

Q    And prior to this position, what position did you hold previously?

A    I was a mechanical engineering manager.

Q    And when did you hold that position?

A    From March of 2019 until May of 2021.

Q    And what were your responsibilities as mechanical engineering manager?

A    Oversee the day-to-day operations of the mechanical engineering staff.

Q    And who did you report to?

A    William Heindl.

Q    How do you spell the last name?

A    H-E-I-N-D-L.

A   Approximately from -- sometime in 2016 until April of 2019.

Q   Sorry.  William Heindl, what was his position?

A   I'm not aware of his official title, but he was the engineering -- overall engineering manager.

Q   And Dave Rose, what was his position?

A   From 2016 until 2019, he was a mechanical engineering manager.

Q   Okay.

And what is your highest level of education?

(Technical difficulty.)

(Pause in the proceedings.)

THE COURT REPORTER:  Would you like me to repeat the last question so we can get an answer on the record, Counsel?

MS. FLORES:  That's okay.  I'll ask a different question.

BY MS. FLORES:

Q   And so -- okay.  So currently, you're a senior mechanical engineer.  Previously, you were a mechanical engineering manager.  Was that for a particular department?

A   Yes.  Mechanical engineering department.

Q   Oh, for the mechanical engineering department.  Okay.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

And how many employees work in the mechanical engineering department?

A    Currently, I believe there's seven.

Q    And did -- when you were a mechanical engineering manager, did you work on an FDA contract?

A    I'm not familiar with that.

Q    Okay.

And what is your highest level of education?

A    I have a technical diploma from Platt College in San Diego.

Q    From what year?

A    1987.

Q    When did you first begin to manage Steven Baird?

A    In April of 2019.

Q    And had you interacted with him before then?

A    Yes.

Q    In what capacity?

A    As a mechanical staff engineer.

Q    Do you recall when you first met him?

A    I do not recall the date.

Q    And how was it that you became Steven Baird's manager?

A    I was offered a mechanical engineering manager position.

Q    And what was Steven Baird's position at the time

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

that you became his manager?

A    He was a machinist.

Q    And what were his responsibilities?

A    He had varying responsibilities, from general project support to specific machining duties in support of manufacturing.

Q    In support of manufacturing what?

A    The industrial X-ray systems that Leidos manufactures.

Q    And what was your impression of him when you first took over -- when you first became manager for him?

A    He was a member of the staff.  I -- he was a team member.  I had no specific impression.

Q    And does the mechanical engineering department work with other departments?

A    Yes.

Q    And which other departments are those?

A    Shall I list them all?

Q    Yes.

A    Electrical engineering, software engineering, manufacturing personnel, inventory control, safety department, and general operations, administration personnel for the building, for the facility.

Q    And do all these departments work together on specific contracts?

A     I'm not aware of contracts.  We focus on projects.

Q     During Steven Baird's employment, did he ever ask for sick leave?

A     I'm not quite sure how to answer the question. Were there -- there is no sick leave at Leidos.

Q     Is the term "medical leave"?

A     There is a medical leave.

Q     And did Steven Baird ever ask for a medical leave?

A     He never asked me specifically.

Q     Are you aware of him asking for medical leave?

A     Yes.

Q     And approximately how many times are you aware of him asking for medical leave?

A     Just once.

Q     And when was that?

A     I don't recall the date.

Q     And what do you recall was the reason for his request for medical leave?

A     He had injured his shoulder in an accident of some kind.

Q     And how did you learn that he had asked for medical leave?

A     He showed me a doc- -- well, ultimately, he

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

showed me a doctor's note that limited his work restrictions, but I had -- I was informed by the HR department that he was out on medical leave.

Q    And do you recall how long he was out on medical leave?

A    I do not.

Q    And do you recall what the work restrictions were?

A    He had limitation of how much mass he could lift.

Q    And what were the requirements of his position with regard to lifting weights?

A    The Leidos policy for someone in that position is that they're able to physically lift 50 pounds.

Q    And why is that?

A    We deal with large fabrications and machinery that needs to be handled.

Q    And prior to his request for accommodation, were you aware of any other time where he was not capable of lifting 50 pounds?

A    No.

Q    And what do you recall from your conversation with him regarding his accommodation?

A    The accommodation for lifting?

Q    Yes.

A    What I recall is that it was an unremarkable

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

request, and we could accommodate that very easily.

Q    Did he request the accommodation for a limited amount of time?

A    I don't recall if a time period was attached to that.

Q    And how were you able to accommodate the request easily?

A    The discussion I had with Mr. Baird was that if he came across an instance where he needed to lift something, he was to get myself or any of -- other personnel on the mechanical engineering staff or anybody in the building that as part of their job description is to lift 50 pounds to perform the task.

Q    Do you have an estimate as to how many times in a day or a week he might have to lift something 50 pounds or heavier?

A    Once a day is a reasonable estimate.

Q    And after that conversation, did he ask you for help with lifting something?

A    No.

Q    And after that conversation, are you aware of anyone else helping him with lifting 50 pounds or more?

A    No, I'm unaware.

Q    And did you notify anyone else that they should help him?

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

A    The entire staff at the time was aware that they were to help him if he requested it.

Q    And how did they become aware?

A    I don't recall how the information was passed along.

Q    So was this something that you would have communicated to the entire staff?

A    Yes.

Q    So when you say that you don't recall, are you saying that you don't remember how you communicated it to the entire staff or that someone else -- you just don't recall how it was communicated and perhaps someone else communicated it to the other staff?

A    No.  It would have come from me specifically, but I don't recall if it was an individual conversation with staff members or if it was in our weekly staff meeting.

Q    And who was the person who approved his request for accommodation?

A    I'm not aware of that person.

Q    So it was not you?

A    No.

Q    Were there any concerns that you were aware of regarding his request for accommodation?

A    No.

Q    And do you recall that he required leave for an

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

those tasks?

A   Yes.

Q   Any other reason that you recall as to why you gave him a result rating of strong performance?

A   Steve was an employee that I could count on to complete the task.

Q   Okay.

And does this document refresh your recollection about any conversation that you had with Steven Baird regarding his performance for 2020?

A   Not specifically, no.

Q   Okay.

And did Steven Baird raise any complaints or concerns during his employment?

A   Not that I can recall specifically.

Q   And are you aware of any complaints about Steven Baird during his employment?

A   Yes.

Q   And which complaints are you aware of?

A   I'm aware of one instance where I was approached by an employee, and they were informing me that they felt uncomfortable around Steve and his behavior towards them.

Q   When was this?

A   I don't recall the date.

Q   Is this when you were Steven Baird's manager?

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

A    Yes.

Q    Do you remember the year?

A    I do not.

Q    Do you recall approximately what time period before his termination this employee approached you?

A    Yes.

Q    And what time period is that?

A    Somewhere between 2019 and 2020.

Q    And who was the employee?

A    His name is Efren Ricardo.

Q    And what was his concern?

A    His concern was Steve was making what he thought were racial comments in the lunchroom at the facility.

Q    And what comments were those?

A    I'm not aware of the specific comments.

Q    And did he refer to any other reason as to why he felt uncomfortable?

A    Not to my recollection.

Q    And what was the outcome of that concern expressed by the employee?

A    I don't remember the specific conversation I had with Steve.  I did bring it up and told him in an -- my general recollection of it is to keep the work about the work and leave any personal feelings or ideas outside the building.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

Q    And other than that, are you aware of any other complaints or concerns about Steven Baird during his employment?

A    Another instance that had happened after the masking, social distancing mandates came down is an employee was concerned that Steve was not following the masking rules or the 6-foot spacing guidelines that were mandated by the company, Leidos.

Q    And who was that employee?

A    His name is Robert Shannon.

Q    And did you speak with Steven Baird about that?

A    Yes, I did.

Q    And did Robert Shannon express any other concern in that conversation?

A    No.

Q    And what was your conversation with Steven Baird?

A    I don't remember specific words or terms, but the gist of the conversation was that we are to follow corporate mandating guidelines for mask and social distancing at all times.

Q    And did any concerns -- or strike that.

What was his response?

A    He was begrudgingly accepting of the direction.

Q    And after that, did you receive any other complaints or concerns about his compliance with masking

policies?

A    Not that I can recall.

Q    And do you recall approximately when Robert Shannon expressed that concern?

A    I don't recall specifically.  I believe it would have been at the beginning of 2021.

Q    And are you aware of any other complaints or concerns about Steven Baird?

A    Not specifically.

Q    Are you aware that there was an incident on approximately March 11th, 2021?

A    Yes.

Q    And what was the incident on March 11th, 2021?

A    I wasn't a witness to any part of the incident, but Steve came to me and said that he was involved in an altercation in the inventory stockroom.

Q    Did he use the word "altercation"?

A    No.  That's my term.

Q    Do you recall what his term was?

A    I do not.

Q    What else do you recall that he said to you?

A    I don't -- I don't recall him saying anything else.

Q    And what did you do after that?

A    I instructed him to return to the shop and

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

continue with his day, and I would go and speak to the manager of the inventory stockroom.

Q    And who was that?

A    His name is James Wilson.

Q    And was that the next step you took after you spoke with him?

A    Yes.

Q    And what was your conversation with James Wilson?

A    We discussed what had happened.  James Wilson heard the altercation evidently, and we decided that this was something that needed to be escalated to HR.

Q    And why did you decide that it should be escalated to HR?

A    Because it sounded like there was physical contact of some kind.

Q    And this was a decision that both you and James Wilson made together?

A    Yes.

Q    And so what happened after that?

A    I reached out to the HR representative, informed them that there was an incident.

Q    Which HR representative did you reach out to?

A    His name is Adam Johns.

Q    And did Steven Baird require accommodation at this point?

A    Not that I can recall.

Q    Did you ever, during Steven Baird's employment, hear anyone state that Steven Baird was racist?

A    Yes.

Q    Who did you hear state that Steven Baird was racist?

A    The Efren Ricardo that I referred to earlier.

Q    What did Efren Ricardo say?

MR. DEDDEH:  Objection.  Asked and answered.

BY MS. FLORES:

Q    You can respond.

A    Efren stated that he heard Steve making what he thought were racist comments in the lunchroom.

Q    And while Steven Baird was requiring accommodation in the form of limited lifting, did he appear to be injured?

A    I saw no indication of physical detriment or injury.

Q    And were you interviewed as part of the investigation of the incident on March 11th?

A    Yes.

Q    And who interviewed you?

A    The -- there was a review committee of some kind. I believe I spoke to Bob Ating [phonetic].  I'm not sure how you pronounce his name.  And I remember Katie Rice.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

BY MS. FLORES:

Q    Mr. Sim, you understand we're still -- you're still under oath?

A    Yes.

Q    Did Steven Baird receive any warnings during his employment?

A    Yes.

Q    How many warnings did he receive?

A    I believe there was one written warning and one or two verbal warnings.

Q    What was -- do you recall when the first warning was?

A    I don't recall specific dates.  It would have been in the 2019 time frame.

Q    Do you recall if there was a written warning first or a verbal warning first?

A    There were two verbal warnings first and a written warning was the third.

Q    What were the verbal warnings for?

A    They were all for inappropriate and unprofessional outbursts in the office space.

Q    What kind of inappropriate and unprofessional outbursts?

A    He tended to call reasonable direction asinine and stupid.

Q    Who did he say that to?

A    Me.

Q    What other inappropriate and unprofessional outbursts did he make?

A    Those were the only three that were directed at me that I'm aware of.

Q    Do you recall when you gave him a written warning?

A    I do not recall the specific dates.

Q    But they were all in 2019?

A    Probably pushed into 2020.

Q    Are you aware of any other warning that Steven Baird had?

A    From someone other than me?

Q    Yes.

A    No.

Q    Okay.

And was there an issue with leaving a mill unattended?

A    Yes.

Q    What was that issue?

A    It's a safety issue.

Q    And was Steven Baird leaving a mill unattended?

A    Yes.

Q    And when was that, approximately?

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

A        I don't recall the specific dates.

Q        And what was company policy with regards to attendance to mills?

A        It's listed at least twice in our machine shop guidelines that no machine is to be left running and unattended.

Q        And did Steven Baird raise an issue with regards to that rule?

A        Yes.

Q        And who did he communicate this to?

A        Initially it was myself.

Q        And what did he say?

A        He said the rule is asinine and stupid.

Q        And what was the next step after that?

A        We argued, and I told him that the safety guidelines must be followed without exception.

Q        And then what happened after that?

A        We escalated the issue to our division safety manager.

Q        And who was that?

A        His name is Jeff King.

Q        And what happened?

A        Jeff King visited the facility and agreed that all safety measures as spelled out in the guidelines are to be followed at all times.

Q    And did anything -- was that issue discussed again after that?

A    We developed a protocol to where if Steve felt he needed to leave the machine unattended and running, that we instigated a phone tree that anyone of the staff members, including myself, could come and be present when the mill was running.  But that was only to be used in lieu of stopping the machine.  The preference is to stop the machine.

Q    And are you aware of Steven Baird raising any other concerns during his employment?

A    No, not specifically.

Q    And before Steven Baird was terminated, did you ever recommend that he should be terminated?

A    No.

Q    And do you believe that Katie Rice and Robert Ating were involved in the decision to terminate Steven Baird?

A    I do believe that, yes.

Q    And do you believe that there were others involved as well?

A    I believe there are other committee members, yes.

Q    And why do you believe that there were other committee members?

A    I remember seeing other names on correspondence.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

A    No.

Q    And did you state that Steven Baird had difficulty managing emotions?

A    Did I state where?  I'm sorry.  In this testimony?

Q    As part of an observed behavior assessment?

A    Yes.

Q    And why did you state that he had difficulty managing emotions?

A    In my opinion, he did.

Q    And why is that?

A    His propensity to lash out and call reasonable direction asinine and stupid in the workplace.

Q    Any other bases for that?

A    He became agitated around other -- I wouldn't call them incidences, but other items, he became easily agitated.

Q    What other items?

A    One day, when the stock market was not doing well, he felt compelled to exit the building in a very frustrated manner.

Q    Okay.

        MS. FLORES:  I have no further questions.

        MR. DEDDEH:  I just have a couple of questions.

        MS. FLORES:  Okay.

EXAMINATION

BY MR. DEDDEH:

Q    Mr. Sim, can you provide us the timeline that led to your discussion with Mr. Baird and Mr. King regarding the mill?

A    Yes.  So I don't recall specific dates or times, but the timeline, the first safety issue I found is when I went into the shop and the mill was running and no one was attending the shop.  The shop was completely empty.  That was the first time I had seen a machine left unattended.

Q    And who left the machine unattended?

A    Steven Baird.

Q    And what happened next?  What was the next step?

A    So I waited, made sure that the machine was operating safely and not in any catastrophic danger, and it was fine.  It was near the end of its run.  I waited until Steven Baird returned to the machine shop so I could be there and not leaving it unattended.

Q    And then what happened?

A    And then -- so then we discussed the safety guidelines and how the machine cannot be left unattended, and Steve became very agitated, called the direction asinine and stupid, and then we escalated it to Jeff King's attention to come to a resolution.

Q    And who escalated it?

A     I did, initially.

Q     And then that was the conversation with Jeff King and Mr. Baird where you decided to implement the phone tree -- is that correct? -- that you spoke about earlier?

A     So the phone tree came after the meeting with Jeff King.  So Jeff King came over.  We met in the shop. We outlined everything that we -- what we understood about the machine, how it really is not an autonomous to be running CNC mill, and then the phone tree was implemented. If he had to leave the shop for any reason, he was to call a body.

Q     Okay.

        MR. DEDDEH:  I don't have any further questions.

        MS. FLORES:  Okay.

        THE COURT REPORTER:  Mr. Deddeh, do you need a copy of the transcript?

        MR. DEDDEH:  Yes, please.


        (PROCEEDINGS CONCLUDED AT 10:06 A.M.)

                        * * *

CERTIFIED STENOGRAPHIC REPORTER'S CERTIFICATION

I, SHIRLEY Q. CASILAN, a Certified Shorthand Reporter licensed in the State of California do hereby certify:

That prior to being examined, JOHN SIM, the witness named in the foregoing proceedings, was by me duly sworn;

That said proceedings were taken before me at the time and place set forth therein and was stenographically reported by me; that said proceedings are a full, true, and correct transcript of my shorthand notes so taken; that the dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way financially interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 2nd day of March 2023.

SHIRLEY Q. CASILAN, CSR
CA CSR No. 12361
WA CSR No. 3443
Expiration Date:  4/2023