# EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STEVEN BAIRD, | ) | Case No. |
| | ) | 3:22-cv-00060- |
| Plaintiff, | ) | LL-BGS |
| | ) | |
| vs. | ) | |
| | ) | |
| LEIDOS, INC., a Delaware | ) | |
| corporation; and DOES 1-99, | ) | |
| inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

REMOTE DEPOSITION

OF

JAMES WILSON

FEBRUARY 21, 2023

Reported by:
Christine Bemiss, RPR
CA CSR No. 10082, AZ CR No. 50073

Job No. 536416

counsel, did you discuss this deposition with anyone?

A.    No.

Q.    Okay.   And who is your current employer?

A.    Leidos.

Q.    Since when have you been working with Leidos?

A.    Since March of '02.

Q.    What is your current position?

A.    Warehouse traffic manager.

Q.    And how long have you held that position?

A.    About seven years.

Q.    And what are your responsibilities as warehouse traffic manager?

A.    Take care of all the receiving, shipping and orders pulled for production.

Q.    And how many people do you supervise?

A.    I have six on my team right now.

Q.    And who do you report to?

A.    Louie Reyna.

Q.    And what is his position?

A.    He is the director of supply chain.

Q.    And the people that you supervise, are they employees?

A.    Yes.   I have temporary employees and permanent employees.

Q.    Okay.   And what is your highest level of

education?

A.   High school.

Q.   Okay.  And do you have any certifications?

A.   Yes, forklift certification, and that's about it.

Q.   Okay.  No other certifications?

A.   No.

Q.   Okay.  And are you familiar with Steven Baird?

A.   Yes.

Q.   Do you recall when you first met Steven Baird?

A.   Not when I first met him, but while he was working here.

Q.   How often did you interact with Steven Baird while he was employed by Leidos?

A.   Probably about two to three times a week, just passing by, saying hi.

Q.   Did you work on a project together?

A.   Not specifically, no.

Q.   Did your team work with the mechanical engineering department on a project?

A.   Sometimes we would assist them maybe moving pallets or freight.

Q.   How often would that happen during the time

that Steven Baird was employed?

A. My team could help them at least once, twice a week.

Q. And was it that both members of the mechanical engineering department and members of your team together were moving these items?

A. Yes.

Q. Okay. And what was your understanding of Steven Baird's responsibilities?

A. He worked in our machine shop. He'd work on prototype items.

Q. What do you mean?

A. He could be reworking material. So if items come in and maybe the depth of the holes weren't right or the size of the holes weren't right, he would do rework on those items and make them fit for production without us sending them back to the supplier.

Q. What was your understanding of Steven Baird's political beliefs?

A. I'd say he was very anti-Trump, from what I heard.

Q. That Steven Baird was very anti-Trump?

A. Yeah.

Q. Who did you hear that from?

A. I would hear that from personnel on my team.

Leidos?

A. I don't recall exactly when, but I believe it was during sometime late 2020, mid to late 2020.

Q. And until when did he work with Leidos?

A. Till the incident happened with Mr. Baird.

Q. And how often did you interact with Cooper Garner?

A. On a daily basis.

Q. And what were Cooper Garner's responsibilities?

A. His main responsibilities were putting away inventory and pulling manufacturing orders for the production floor.

Q. And was he employed by another entity?

A. Yes. He was employed by Insight Global, I believe is the name of the temp agency.

Q. And does Leidos often work with Insight Global to --

A. Yes.

Q. -- for temporary employees?

A. Yes. Among many others, but Insight Global's one of the main ones.

Q. And how long was Cooper Garner's employment supposed to last?

A. It was temp-to-perm, so depending on how his

performance was, could have possibly been a permanent employee after his temp position.

Q.   And while Cooper Garner was employed, did you receive any complaints about him?

A.   Not that I recall, no.

Q.   During his employment and prior to March 10th, 2021, did he make any complaints or raise any concerns to you?

A.   Not that I recall.

Q.   And prior to March 10th, 2021, did you have any concerns about Cooper Garner?

A.   No, not that I recall.

Q.   And what was your understanding of Cooper Garner's political beliefs?

A.   I'm not sure.

MR. DEDDEH:  Objection; irrelevant.

Q.   (BY MS. FLORES)  And prior to March 10th of 2021, did you receive any complaints about Steven Baird?

A.   I have heard that he will go into your area and discuss, you know, like, political views and kind of tick people off.

Q.   And this -- you had heard this prior to March 10th of 2021?

A.   After.

Q.  Were you aware of any other reason as to why he was on medical leave?

A.  No.  I thought that was the main reason why.

Q.  Okay.  And when you were -- strike that.

Were you aware that he had work restrictions when he came back to work?

A.  I think most people would in that case.

Q.  But were you aware as to whether he had work restrictions when he returned?

A.  No.  He wasn't under my responsibility.

Q.  And when you saw him back at work from medical leave, did it seem as though he was injured or in any pain of any kind?

A.  No.  He seemed like he recovered at that point.

Q.  Do you remember seeing him lift any heavy items after he came back to work?

A.  No.

Q.  And did your team sometimes help Steven Baird with --

A.  Yes --

Q.  -- lifting?

A.  -- yes.

Q.  How often did your team help Steven Baird with lifting items?

A.   Maybe once a week.

Q.   Okay.  Prior to March 10th, 2021, had anyone raised any concerns to you about Steven Baird?

A.   No.

Q.   Okay.  And what happened on March 10th, 2021?

A.   You mean with the incident between him and Cooper?

Q.   Yes.

A.   Are you referring to that?

Q.   Yes.

A.   Actually, I was taking my lunch break, and I ended up hearing an argument going on, and I got up to go see what was going on.  And in our warehouse, we have a lot of racking and pallets, so my vision wasn't directly clear.  I was able to see from their waist down that I could tell that two people were really close together, like in each other's face.

And as I was walking over there, I ended up seeing one person get shoved back.  And as I got closer, I was able to go around the rack, and I witnessed Mr. Cooper and Mr. Baird -- it looked like they were in an argument.

Q.   Approximately how far away were you from Steven Baird and Cooper Garner when you first heard the argument?

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

A.  I'd say probably about 400 feet but not direct line of sight because we have cubicle walls, crates, and pallets in between.

Q.  You said that you were taking your lunch.  Were you in a lunchroom?

A.  Yeah, we have a little break area in our cube, in our cube section.

Q.  Did you have to go through a doorway in order to get closer to them?

A.  No.  I did have to walk through the cube section, which is away from the direction.  Because when I heard them, they were behind me.  I would have to walk through the cube area, around all the pallets and crates, and go towards the section that they were at.

Q.  And do you recall hearing anything specific when you heard the argument?

A.  Nothing specific.  I was actually on my phone, taking my break, so I wasn't able to tell what words were being said.

Q.  So you said that you could see from the waist down that one person shoved a second person?

A.  Yes.

Q.  And could you tell who shoved who?

A.  I couldn't tell until I walked around the rack section, and I could tell Cooper was closer to me, and

the person that I saw get shoved was on the right side of that.  So that was -- I could tell Steve was the person being pushed.

Q.  And so what happened when you got closer?

A.  I separated them, and I had Steve go back to his area, which is a separate caged area from our warehouse.  So I was able to separate them, have Steve go back to his work area, and then I took Cooper with me and we -- I just separated them so they wouldn't get into an altercation any further.

Q.  So how close were they when you arrived?

A.  Extremely close when I was walking up, until the shove happened.  They were in chest-to-chest at that point.

Q.  Okay.  So they were chest-to-chest, and then the shove happened, and then you arrived after the shove?

A.  Yeah.  'Cause as I was walking over there, I saw the separation of them, so the shove just happened, and I was able to get there and separate them after that.

Q.  And so after the shove happened, did they get close again?

A.  No.  I think they were astonished that I came up, and they -- somebody was witnessing what was going

JAMES WILSON
FEBRUARY 21, 2023

on.  So they both kind of separated without any further altercation.

Q.  Okay.  So they didn't -- they didn't get close again after the shove?

A.  Correct.  Yes.

Q.  And at that time did you have reason to believe that Steven Baird had shoved Cooper Garner?

A.  No, just 'cause the way they were facing.

Q.  And, sorry, you said that you had Steve Baird go back to his area, which was where?

A.  There's a separate gated area inside our warehouse, which is the machine shop where he worked.

Q.  And you took Cooper Garner with you where?

A.  Sorry, could you repeat that?  It was cutting out a little bit.

Q.  You took Cooper Garner where?

A.  Back to our cube area where I was having lunch.  His cube is actually right next to the lunch area as well.

Q.  And what happened after that?

A.  We discussed what happened.  He told me that Steve was making fun of the way he was dressed, something about his beanie that he had on.  And I believe Cooper got pretty heated about the conversation they were having.  Seemed like Steve was antagonizing

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

him.  I don't believe Cooper would just push him for no reason at all.

So from that explanation from Cooper's point of view, he ended up pushing him to get him away from him.

Q.  Did Cooper say anything else about what Steven Baird said, other than that he was making fun of the way he was dressed?

A.  No, I believe that was all I recall.

Q.  And what happened after that?

A.  I ended up sending Cooper home, and I went and addressed Mr. Baird's manager, let him know the situation that I saw.

Q.  Do you mean John Sim?

A.  Yes, Mr. Sim.

Q.  And what did you say to him?

A.  I told him that I witnessed an altercation between his employee and mine, and I explained that -- what I saw and that I separated them.  And I also let my manager know as well.

Q.  Who was your manager at the time?

A.  Mr. Colmer, Craig Colmer.

Q.  And what did you say to Craig Colmer?

A.  I told him what I witnessed between Mr. Baird and Mr. Cooper.

Q.  Did you say the same thing to Craig Colmer that

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

you did to John Sim?

A.   Yes.

Q.   And what did John Sim say before you went to Craig Colmer?

A.   He said, "Can you send me an email, document what you saw" so they can report it to HR.

Q.   And did you send that email?

A.   Yes.

Q.   Did you send the email before speaking with Craig Colmer or after?

A.   I believe it was within the same day.  It was after I talked to -- I talked to John Sim first, and then I talked to Craig, and then I sent the email.

Q.   And what was Craig Colmer's response to your report?

A.   His was the same, we need to document it and submit to HR.

Q.   And who did you send the email to?

A.   Mr. Sim.

Q.   Did you send it to anyone else?

A.   Let me see.  I think I just sent it to -- hold on.

I sent it to both my manager and Steve's manager.  So John Sim and Craig Colmer.

Q.   And at that time did you have any reason to

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

believe that Cooper Garner was upset with Steven Baird beyond his comment about his appearance?

MR. DEDDEH:  Objection; speculation.

THE WITNESS:  Not sure.

Q.  (BY MS. FLORES)  Sorry, was it that you're not sure of what I was asking, or you're not sure --

A.  Not sure if Cooper had any other issues with Steve before that.

Q.  Okay.  And after sending the email, did you report the incident to anyone else?

A.  No.

Q.  And when was the next time that you heard anything about the incident?

A.  When HR investigated it.

Q.  So someone contacted you?

A.  Yes.

Q.  Who contacted you?

A.  Leidos HR.

Q.  Who in Leidos HR?

A.  I don't recall.

Q.  Would it have been Adam Johns?

A.  Adam John is our direct HR here within our Vista facility, but this was our corporate investigation as well.

Q.  Okay.  So could it have been Robert Athing?

initial phone call about Steven Baird?

A.  Not that I recall.

Q.  And so after you made the report about what you saw, you said that someone told you that Steven Baird would sometimes go to someone's desk to talk about politics?

A.  Ian's desk.

Q.  Do you recall when your conversation with Ian took place?

A.  No.

Q.  What did Ian say?

A.  I don't recall exactly the conversations.

Q.  Do you recall how often Ian claimed that Steven Baird would go to his desk?

A.  No.

Q.  And did you hear any complaints after March 10th, 2021, about Steven Baird?

A.  Not that I recall.

Q.  Did anyone inform you that Steven Baird was terminated?

A.  Yes.  I found out through John after.

Q.  Through Adam Johns?

A.  No, John Sim.

Q.  What did John Sim say?

A.  That he had to let him go.

Q.  What else did he say?

A.  That's all that I recall.

Q.  Who made the decision to terminate Cooper Garner?

A.  I did.

Q.  And why did you decide to terminate Cooper Garner?

A.  I don't feel anybody should put hands on somebody else at the workplace, so I couldn't trust him going further.

Q.  And do you believe that Steven Baird should have been terminated?

MR. DEDDEH:  Objection; legal conclusion, speculation.

THE WITNESS:  It's not my call for him.

Q.  (BY MS. FLORES)  And during your 15-minute -- 10- to 15-minute conversation with HR, did you give a recommendation for termination?

A.  No.

MR. DEDDEH:  Objection; vague.

MS. FLORES:  Okay.  I'm just gonna ask for five minutes, but I don't have many more questions left.

MR. DEDDEH:  Okay.

MS. FLORES:  Yeah.

MR. DEDDEH:  So come back 3:05?

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

REPORTER'S CERTIFICATE

I, Christine Bemiss, a Certified Shorthand Reporter of the State of California and Arizona, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings were made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  MARCH 6, 2023

_____
Christine Bemiss, RPR,
CA CSR No. 10082
AZ CR No. 50073