# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD,                          )   Case No.
                                       )   3:22-cv-00060-
                    Plaintiff,         )   LL-BGS
                                       )
            vs.                        )
                                       )
LEIDOS, INC., a Delaware               )
corporation; and DOES 1-99,            )
inclusive,                             )
                                       )
                    Defendants.        )
_____)

REMOTE DEPOSITION

OF

AARON VALERA

FEBRUARY 21, 2023

Reported by:
Christine Bemiss, RPR
CA CSR No. 10082, AZ CR No. 50073

Job No. 536415

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.   What were your job duties?

A.   Forklift operation, inventory management, cycle counts, material handling.  Basic warehouse operations.

Q.   As a temp, were you paid directly by Leidos or the other company?

A.   The other company.

Q.   In 2019 when you became a direct employee with Leidos, did your job title change?

A.   No.

Q.   Did any of your job duties change?

A.   No.

Q.   What's your current position?

A.   Material specialist.

Q.   In 2017 when you started, were you -- did you work with Mr. Baird at all?

A.   Not directly.

Q.   In 2017, where was Mr. Baird working?

A.   He was the fabrication person.  He helped with the engineering side of the -- of Leidos.

Q.   Do you remember what his job title was?

A.   No, I do not.

Q.   Do you know -- do you remember where his work station was?

A.   Yes, I do.

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.  Where was his work station?

A.  It was right next -- it's connected into the warehouse, but it's been -- it's gated off.

Q.  Did Mr. Baird start before -- sorry, strike that.

Did you start at Leidos before or after Mr. Baird?

A.  Before.

Q.  And when Mr. Baird first started, did he replace another employee, or was that an open position, as far as you know?

MR. DEDDEH:  Objection; speculation.

You can answer.

THE WITNESS:  I don't know for sure.

Q.  (BY MR. MYONG)  Did he take over someone's work station, or did they set up a new work station for him?

A.  The work station was already there prior to him.

Q.  Was someone else using that work station before Mr. Baird?

A.  I don't know.  Before him, I don't remember who was there.

Q.  When Mr. Baird started, how often did you interact with him?

within our -- like, between me and him, it was just always me and him.

Q.   Did you ever socialize with Mr. Baird outside of work?

A.   No.

Q.   When you became a direct employee, did you have any concerns or complaints about Mr. Baird?

A.   No.

Q.   When did Mr. Ian Arroyoavila start working at Leidos?

A.   Before I did.

Q.   What was his position?

A.   I'm not entirely -- I know he was in shipping, but I don't know his -- if his position was material specialist, like us, or shipping, so...

But I know he was in shipping.

Q.   Is he still currently employed with Leidos?

A.   No.

Q.   When did he leave Leidos?

A.   I wanna say prior to COVID.

Q.   So before 2020?

A.   I believe so.  I'm not entirely sure, though.

Q.   Do you know why he left?

A.   From my understanding, he got a new job.

Q.   How often did you interact with

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

station that would show his political beliefs?

A.   No.

Q.   Anything on his vehicle?

A.   No.

Q.   Did he ever wear anything that showed his political beliefs?

A.   No.

Q.   You're familiar with the event that took place in Washington, D.C. on January 6th?

A.   Was that the -- how you say -- insurrection?

Q.   Insurrection.

A.   Yes, I am familiar with it somewhat.

Q.   Did you ever hear Mr. Baird say he was going to attend the insurrection?

A.   He did mention that he would like -- would like to, I guess.

Q.   What do you recall Mr. Baird saying about attending the insurrection?

A.   That he would like to be there and be a part of it.

Q.   Be a part of it how?

A.   Just to be there, I guess, you know, to be there and do what everyone else is doing.

Q.   At the time did you think it was more of a rally, or did you have some sort of understanding that

Q.  Did Mr. Baird ever complain about Mr. Garner?

A.  Yes.

Q.  What complaints did Mr. Baird have about Mr. Garner?

A.  Just saying that he's young and kind of a know-it-all or a -- someone that's -- how would you say -- very hot-tempered or thinks, like, they're a lot bigger than what they think they are.  You know, a lot more important than what they think they are, I guess I should say.

Q.  Did you think that Mr. Garner was hot-tempered?

A.  I think he could be, yes.

Q.  Did you ever see an example where Mr. Garner lost control of his temper?

A.  No.

Q.  Did you think that Mr. Garner thought he was more important than he really was?

A.  I thought he was a young kid that, you know, any young 20-year-old would hold himself to be.

Q.  Do you remember that there was a fight or some sort of physical altercation between Mr. Garner and Mr. Baird?

A.  I do remember.

Q.  Did you observe the altercation?

A.   Partially.  I didn't visually see the whole thing.  I heard bits and parts of it.

Q.   Do you remember if it was one altercation or many?

A.   I think there was no altercation prior to the main one.

Q.   What did you observe or hear regarding the main altercation?

A.   I observed them kind of, you know, in each other's faces and arguing about whatever it is they were arguing about and saying profanities towards each other and egging each other on.

Q.   Do you remember who -- strike that.

Do you recall how the main altercation started?

A.   I don't know what exactly happened.  From what I heard, I can speculate, but that's about it.

Q.   What did you hear?

A.   So I heard that Cooper was wearing a beanie that day, and I heard that Steve Baird went to Cooper and said, "Hey, Home Alone Bandit," referencing Joe Pesci in Home Alone, 'cause he wore a beanie in the movie.

And I guess Cooper did not like that at all, and that kind of set him off, and so that's when the whole confrontation started.

Q.  Who told you that, or where did you hear that from?

A.  I think I heard that from Steve and Cooper.

Q.  Do you remember the sequence of how that happened?  Did Mr. Baird make that comment and then things turned physical, or did Mr. Baird make that comment and then there was an incident later?

A.  I think Steve Baird made that comment, and then they were kind of in each other's faces, and then they broke apart for a little bit, and then they came back at each other, and then that's when a physical altercation happened.

Q.  Do you know how much time passed between the first comment?

A.  It had to have been, like, maybe a matter of minutes.

Q.  Is that based on your observations or what you heard?

A.  It's based on my observations 'cause I was working in that area, and I remember seeing them kind of arguing, and then they kind of separated.  And then as I was working, I guess they kind of got -- I didn't see Steve go back there, but I guess Steve went back towards Cooper.  And then I was coming around the corner, and then that's when kind of like the physical altercation

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

happened.  And that's when me and James Wilson kind of had to, you know, tell them to, you know, break apart and go their separate ways.

Q.  Did anyone else observe it besides yourself and Mr. Wilson?

A.  No.

Q.  Did you see from your viewpoint who started the physical altercation?

A.  I did not see physically myself.  I just -- I heard what happened.

Q.  What did you hear?

A.  I heard that Steve and Cooper were in each other's faces, and then Cooper pushed Steve and said -- I think he said, you know, "Get out of my face," and then that's when me and James Wilson kind of got in the middle and said, "Hey, you guys need to separate.  You guys need to cool off."

Q.  Do you know if Laird -- sorry.  Strike that.

Do you know if Leidos has any workplace violence rules?

A.  I know they do.

Q.  Do you know what the normal response is supposed to be when there's a physical altercation between co-workers?

A.  I do not --

Q.  After the altercation, was there any type of training or meeting?

A.  I believe there was a small meeting between just the main warehouse of saying, you know, how to -- you know, just to keep your cool and to -- when you have problems with someone, to notify, you know, direct management or HR.

Q.  Did they tell you what the consequences would be if there was an altercation?

A.  I think -- I'm pretty sure they mentioned it, but I think it's well understood that, you know, if you do get in a physical fight at work, then it is gonna become -- you will be terminated.

Q.  Do you think it was fair that Mr. Baird was terminated as a result of the altercation?

MR. DEDDEH:  Objection; legal conclusion, speculation.

THE WITNESS:  That's -- I don't know.

Q.  (BY MR. MYONG)  I'm just asking for your opinion.  Do you think it's fair?

MR. DEDDEH:  Objection; irrelevant.

THE WITNESS:  I refuse to answer.

Q.  (BY MR. MYONG)  Unfortunately, you can't refuse to answer.

A.  I don't know.  It's subjective, so -- yes and

towards Mr. Garner were meant to be derogatory?

A.  I'm not sure.  I don't know of what comments he would have made that were derogative.

Q.  Did you ever hear any comments that Mr. Baird made towards Mr. Garner that you thought were derogatory?

A.  During the altercation, they were both saying derogative words to each other.

Q.  Before that.

A.  No.

Q.  During the altercation, what kinds of profanities were they exchanging?

A.  They were mostly using the word "pussy" towards each other, calling each other a pussy.

Q.  Anything else?

A.  That was the only words I heard.  You know, they could have said other ones.

Q.  Did you hear them use any cuss words?

A.  Maybe "asshole" or "fucker."

Q.  Do you know if Mr. Baird made any of those statements?

A.  I'm sure he -- yes, I believe -- I know he used "pussy," but I don't know if he used any of the other words.

Q.  Do you believe that Mr. Baird instigated the

altercation?

A.   Yes.

Q.   Why?

A.   'Cause Mr. Baird is -- doesn't back down from an altercation or challenge, I guess, or a debate or, you know, whatever it's gonna be.

Q.   Besides Mr. Arroyoavila, did anyone else complain about Mr. Baird?

A.   Michael Angelo Veneracion, Ricardo Loza, maybe James Wilson.

Q.   What were Mr. Wilson's complaints about Mr. Baird?

A.   That he was too loud and maybe too political.

Q.   What do you mean by "too loud"?

A.   Just a loud person in general, you know, how he talks and how he, you know, kind of just talks to everyone and asks, you know, questions that are maybe not questions you should be having in the workplace.

Q.   What kinds of questions?

A.   Political questions.

Q.   Do you know Mr. James Wilson's political beliefs?

A.   No, I do not.

Q.   Have you ever discussed politics with Mr. Wilson?

in the workplace?

A.  Maybe weekly or monthly.  He didn't go out of his way to talk to you about them.

Q.  Did you find any of Mr. Baird's political beliefs offensive?

A.  No.

Q.  Did he ever threaten anyone regarding his political beliefs?

A.  No.

Q.  Did he ever threaten violence?

A.  No.

Q.  Was he usually just pro right wing, or did he make derogatory comments about the left wing?

A.  He was just pro right wing.  And I guess he would say, like, the left wing people are stupid or just wrong.

Q.  Did he ever threaten violence against left wing political belief holders?

A.  No.

Q.  Did you ever hear Mr. Baird threaten to shoot President Biden?

A.  No.

Q.  Do you know if anyone else ever reported that Mr. Baird threatened to shoot Mr. Biden -- President Biden?

A.   I believe Ian Arroyoavila reported that.

Q.   How do you know that?

A.   Heard through the grapevine.

Q.   Do you know specifically what Mr. Arroyoavila said?

A.   Pretty much what you said, that he was gonna go shoot President Biden.

Q.   Do you know if that's a statement that Mr. Baird made, or is that something that Mr. Arroyoavila believed that Mr. Baird was capable of doing?  Do you know the contents --

A.   That is --

Q.   -- of that?

A.   That is a statement that Ian made that he believes that Mr. Baird said to him.

Q.   Do you know when that statement was supposed to have been made?

A.   Sometime after the insurrection and maybe Mr. -- President Biden's presidency.

Q.   Did Mr. Baird make that -- ever make that statement to you?

A.   No.

Q.   Does that sound like a statement that Mr. Baird would have made to Mr. Arroyoavila?

A.   Possibly.

Q.   Does that sound like a statement that Mr. Baird would make just as part of his normal political speech?

A.   No.

Q.   Why do you believe that Mr. Baird may have said that to Mr. Arroyoavila?

A.   'Cause they're both on opposite sides of the political spectrum, and their debates could get heated, and I believe that Mr. Baird can, you know, say things in the heat of the moment just to maybe egg someone on or just to make someone upset, I guess.

Q.   Do you know if Mr. Arroyoavila was ever written up for political speech?

A.   I do not.

Q.   Do you know if Mr. Baird was ever written up for political speech?

A.   I do not.

Q.   Do you know if Mr. Ricardo Loza was ever written up for political speech?

A.   I don't think so.

Q.   Have you ever been written up at work?

A.   No, I haven't.

Q.   Do you know if there's a formal process?

A.   I do not know if there's a formal process or not.

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

REPORTER'S CERTIFICATE

I, Christine Bemiss, a Certified Shorthand Reporter of the State of California and Arizona, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings were made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  MARCH 6, 2023

_____
Christine Bemiss, RPR,
CA CSR No. 10082
AZ CR No. 50073