Alan Romero (SBN 249000)
Robert S. Myong (SBN 262097)
Elizabeth Villarreal (SBN 327937)
Email: private@romerolaw.com
ROMERO LAW, APC
251 S. Lake Avenue, Suite 930
Pasadena, CA 91101-4873
Telephone: (626) 396-9900
Facsimile: (626) 396-9990

Attorneys for Plaintiff
STEVEN BAIRD

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BAIRD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>LEIDOS, INC., a Delaware; and DOES 1-99, inclusive;<br><br>Defendants. | Case No.:  3:22-cv-00060-LL-BGS<br><br>**PLAINTIFF STEVEN BAIRD'S APPENDIX OF EVIDENCE IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>*Assigned to: Judge Linda Lopez*<br>*Referred to: Magistrate Judge Bernard G. Skomal*<br><br>Hearing Date: April 27, 2023<br>State Complaint filed:  November 30, 2021<br>Trial Date: None Set |

1

**PLAINTIFF STEVEN BAIRD'S APPENDIX OF EVIDENCE**

CASE NO.: 3:22-cv-00060-LL-BGS

Plaintiff STEVEN BAIRD ("PLAINTIFF") submits this Appendix of Evidence in Support of his Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication.

## APPENDIX OF EVIDENCE

| Exhibit No. | Description of Evidence |
|---|---|
| 1. | Declaration of Steven Baird and Exhibits<br><br>Ex. A:  2019 Performance Review<br><br>Ex. B:  2020 Performance Review<br><br>Ex. C:  Feb. 2021 Work Restrictions |
| 2. | Declaration of Alan Romero<br><br>Ex. D:  Deposition of John Sim<br><br>Ex. E:  Deposition of James Wilson<br><br>Ex. F:  Deposition of Aaron Valera<br><br>Ex. G:  Deposition of Robert Athing |

**ROMERO LAW, APC**

**Dated: April 13, 2023**

**Alan J. Romero (SBN 249000)**
**Robert S. Myong (SBN 262097)**
**Elizabeth Villarreal (SBN 327937)**
**Attorneys for Plaintiff**
**STEVEN BAIRD**

# EXHIBIT 1

Alan Romero (SBN 249000)
Robert S. Myong (SBN 262097)
Elizabeth Villarreal (SBN 327937)
Email: private@romerolaw.com
ROMERO LAW, APC
251 S. Lake Avenue, Suite 930
Pasadena, CA 91101-4873
Telephone: (626) 396-9900
Facsimile: (626) 396-9990

Attorneys for Plaintiff
STEVEN BAIRD

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BAIRD, an individual,<br><br>                    Plaintiff,<br><br>     vs.<br><br>LEIDOS, INC., a Delaware; and DOES 1-99, inclusive;<br><br>                    Defendants. | Case No.:  3:22-cv-00060-LL-BGS<br><br>**DECLARATION OF STEVEN BAIRD'S IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>*Assigned to: Judge Linda Lopez*<br>*Referred to: Magistrate Judge Bernard G. Skomal*<br><br>Hearing Date: April 27, 2023<br>State Complaint filed:  November 30, 2021<br>Trial Date: None Set |

**1**
**DECLARATION OF STEVEN BAIRD**

Case No.: 3:22-cv-00060-LL-BGS

## DECLARATION OF STEVEN BAIRD

I, STEVEN BAIRD, hereby declare:

1.      I am the Plaintiff in this instant action. I have personal knowledge of the foregoing facts and if called upon as a witness, I could and would testify competently thereto.

2.      I was born in Canada and grew up in California. I have worked hard throughout my life and held long term employment throughout. I am purpose driven and care about civic duty. I worked as a firefighter in Santa Maria for many years.

3.      On November 26, 2018, I began working at Leidos as a machinist. I worked hard, I was reliable, and I was competent. There was never any issue with my work product or capabilities.

4.      In late 2019, I was verbally counseled by my manager John Sim because comments I made in the lunch room were perceived to be racist and offensive to one of my co-workers. I had expressed my support for securing our borders and that I believed people should migrate to this country through legal channels rather than illegally.

5.      The comment offended one of my co-workers, Efren, but I meant no offense. I understand that an opposition to illegal immigration is often perceived as racist because people equate being against illegal immigration with being racist against people of color. I am against illegal immigration but against any group of people.

6.      Following my verbal counseling, I did not discuss immigration with Efren. Efren and I got along and did our jobs. I never heard anything about it until I was suspended some 16 months later.

7.      The immigration comment did not come up in performance review that occurred not long after. I received good performance reviews during my employment. There is nothing in my performance review about intimidation, bullying, making people feel uncomfortable or hostility. In my 2020 performance review, given to me in early 2021, I received a "valued performance" in the Behaviors category. A true and correct

copy of my 2019 performance review is attached as **Exhibit A**. A true and correct copy of my 2020 performance review is attached as **Exhibit B**.

8.    Leidos manufacturers and produces x-rays for border security to detect human smuggling, drug smuggling, dirty bombs, nuclear bombs, weapons, illicit contraband. Leidos also does the airport body scanners. The reality is we were working for a company that kept our nation's borders secure.

9.    I am not aware of any Leidos policy that prohibits discussing politics at work. I was never told I could not talk about politics at works.

10.    I did talk politics perhaps once a week or so. My talking politics never got in the way of me doing my work. I mostly talked to Ian Arroyoavila. I am a Republican and have a conservative orientation and Mr. Arroyoavila is a Democrat and has a liberal orientation. Our conversations were always civil, they were never heated. I enjoyed talking politics with Mr. Arroyoavila. For the most part, we had substantive discussions. There was some good-natured ribbing to each other as well. Mr. Arroyoavila never told me he was offended by me.

11.    I did not bully or antagonize co-workers, or make racist and inflammatory comments. In the four years I worked there, one person, Efren, as discussed above, complained about being uncomfortable with my comment about immigration and that was it.

12.    Insofar as something that actually could be inflammatory, such as the alleged comment that I would put a bullet in President Biden's head, I never said that. I never said I wish there was a different outcome at the Capital riots. I was extremely disappointed with the actions of the rioters. I told Mr. Arroyoavila that I did not support the rioters.

13.    In our discussions, I did tell Mr. Arroyoavila that I wished Mr. Trump had won the 2020 election. We both discussed the country going down the wrong path but we both felt it was for different reasons. It was election time in a divided country, many people were talking about these issues, the entire company was talking about it. It is the

**3**
**DECLARATION OF STEVEN BAIRD**

Case No.: 3:22-cv-00060-LL-BGS

business the company is in - border security, funding, budgets, whether a wall would be built. The outcome was important to Leidos and its employees because it would determine to an extent our budgets, funding, and projects the company worked on.

14.    I was written up only once in four years, around September 2020. That was a single issue and resolved. It never was an issue again. Leidos had purchased an automated machine. I left my station to do other work. Mr. Sim, my boss, counseled me and told me I shouldn't leave the station with the machine running, it violated our rules.

15.    I told Mr. Sim the rules should be updated. Most of the machines we had were manual machines that required hands-on operation. Thus, the rule made sense in that regard. However, Leidos had purchased this automated machine. The purpose of an automated machine, among others, is that it did not require a person to manually operate it, saving the company costs and labor time. I was actually only being productive. Mr. Sim disagreed.

16.    I listened to Mr. Sim and he listened to me. Along with Jeff King, the safety officer, we came up with an outcome that was satisfactory and I never left an automated machine unattended thereafter.

17.    On or about late December 2020, I learned I needed to have a medical procedure on my heart, specifically an ablation. My understanding from the doctors was I would need time to recover from the surgery. The surgery was scheduled for early February 2021.

18.    I informed Mr. Sim that I would be having heart surgery and needed time off. I qualified for medical leave and initially scheduled medical leave for the day of the surgery and the following week to recover from the surgery.

19.    On January 18, 2021, I suffered a broken arm when I stopped to aid a driver that was having a medical emergency. The person had crashed their car. I am retired firefighter and medic. I went to assist the person and once inside their car, the driver accidentally accelerated, hit a wall, breaking my arm.

**4**
**DECLARATION OF STEVEN BAIRD**

20.     Because my arm was broken, I needed time off for it to heal. I could barely move my right arm. I contacted Leidos and changed the dates of my medical leave to January 19, 2021 to February 22, 2021. I underwent heart surgery as planned in early February 2021.

21.     In late February 2021, I returned to work. My right arm was in a sling. I had restrictions that stated "no reaching above the right shoulder" and "no lifting, carrying, pushing, pulling, more than 0 pounds." A true and correct copy of my work restrictions are attached as **Exhibit C**.

22.     My regular job duties require lifting between 20 and 50 pounds. Leidos did allow other employees to help me when I requested help lifting heavy items. There were times employees were unavailable and I waited and waited. Getting help did slow work on occasion.

23.     I sometimes greet co-workers in jest, such as, "hey Denver Bronco" if the co-worker is always wearing a Denver Broncos hat. On March 10, 2021, I greeted Cooper Garner as "Hey Home Alone bandit guy." Mr. Garner was wearing a beanie and it reminded me of Joe Pesci's character in the movie. Mr. Garner gave me a look and I left him alone.

24.     Our workstations were next to each other, separated by a chain link fence and gate that I had the keys to. There would be days I never had to go through the gate, and sometimes there were days I had to go through the gate 20 times or so. It just depended on what needed to get done. I would also have to go through the gate to use the restroom.

25.     Around noon, several hours after I had greeted Mr. Garner, I had to obtain materials, requiring me to go through the gate and past Mr. Garner's workstation. I went through the gate and started walking through the area. Mr. Arroyoavila was not present.

26.     When I stepped into the area, Mr. Garner came up to me fast. Mr. Garner was agitated, upset and aggressive. Mr. Garner rolled up his sleeves, he is heavily

**5**
**DECLARATION OF STEVEN BAIRD**

tattooed, he accused me of repeating the Home Alone comment to James Wilson, his supervisor. I had not. I had not discussed the comment with anyone.

27.    Mr. Garner got face to face with me. I did not lay a hand on Mr. Garner. My arm was in a sling. At no point did I chest bump him. Mr. Garner gave me a two-handed shove, I stumbled backwards into shelving. Mr. Garner started screaming at me and at that point I shouted back to him, we exchanged some words. I then told him words to the effect of "you just assaulted me, you're going to get fired."

28.    I turned around and started walking to go report the assault to Mr. Sim. That is when Mr. Wilson approached us both, he told Mr. Garner to calm down. I told Mr. Wilson that I was going to report the workplace assault to Mr. Sim.

29.    I continued working that day and finished my regular shift. I reported to work the next day, I worked almost the full day and went home. That evening, when I was at home, I received a phone call from Leidos human resources department informing me I had been placed on suspension.

30.    About one week later, I had a conversation with Robert Athing and a woman on the telephone. Mr. Athing told me he was investigating and that the woman was in human resources. I cooperated and told them the truth, that I had made a Home Alone reference, that later that day, I had been assaulted by Cooper Garner, that I was going to report it when Mr. Wilson showed up. The woman accused me of making threats against the President, which I absolutely denied. The woman accused me of making other outrageous comments, which I denied. I asked her where this information was coming from, she didn't respond. Leidos fired me the next week.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 12, 2023 at San Diego, California.

_____
STEVEN BAIRD

**6**
**DECLARATION OF STEVEN BAIRD**

# EXHIBIT A



## Baird, Steve M. (613234)

## Annual Performance Assessment 2019

Organization :

Manager:

Location:

Evaluated by:  John M. Sim (130632)

Jan 1, 2019 - Jan 3, 2020

## Overall Performance Rating and Assessment

**Rating:** **Consistently Meets Expectations (3)**

**Comment::** Steve is a key member of the Mechanical Engineering Team. He is willing to jump from task to task with very short notice and put efforts into meeting schedule parameters. He performs quality machining/fabrication work with a professional appearance. He has embraced other tasks that are generally outside his job description as an Engineering Machinist/Technician. For example, he worked to remediate rodent feces and urine from a vehicle in our Test Lane. He also put great effort into ensuring the infrastructure was in place for a key Engineering event at the last minute. He was happy to complete these tasks which speaks to his work ethic, personality, and helpful nature. An area of career development for Steve would be in computer applications. Understanding how technology is applied both internally and externally to our group.

## Acknowledgment

### Employee

**Comment:** I have reviewed my Annual Performance Review and I would like to provide additional comments

Looking forward to enhancing my computer skills

## Goals and Results

### 100-Day Assimilation Goal

Enter up to 5 actions under **Supporting Activity** (one per line) you plan to accomplish as you assimilate into the organization over your first 100 days.  Refer to the QRC for examples.

*Note: Performance goals align with your job-specific goals and expectations while the 100-Day Assimilation goal aligns with your assimilation into the organization.*

| Due Date: | Mar 15, 2019 | Status: | | Completion Date: |
|---|---|---|---|---|

**Rating:** Consistently Meets Expectations (3)

**Manager Goal Comment:**
As a new employee in 2019, Steve has assimilated well in the Mechanical Engineering Team. He has adopted and embraced our unique division nature.

### Division 1769 Established Processes

LEIDOS000631

As part of everyday general work efforts, follow and promote adherence to the established processes unique to Division 1769

| Due Date: | Dec 31, 2019 | Status: | | Completion Date: |
|---|---|---|---|---|

Rating:          Consistently Meets Expectations (3)

Manager Goal Comment:

Steve has strived to learn and apply the various policies and practices that have evolved over a long period of time. As a new employee he learned quickly and and applied this knowledge in day to day activities to complete assigned tasks.

## Fabricate Coupons

Successful and timely fabrication of Imaging Coupons. This effort is on an accelerated schedule for an important imaging tests required for a critical customer FAT.

| Due Date: | May 31, 2019 | Status: | | Completion Date: |
|---|---|---|---|---|

Rating:          Frequently Exceeds Expectations (4)

Manager Goal Comment:

As part of an accelerated effort, many large aluminum coupons needed to be quickly fabricated. This type of work is typically performed by an outside vendor, but schedule was prohibitive. Steve was tasked with fabricating the coupons which was a daunting task. After a slow start, Steve stepped up and embraced the effort and fabricated all required coupons on time which helped the project succeed. Steve came to understand that in his role he'll be asked to react quickly and accommodate aggressive schedule requests.

## Leidos Values

Our Values Goal provides the context for performance discussions, focusing on *how* you achieve your individual goals and objectives (i.e., your behaviors and actions).  Employees are expected to act in accordance with the Leidos values at all times.

- **Integrity** - having the courage to make the tough ethical decisions, taking pride in our work, being transparent with our team, and being respectful of everyone.
- **Innovation** - not limited to our engineers and scientists. We must all act as catalysts. Be tenacious and curious to help us excel, and be a part of a learning organization.
- **Agility** - our ability to think and act small while using the size and strength of our balance sheet to our advantage. It is about being flexible, creative, and resilient.
- **Collaboration** - being inclusive, team-oriented, and proactively engaging — building relationships and staying connected with each other.
- **Commitment** - to our customers and our team means we are accountable, take ownership, model servant leadership, and operate with a sense of urgency.

| Due Date: | Dec 31, 2019 | Status: | | Completion Date: |
|---|---|---|---|---|

Rating:          Consistently Meets Expectations (3)

Manager Goal Comment:

## Process Adherence & Work Simplification/Efficiency

Make adhering to the established processes and work simplification/efficiency a top priority. Demonstrate a willingness to became a proponent of simplicity/efficiency and eliminate unnecessary redundancy.

LEIDOS000632

| Due Date: | Dec 31, 2019 | Status: | | Completion Date: | |

Rating:      Consistently Meets Expectations (3)

Manager Goal Comment:

Steve has integrated well into our group culture and philosophies as related to his daily work efforts. He's willing to change his approach to tasks in an effort to optimize work for schedule, simplicity, and cost. He has an penchant for quality work, and is adjusting his work output realizing that not everything can, or needs to be perfect. An area for potential growth can be in computer applications and improved use of our internal systems (Costpoint, QuickBase). With MFA being the norm now, a practical understanding of various applications would be beneficial.

LEIDOS000633

**EXHIBIT B**



**Baird, Steve M. (613234)**

**Annual Performance Assessment 2020**

Organization:

Manager:                                                                                           Location:

Evaluated by: John M. Sim (130632)                                        Jan 4, 2020 - Jan 1, 2021

## OVERALL PERFORMANCE RATING AND ASSESSMENT

**Overall Rating:**            Valued Performance

**Rating Description:**     Contribution reflects meeting expected level of performance definitions across all three elements (Results, Impact and Behaviors).

**Overall Performance Assessment:**     Despite the numerous outside challenges of 2020, Steve's contributions to the Mechanical Group were key to the successful completion of virtually every project on our plates. As the Mechanical Groups machinist/technician, he took on many challenges and worked diligently to achieve the desired results. His CNC programming skills improve with every challenging job and his communication is more thought out and concise. An area for development would be to balance the importance of details, with keeping the schedule for completion of the tasks. Steve's flexibility and willingness to perform many duties, some of which are outside the general scope of work, make him a great team asset.

## RESULTS RATING

The **Results** section looks at performance against all goals or expectations set. It represents the "what" of performance. Examples of results include achievement against project or program milestones, financial metrics, or customer feedback.

**Rating:**            Strong Performance

**Rating Description:**     Exceeds goals and/or expectations for role. Performance demonstrates high levels of leadership/ personal effectiveness against difficult/complex tasks.

## IMPACT RATING

The **Impact** section measures the employee's contribution to the team, the organization, the customer and/or Leidos as a whole.  It represents the "why" of performance.  Examples of impact include creating a best practice that can be replicated across the team, reaching out across Leidos to help a team with a difficult challenge or volunteering to take on additional tasks when the team was presented with additional scope or work orders by a customer (internal or external).

**Rating:**            Valued Performance

**Rating Description:**     Makes an impact on team, organization and/or Leidos performance. Actions support needs of team or organization.

## BEHAVIORS RATING

The **Behaviors** section measures the employee's demonstration of Leidos Values.  It represents the "how" of performance.  Demonstration of the Leidos Values in our words and actions enables us to differentiate Leidos in how we achieve Results and make an Impact.  Examples of

LEIDOS000628

Behaviors:

• Integrity - Is having the courage to make tough ethical decisions, taking pride in our work, being transparent with our team, and being respectful of everyone.
• Inclusion – Is fostering a sense of belonging, welcoming all perspectives and contributions, and providing equal access to opportunities and resources for everyone.
• Innovation - Is not limited to our engineers and scientists. It is acting as a catalyst. Being tenacious and curious to help us excel and be a part of a learning organization.
• Agility - Is being flexible, creative, and resilient. It is our ability to think and act small while using the size and strength of our balance sheet to our advantage.
• Collaboration - Is being team-oriented and proactively engaging to meet shared objectives. It is about building relationships and staying connected with each other.
• Commitment - Is being accountable, taking ownership, modeling servant leadership, and operating with a sense of urgency to our customers and teams.

| | |
|---|---|
| **Rating:** | Valued Performance |
| **Rating Description:** | Demonstrates Leidos Values in words and actions on a consistent basis. (Integrity, Inclusion, Innovation, Agility, Collaboration and Commitment.) |

## GOALS AND GOAL PROGRESS

| Goal | Goal Progress | Due Date |
|---|---|---|
| Improve CNC programming | improve programming more of a complex part on the machine itself | Dec 31, 2020 |
| improve my communication skills | Working on listening more and reacting less | Dec 31, 2020 |
| Leidos Values - Our Values provide a roadmap for our behavior, help to guide our decisions, and embody the characteristics we should all emulate: Integrity – Is having the courage to make tough ethical decisions, taking pride in our work, being transparent with our team, and being respectful of everyone. Inclusion – Is fostering a sense of belonging, welcoming all perspectives and contributions, and providing equal access to opportunities and resources for everyone. Innovation – Is not limited to our engineers and scientists. It is acting as a catalyst.  Being tenacious and curious to help us excel and be a part of a learning organization. Agility – Is being flexible, creative, and resilient. It is our ability to think and act small while using the size and strength of our balance sheet to our advantage. Collaboration – Is being team-oriented and proactively engaging to meet shared objectives. It is about building relationships and staying connected with each other. Commitment – Is being accountable, taking ownership, modeling servant leadership, and operating with a sense of urgency to our customers and teams. | *Use this box to document examples of how you demonstrate the Leidos Values.* | Dec 31, 2020 |

LEIDOS000629

## EMPLOYEE ACKNOWLEDGMENT

| | |
|---|---|
| **Status:** | I have reviewed my Annual Performance Review and have no further comments |
| **Comment:** | |
| **Entered By:** | Steve M. Baird (Terminated) (613234) |
| **Date:** | Feb 23, 2021 11:17 AM |

LEIDOS000630

# EXHIBIT C

*PII*



DATE:              03/03/2021

FROM:              **HR Services, Employee Services**

SUBJECT:           **Approval of ADA Accommodation**

EMPLOYEE NAME:   Steve Baird

EMPLOYEE ID:      613234


To Steve:

The following accommodation request is approved:

- **No reaching above right shoulder**
- **No lifting/carrying/pushing/pulling more than 0 pounds**

The duration for this approved accommodation is:

- **02/22/21 – 03/07/21**

Leidos may review this accommodation at any time.  Please contact HR Services, Employee Services at LeaveAdmin@leidos.com or 855-553-4367, option 3, option 2 if you have any questions, concerns or need to request a modification to this approved accommodation.

LEIDOS001294

**EXHIBIT 2**

Alan Romero (SBN 249000)
Robert S. Myong (SBN 262097)
Elizabeth Villarreal (SBN 327937)
Email: private@romerolaw.com
ROMERO LAW, APC
251 S. Lake Avenue, Suite 930
Pasadena, CA 91101-4873
Telephone: (626) 396-9900
Facsimile: (626) 396-9990

Attorneys for Plaintiff
STEVEN BAIRD

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BAIRD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>LEIDOS, INC., a Delaware; and DOES 1-99, inclusive;<br><br>Defendants. | Case No.:  3:22-cv-00060-LL-BGS<br><br>**DECLARATION OF ALAN ROMERO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>*Assigned to: Judge Linda Lopez*<br>*Referred to: Magistrate Judge Bernard G. Skomal*<br><br>Hearing Date: April 27, 2023<br>State Complaint filed: November 30, 2021<br>Trial Date: None Set |

1

## DECLARATION OF ALAN ROMERO

I, ALAN ROMERO, hereby declare:

1.      I am an attorney at law, duly licensed to practice in California. I represent the plaintiff, Steven Baird, in this instant action. I am familiar with the file, pleadings, correspondence and such. I have personal knowledge of the foregoing facts and if called upon as a witness under oath, I could and would testify competently thereto.

2.      The Deposition of John Sim occurred on February 15, 2023. Attached as **Exhibit D** are true and correct copies of the pertinent portions of his deposition.

3.      The Deposition of James Wilson occurred on February 21, 2023. Attached as **Exhibit E** are true and correct copies of the pertinent portions of his deposition.

4.      The Deposition of Aaron Valera occurred on February 21, 2023. Attached as **Exhibit F** are true and correct copies of the pertinent portions of his deposition.

5.      The Deposition of Robert Athing occurred on February 23, 2023. Attached as **Exhibit G** are true and correct copies of the pertinent portions of his deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 13, 2023 at Pasadena, California.

_____
ALAN ROMERO

2

**DECLARATION OF ALAN ROMERO**
Case No. 3:22-cv-00060-LL-BGS

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD, an individual,       )
                                   )
                   Plaintiff,      )
                                   )
         vs.                       )   Case No.
                                   )   3:22-cv-00060-LL-BGS
LEIDOS, INC., a Delaware           )
corporation; and DOES 1-99,        )
inclusive,                         )
                                   )
                   Defendants.     )
                                   )

VIDEOCONFERENCE DEPOSITION OF

JOHN SIM

WEDNESDAY, FEBRUARY 15, 2023

REPORTED BY:  SHIRLEY Q. CASILAN
CSR NO. 12361
JOB NO. 529013

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


STEVEN BAIRD, an individual,    )
                                )
                Plaintiff,      )
                                )
       vs.                      )    Case No.
                                )    3:22-cv-00060-LL-BGS
LEIDOS, INC., a Delaware        )
corporation; and DOES 1-99,     )
inclusive,                      )
                                )
                Defendants.     )
                                )

        VIDEOCONFERENCE DEPOSITION OF JOHN SIM, taken on

behalf of the Plaintiff, commencing from 8:11 a.m. to

10:06 a.m., Wednesday, February 15, 2023, before

Shirley Q. Casilan, CSR No. 12361,

REMOTE APPEARANCES OF COUNSEL:


FOR PLAINTIFF:

          ROMERO LAW, APC
          BY:  JESSICA FLORES, ESQ.
          251 South Lake Avenue
          Suite 930
          Pasadena, California   91101
          (626) 396-9900
          jrf@romerolaw.com


FOR DEFENDANT LEIDOS, INC.:

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          BY:  ANDREW J. DEDDEH, ESQ.
          4660 La Jolla Village Drive
          Suite 900
          San Diego, California   92122
          (858) 652-3109
          andrew.deddeh@ogletree.com


ALSO PRESENT:

          PAUL KEHOE, In-house counsel for Leidos

I N D E X

WITNESS:  JOHN SIM

EXAMINATION BY:                                    PAGE

          MS. FLORES                                  5

          MR. DEDDEH                                 42

E X H I B I T S

NUMBER                  DESCRIPTION                 PAGE

Exhibit 1        Annual performance assessment form   19

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

(None)

INFORMATION REQUESTED:

(None)

P R O C E E D I N G S

WEDNESDAY, FEBRUARY 15, 2023

8:11 A.M. - 10:06 A.M.

-oOo-

JOHN SIM,

having been first duly sworn by the Court Reporter, was

examined and testified as follows:


EXAMINATION

BY MS. FLORES:

Q    Good morning, my name is Jessica Flores, and I'm counsel for plaintiff, Steven Baird.  I'm just going to go ahead and start the deposition.

Have you ever been deposed before?

A    No.

Q    Okay.  So I'll just briefly go over some general deposition guidelines.

Do you understand that you're under oath and that your testimony has the same force and effect as if given in a court of law, subject to the penalty of perjury?

A    Yes.

Q    The court reporter is writing down everything we say unless we agree to go off the record.  After the deposition ends, the court reporter will prepare a

Q    Okay.

So you oversaw day-to-day operations of mechanical engineering staff.  So how many people were on the mechanical engineering staff that you oversaw?

A    It varied between five and seven at any given time.

Q    What do you mean that it varied "at any given time"?  How did it vary?

A    People left for other jobs.  Staff level fluctuated.

Q    And when did you begin your employment with Leidos?

A    2004.  I don't recall the exact month.

Q    So prior to mechanical engineering manager, what position did you hold?

A    I was a staff mechanical engineer.

Q    And when did you hold that position?

A    From 2004 until April of 2019.

Q    And who did you report to?

A    I had various bosses.  Would you like me to name them?

Q    Starting with the most recent one in April 2019.

A    So that would have been Dave Rose, R-O-S-E.

Q    And during what time period did you report to him?

A    I'm not aware of contracts.  We focus on projects.

Q    During Steven Baird's employment, did he ever ask for sick leave?

A    I'm not quite sure how to answer the question. Were there -- there is no sick leave at Leidos.

Q    Is the term "medical leave"?

A    There is a medical leave.

Q    And did Steven Baird ever ask for a medical leave?

A    He never asked me specifically.

Q    Are you aware of him asking for medical leave?

A    Yes.

Q    And approximately how many times are you aware of him asking for medical leave?

A    Just once.

Q    And when was that?

A    I don't recall the date.

Q    And what do you recall was the reason for his request for medical leave?

A    He had injured his shoulder in an accident of some kind.

Q    And how did you learn that he had asked for medical leave?

A    He showed me a doc- -- well, ultimately, he

showed me a doctor's note that limited his work restrictions, but I had -- I was informed by the HR department that he was out on medical leave.

Q    And do you recall how long he was out on medical leave?

A    I do not.

Q    And do you recall what the work restrictions were?

A    He had limitation of how much mass he could lift.

Q    And what were the requirements of his position with regard to lifting weights?

A    The Leidos policy for someone in that position is that they're able to physically lift 50 pounds.

Q    And why is that?

A    We deal with large fabrications and machinery that needs to be handled.

Q    And prior to his request for accommodation, were you aware of any other time where he was not capable of lifting 50 pounds?

A    No.

Q    And what do you recall from your conversation with him regarding his accommodation?

A    The accommodation for lifting?

Q    Yes.

A    What I recall is that it was an unremarkable

request, and we could accommodate that very easily.

Q    Did he request the accommodation for a limited amount of time?

A    I don't recall if a time period was attached to that.

Q    And how were you able to accommodate the request easily?

A    The discussion I had with Mr. Baird was that if he came across an instance where he needed to lift something, he was to get myself or any of -- other personnel on the mechanical engineering staff or anybody in the building that as part of their job description is to lift 50 pounds to perform the task.

Q    Do you have an estimate as to how many times in a day or a week he might have to lift something 50 pounds or heavier?

A    Once a day is a reasonable estimate.

Q    And after that conversation, did he ask you for help with lifting something?

A    No.

Q    And after that conversation, are you aware of anyone else helping him with lifting 50 pounds or more?

A    No, I'm unaware.

Q    And did you notify anyone else that they should help him?

issue with his heart?

A    No.

Q    And were you responsible with providing him with performance reviews?

A    Yes.

Q    And do you recall when the last time was that you provided him with a performance review?

A    I do not recall the exact date.

Q    Approximately.

A    2018, I believe, would have been his last -- I'm sorry.  That is incorrect.  2020, I believe, would have been his last review from me.

Q    And do you recall what performance review you gave him for 2020?

A    I do not.

Q    Do you recall anything about your conversation with him regarding his performance for 2020?

A    I don't remember any specific conversation or terms that were used.

Q    What do you recall with regard to his performance in 2020?

A    I don't recall any specifics.  I do recall that there typically is a conversation with all staff members, and I typically cover successes and areas for improvement for the next year.

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

Q    And this is the annual performance assessment that you gave to Steven Baird for the year 2020?

A    It appears so, yes.

Q    Okay.  Okay.

So you gave him an overall performance rating and assessment of "valued performance."  What does that mean?

MR. DEDDEH:  Objection.  The record speaks for itself.

BY MS. FLORES:

Q    You can respond.

A    "Valued performance" is in the midrange of the three tiers of the performance evaluation.

Q    What are the three tiers?

A    I don't recall what the lower tier is called. Valued performance is the midrange and strong performance is the upper range.

Q    Okay.

And so -- and so the results -- for the results rating, you gave him a strong performance.  Do you remember why that was?

A    The best that I can recollect is that year was -- the team was tasked with some interesting challenges that were outside the scope of what a typical engineering group would have to perform.

Q    And so the group as a whole performed strongly on

those tasks?

A     Yes.

Q     Any other reason that you recall as to why you gave him a result rating of strong performance?

A     Steve was an employee that I could count on to complete the task.

Q     Okay.

And does this document refresh your recollection about any conversation that you had with Steven Baird regarding his performance for 2020?

A     Not specifically, no.

Q     Okay.

And did Steven Baird raise any complaints or concerns during his employment?

A     Not that I can recall specifically.

Q     And are you aware of any complaints about Steven Baird during his employment?

A     Yes.

Q     And which complaints are you aware of?

A     I'm aware of one instance where I was approached by an employee, and they were informing me that they felt uncomfortable around Steve and his behavior towards them.

Q     When was this?

A     I don't recall the date.

Q     Is this when you were Steven Baird's manager?

policies?

A    Not that I can recall.

Q    And do you recall approximately when Robert Shannon expressed that concern?

A    I don't recall specifically.  I believe it would have been at the beginning of 2021.

Q    And are you aware of any other complaints or concerns about Steven Baird?

A    Not specifically.

Q    Are you aware that there was an incident on approximately March 11th, 2021?

A    Yes.

Q    And what was the incident on March 11th, 2021?

A    I wasn't a witness to any part of the incident, but Steve came to me and said that he was involved in an altercation in the inventory stockroom.

Q    Did he use the word "altercation"?

A    No.  That's my term.

Q    Do you recall what his term was?

A    I do not.

Q    What else do you recall that he said to you?

A    I don't -- I don't recall him saying anything else.

Q    And what did you do after that?

A    I instructed him to return to the shop and

JOHN SIM
FEBRUARY 15, 2023

JOB NO. 529013

continue with his day, and I would go and speak to the manager of the inventory stockroom.

Q    And who was that?

A    His name is James Wilson.

Q    And was that the next step you took after you spoke with him?

A    Yes.

Q    And what was your conversation with James Wilson?

A    We discussed what had happened.  James Wilson heard the altercation evidently, and we decided that this was something that needed to be escalated to HR.

Q    And why did you decide that it should be escalated to HR?

A    Because it sounded like there was physical contact of some kind.

Q    And this was a decision that both you and James Wilson made together?

A    Yes.

Q    And so what happened after that?

A    I reached out to the HR representative, informed them that there was an incident.

Q    Which HR representative did you reach out to?

A    His name is Adam Johns.

Q    And did Steven Baird require accommodation at this point?

Q    And did anything -- was that issue discussed again after that?

A    We developed a protocol to where if Steve felt he needed to leave the machine unattended and running, that we instigated a phone tree that anyone of the staff members, including myself, could come and be present when the mill was running.  But that was only to be used in lieu of stopping the machine.  The preference is to stop the machine.

Q    And are you aware of Steven Baird raising any other concerns during his employment?

A    No, not specifically.

Q    And before Steven Baird was terminated, did you ever recommend that he should be terminated?

A    No.

Q    And do you believe that Katie Rice and Robert Ating were involved in the decision to terminate Steven Baird?

A    I do believe that, yes.

Q    And do you believe that there were others involved as well?

A    I believe there are other committee members, yes.

Q    And why do you believe that there were other committee members?

A    I remember seeing other names on correspondence.

that effect.

Q    And why did you decide to talk to James Wilson?

A    In case I needed to follow up and try to understand what happened.

Q    And does Leidos have a policy for making sure that accommodations after approved are observed?

MR. DEDDEH:  Objection.  Vague and ambiguous.

THE WITNESS:  I'm not aware of a specific step-by-step policy that outlined how the accommodations are served.

BY MS. FLORES:

Q    And after Steven Baird requested accommodation and received approval and you told him that he could ask other employees for help, did you take actions to verify whether he was asking other employees for help?

A    No.

Q    Okay.

And do you have an estimate as to approximately what time period he needed accommodation for with regards to the limited lifting?

A    I don't specifically recall.  I believe it was in the four- to -six week time frame.

Q    And prior to that, had any other employee presented an accommodation request to you?

A    No.

CERTIFIED STENOGRAPHIC REPORTER'S CERTIFICATION

I, SHIRLEY Q. CASILAN, a Certified Shorthand Reporter licensed in the State of California do hereby certify:

That prior to being examined, JOHN SIM, the witness named in the foregoing proceedings, was by me duly sworn;

That said proceedings were taken before me at the time and place set forth therein and was stenographically reported by me; that said proceedings are a full, true, and correct transcript of my shorthand notes so taken; that the dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way financially interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 2nd day of March 2023.

SHIRLEY Q. CASILAN, CSR
CA CSR No. 12361
WA CSR No. 3443
Expiration Date:  4/2023

# EXHIBIT E

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD,                          )  Case No.
                                       )  3:22-cv-00060-
                   Plaintiff,          )  LL-BGS
                                       )
          vs.                          )
                                       )
LEIDOS, INC., a Delaware               )
corporation; and DOES 1-99,            )
inclusive,                             )
                                       )
                   Defendants.         )
_____)

REMOTE DEPOSITION

OF

JAMES WILSON

FEBRUARY 21, 2023

Reported by:
Christine Bemiss, RPR
CA CSR No. 10082, AZ CR No. 50073

Job No. 536416

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD,                          )   Case No.
                                       )   3:22-cv-00060-
                    Plaintiff,         )   LL-BGS
                                       )
          vs.                          )
                                       )
LEIDOS, INC., a Delaware               )
corporation; and DOES 1-99,            )
inclusive,                             )
                                       )
                    Defendants.        )
_____)

          REMOTE DEPOSITION OF JAMES WILSON, taken on

behalf of Plaintiff, beginning at 1:53 p.m. and ending

at 3:05 p.m., on Tuesday, February 21, 2023, before

Christine Bemiss, Registered Professional Reporter,

Certified Shorthand Reporter in and for the State of

California, and Certified Reporter in and for the State

of Arizona, appearing via videoconference.

REMOTE APPEARANCES:


For Plaintiff:

          ROMERO LAW, APC
          BY:  JESSICA FLORES, ESQ.
          251 South Lake Avenue, Suite 930
          Pasadena, California 91101-4873
          (626) 396-9900
          jrf@romerolaw.com


For Defendants:

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          BY:  ANDREW J. DEDDEH, ESQ.
          4660 La Jolla Village Drive, Suite 900
          San Diego, California 92122
          (858) 652-3109
          andrew.deddeh@ogletree.com


Also Present:

          Avery Johnson, Tech Assistant

INDEX

WITNESS:  JAMES WILSON

EXAMINATION                                              PAGE

     By Ms. Flores                                          6

EXHIBITS

(NONE OFFERED)

TUESDAY, FEBRUARY 21, 2023

1:53 P.M.

* * *

THE COURT REPORTER:  I have a read-on.

The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that the witness may be in a state where I am not a licensed court reporter and stipulate, pursuant to Federal Rule of Civil Procedure 29, that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

MR. DEDDEH:  No.

THE COURT REPORTER:  Hearing none, we can proceed.

Raise your right hand, please.


JAMES WILSON,
having been first duly sworn, testified as follows:
THE WITNESS:  I do.

JOB NO. 536416

counsel, did you discuss this deposition with anyone?

A.   No.

Q.   Okay.   And who is your current employer?

A.   Leidos.

Q.   Since when have you been working with Leidos?

A.   Since March of '02.

Q.   What is your current position?

A.   Warehouse traffic manager.

Q.   And how long have you held that position?

A.   About seven years.

Q.   And what are your responsibilities as warehouse traffic manager?

A.   Take care of all the receiving, shipping and orders pulled for production.

Q.   And how many people do you supervise?

A.   I have six on my team right now.

Q.   And who do you report to?

A.   Louie Reyna.

Q.   And what is his position?

A.   He is the director of supply chain.

Q.   And the people that you supervise, are they employees?

A.   Yes.   I have temporary employees and permanent employees.

Q.   Okay.   And what is your highest level of

that Steven Baird was employed?

A. My team could help them at least once, twice a week.

Q. And was it that both members of the mechanical engineering department and members of your team together were moving these items?

A. Yes.

Q. Okay. And what was your understanding of Steven Baird's responsibilities?

A. He worked in our machine shop. He'd work on prototype items.

Q. What do you mean?

A. He could be reworking material. So if items come in and maybe the depth of the holes weren't right or the size of the holes weren't right, he would do rework on those items and make them fit for production without us sending them back to the supplier.

Q. What was your understanding of Steven Baird's political beliefs?

A. I'd say he was very anti-Trump, from what I heard.

Q. That Steven Baird was very anti-Trump?

A. Yeah.

Q. Who did you hear that from?

A. I would hear that from personnel on my team.

Q.   Which personnel?

A.   Specifically, mainly Ian and Aaron.

Q.   From anyone else?

A.   No, not that I recall.

Q.   How many conversations did you have with Ian about Steven Baird's political beliefs?

A.   It wasn't with Ian directly.  It was more hearsay from other personnel.

Q.   Do you mean to say that other personnel heard Ian?

A.   Right, would hear them talk about it.

Q.   And who were these other personnel?

A.   In the shipping department, I have Michael Angelo, and Ian was in the shipping department, so those two would be working together.  And then Aaron works in my receiving department, which was a separate area.

Q.   And what did Michael Angelo -- excuse me -- what did Michael Angelo say to you about Steven Baird's political beliefs?

A.   I don't recall any specifics.  I just know that when Biden was being elected, there was some issues with that portion, but I don't recall exactly what was said.

Q.   And what is your understanding of

Michael Angelo's political beliefs?

A.    He didn't specify any.

Q.    What about Ian's political beliefs?

A.    He was for Biden at the time.

Q.    And what about Aaron?

A.    Aaron, I'm not sure on Aaron.

Q.    Sorry, did you mean to say earlier that Baird was anti-Trump or for Trump?

A.    I meant to say he was for Trump.  Sorry. Anti-Biden.

Hold on, my computer just logged out.

Okay.  I'm back.

Q.    Okay.  And what are your political beliefs?

A.    I don't have any --

MR. DEDDEH:  Objection; irrelevant.

THE WITNESS:  -- actually.

Q.    (BY MS. FLORES)  You don't have any political beliefs?

A.    No.

Q.    Are you aware of any Leidos policy regarding expression of political beliefs?

A.    Not that I recall, no.

Q.    And was Cooper Garner on your team?

A.    Yes.  He was one of my temporary employees.

Q.    Do you recall when he started working for

Q.   Okay.  So before March 10th of 2021, you had not received any complaints --

A.   No.

Q.   -- about Steven Baird?

And prior to March 10th of 2021, had you heard Steven Baird make any political comments?

A.   Not directly to me, no.

Q.   What do you mean?

A.   Just from other people in the department saying stuff.

Q.   So you had heard from other people in the department prior to March 10th, 2021, that Steven Baird sometimes made political statements?

A.   Yes.

Q.   And who said this to you?

A.   The same people.  Ian was the main person.

Q.   And what did Ian say to you?

A.   Just that they were discussing stuff about the presidential election.

Q.   What else did Ian say?

A.   That's all I recall.

Q.   Did Ian seem upset prior to March 10th when he said this to you?

A.   He seemed like it was bothering him.

Q.   Did he say anything about why he was

bothered?

A.  I believe just 'cause they had two different opinions on the matter.

Q.  When you say "the matter," you mean the presidential election?

A.  Yeah, of who was gonna end up winning the election.

Q.  And this was something that you heard from Ian directly?

A.  Yes.

Q.  And prior to March 10th, 2021, had you spoken with Aaron about Steven Baird?

A.  Not specifically about this matter, no.

Q.  And prior to March 10th, 2021, were you aware that Steven Baird had taken medical leave?

A.  Yes.

Q.  And how were you aware?

A.  I was told by his manager, and at the time Aaron talked to him.  He was assisting somebody that was in the middle of the freeway or on the side of the freeway.  He stopped to assist that pedestrian, hopped inside their car, and while they were on the side of the freeway, I guess they got hit by another car, so they were in an accident while he was assisting a pedestrian on the freeway, from what I was told.

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

Q.  Were you aware of any other reason as to why he was on medical leave?

A.  No.  I thought that was the main reason why.

Q.  Okay.  And when you were -- strike that.

Were you aware that he had work restrictions when he came back to work?

A.  I think most people would in that case.

Q.  But were you aware as to whether he had work restrictions when he returned?

A.  No.  He wasn't under my responsibility.

Q.  And when you saw him back at work from medical leave, did it seem as though he was injured or in any pain of any kind?

A.  No.  He seemed like he recovered at that point.

Q.  Do you remember seeing him lift any heavy items after he came back to work?

A.  No.

Q.  And did your team sometimes help Steven Baird with --

A.  Yes --

Q.  -- lifting?

A.  -- yes.

Q.  How often did your team help Steven Baird with lifting items?

A.   Maybe once a week.

Q.   Okay.  Prior to March 10th, 2021, had anyone raised any concerns to you about Steven Baird?

A.   No.

Q.   Okay.  And what happened on March 10th, 2021?

A.   You mean with the incident between him and Cooper?

Q.   Yes.

A.   Are you referring to that?

Q.   Yes.

A.   Actually, I was taking my lunch break, and I ended up hearing an argument going on, and I got up to go see what was going on.  And in our warehouse, we have a lot of racking and pallets, so my vision wasn't directly clear.  I was able to see from their waist down that I could tell that two people were really close together, like in each other's face.

And as I was walking over there, I ended up seeing one person get shoved back.  And as I got closer, I was able to go around the rack, and I witnessed Mr. Cooper and Mr. Baird -- it looked like they were in an argument.

Q.   Approximately how far away were you from Steven Baird and Cooper Garner when you first heard the argument?

A.  I'd say probably about 400 feet but not direct line of sight because we have cubicle walls, crates, and pallets in between.

Q.  You said that you were taking your lunch.  Were you in a lunchroom?

A.  Yeah, we have a little break area in our cube, in our cube section.

Q.  Did you have to go through a doorway in order to get closer to them?

A.  No.  I did have to walk through the cube section, which is away from the direction.  Because when I heard them, they were behind me.  I would have to walk through the cube area, around all the pallets and crates, and go towards the section that they were at.

Q.  And do you recall hearing anything specific when you heard the argument?

A.  Nothing specific.  I was actually on my phone, taking my break, so I wasn't able to tell what words were being said.

Q.  So you said that you could see from the waist down that one person shoved a second person?

A.  Yes.

Q.  And could you tell who shoved who?

A.  I couldn't tell until I walked around the rack section, and I could tell Cooper was closer to me, and

the person that I saw get shoved was on the right side of that.  So that was -- I could tell Steve was the person being pushed.

Q.  And so what happened when you got closer?

A.  I separated them, and I had Steve go back to his area, which is a separate caged area from our warehouse.  So I was able to separate them, have Steve go back to his work area, and then I took Cooper with me and we -- I just separated them so they wouldn't get into an altercation any further.

Q.  So how close were they when you arrived?

A.  Extremely close when I was walking up, until the shove happened.  They were in chest-to-chest at that point.

Q.  Okay.  So they were chest-to-chest, and then the shove happened, and then you arrived after the shove?

A.  Yeah.  'Cause as I was walking over there, I saw the separation of them, so the shove just happened, and I was able to get there and separate them after that.

Q.  And so after the shove happened, did they get close again?

A.  No.  I think they were astonished that I came up, and they -- somebody was witnessing what was going

on.  So they both kind of separated without any further altercation.

Q.  Okay.  So they didn't -- they didn't get close again after the shove?

A.  Correct.  Yes.

Q.  And at that time did you have reason to believe that Steven Baird had shoved Cooper Garner?

A.  No, just 'cause the way they were facing.

Q.  And, sorry, you said that you had Steve Baird go back to his area, which was where?

A.  There's a separate gated area inside our warehouse, which is the machine shop where he worked.

Q.  And you took Cooper Garner with you where?

A.  Sorry, could you repeat that?  It was cutting out a little bit.

Q.  You took Cooper Garner where?

A.  Back to our cube area where I was having lunch. His cube is actually right next to the lunch area as well.

Q.  And what happened after that?

A.  We discussed what happened.  He told me that Steve was making fun of the way he was dressed, something about his beanie that he had on.  And I believe Cooper got pretty heated about the conversation they were having.  Seemed like Steve was antagonizing

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

him.  I don't believe Cooper would just push him for no reason at all.

So from that explanation from Cooper's point of view, he ended up pushing him to get him away from him.

Q.  Did Cooper say anything else about what Steven Baird said, other than that he was making fun of the way he was dressed?

A.  No, I believe that was all I recall.

Q.  And what happened after that?

A.  I ended up sending Cooper home, and I went and addressed Mr. Baird's manager, let him know the situation that I saw.

Q.  Do you mean John Sim?

A.  Yes, Mr. Sim.

Q.  And what did you say to him?

A.  I told him that I witnessed an altercation between his employee and mine, and I explained that -- what I saw and that I separated them.  And I also let my manager know as well.

Q.  Who was your manager at the time?

A.  Mr. Colmer, Craig Colmer.

Q.  And what did you say to Craig Colmer?

A.  I told him what I witnessed between Mr. Baird and Mr. Cooper.

Q.  Did you say the same thing to Craig Colmer that

A.  I don't recall.

Q.  Okay.  And so what happened -- so were you contacted by phone or contacted for a meeting?

A.  Yes, contacted by phone.

Q.  Okay.  And how long was your conversation on the phone?

A.  I'd say about 10, 15 minutes.

Q.  And what did Leidos HR ask you?

A.  They asked me what I saw.

Q.  Anything else?

A.  That's all I recall.

Q.  Did they ask you anything about Steven Baird's political beliefs?

A.  I don't believe we discussed that at that time.

Q.  Were they discussed at a later time?

A.  Not that I recall.

Q.  Did you ever hear Steven Baird say that he was racist?

A.  No.

Q.  Did you ever hear anyone say that Steven Baird was racist?

A.  Hearsay from other people.

Q.  And who are those other people?

A.  The same people we discussed.  Mainly Ian.

Q.   And what did Ian say about Steven Baird being racist?

A.   I don't recall.

Q.   And so you heard Aaron say something about Steven Baird being racist?

A.   No.

Q.   Did Cooper Garner ever say anything about Steven Baird being racist?

A.   Not that I recall.

Q.   Did Michael Angelo say anything about Steven Baird being racist?

A.   Not that I recall.

Q.   And so after that 10- to 15-minute interview, when did you hear anything further again about the incident on March 10th, 2021?

A.   I'd say more recently for this deposition.

Q.   Okay.  Did you participate in the decision to terminate Steven Baird?

A.   No.  That was not my responsibility.

Q.   Whose responsibility was it?

A.   That was Mr. Sim.

Q.   Were you present at any meeting regarding the termination of Mr. Steven Baird?

A.   No.

Q.   Did you speak further with HR after your

JAMES WILSON
FEBRUARY 21, 2023

JOB NO. 536416

Q.   What else did he say?

A.   That's all that I recall.

Q.   Who made the decision to terminate Cooper Garner?

A.   I did.

Q.   And why did you decide to terminate Cooper Garner?

A.   I don't feel anybody should put hands on somebody else at the workplace, so I couldn't trust him going further.

Q.   And do you believe that Steven Baird should have been terminated?

MR. DEDDEH:  Objection; legal conclusion, speculation.

THE WITNESS:  It's not my call for him.

Q.   (BY MS. FLORES)  And during your 15-minute -- 10- to 15-minute conversation with HR, did you give a recommendation for termination?

A.   No.

MR. DEDDEH:  Objection; vague.

MS. FLORES:  Okay.  I'm just gonna ask for five minutes, but I don't have many more questions left.

MR. DEDDEH:  Okay.

MS. FLORES:  Yeah.

MR. DEDDEH:  So come back 3:05?

JOB NO. 536416

MS. FLORES:  Yeah.

MR. DEDDEH:  Okay.

(A break was taken from 3:00 p.m. until 3:05 p.m.)

Q.  (BY MS. FLORES)  Okay.  And, Mr. Wilson, you understand that you are still under oath?

A.  Yes.

Q.  Okay.  Do you have any reason to believe that Steven Baird ever initiated physical contact with Cooper Garner?

A.  I'm not aware of that, as I wasn't present at the time until after the altercation.

MS. FLORES:  Okay.  No further questions.

MR. DEDDEH:  I don't have any questions.

(The deposition of JAMES WILSON concluded at 3:05 p.m.)

* * *

REPORTER'S CERTIFICATE

I, Christine Bemiss, a Certified Shorthand Reporter of the State of California and Arizona, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings were made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  MARCH 6, 2023

_____
Christine Bemiss, RPR,
CA CSR No. 10082
AZ CR No. 50073

# EXHIBIT F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD,                            )   Case No.
                                         )   3:22-cv-00060-
                    Plaintiff,           )   LL-BGS
                                         )
          vs.                            )
                                         )
LEIDOS, INC., a Delaware                 )
corporation; and DOES 1-99,              )
inclusive,                               )
                                         )
                    Defendants.          )
_____)

REMOTE DEPOSITION

OF

AARON VALERA

FEBRUARY 21, 2023

Reported by:
Christine Bemiss, RPR
CA CSR No. 10082, AZ CR No. 50073

Job No. 536415

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVEN BAIRD,                              )  Case No.
                                           )  3:22-cv-00060-
                    Plaintiff,             )  LL-BGS
                                           )
          vs.                              )
                                           )
LEIDOS, INC., a Delaware                   )
corporation; and DOES 1-99,                )
inclusive,                                 )
                                           )
                    Defendants.            )
_____    )

REMOTE DEPOSITION OF AARON VALERA, taken on behalf of Plaintiff, beginning at 10:07 a.m. and ending at 11:56 a.m., on Tuesday, February 21, 2023, before Christine Bemiss, Registered Professional Reporter, Certified Shorthand Reporter in and for the State of California, and Certified Reporter in and for the State of Arizona, appearing via videoconference.

REMOTE APPEARANCES:


For Plaintiff:

          ROMERO LAW, APC
          BY:  ROBERT S. MYONG
          251 South Lake Avenue, Suite 930
          Pasadena, California 91101-4873
          (626) 396-9900
          rsm@romerolaw.com


For Defendants:

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          BY:  ANDREW J. DEDDEH, ESQ.
          4660 La Jolla Village Drive, Suite 900
          San Diego, California 92122
          (858) 652-3109
          andrew.deddeh@ogletree.com


Also Present:

          Elektra Knight, Tech Assistant

INDEX

WITNESS:  AARON VALERA

EXAMINATION                                                      PAGE

       By Mr. Myong                                                6


                            EXHIBITS

                         (NONE OFFERED)

TUESDAY, FEBRUARY 21, 2023

10:07 A.M.

* * *

THE COURT REPORTER:  I have a read-on.

The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that the witness may be in a state where I am not a licensed court reporter and stipulate, pursuant to Federal Rule of Civil Procedure 29, that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

(No response.)

THE COURT REPORTER:  Hearing none, we can proceed.

Raise your right hand, please.


AARON VALERA,

having been first duly sworn, testified as follows:

THE WITNESS:  I do.

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.   I don't think this is gonna be a long deposition, but if at any time you need to use the restroom, you need to stretch your legs, please let me know.  You're welcomed to take as many breaks as you need.  I would just ask that you answer any pending question before you take the break.

Is that fair?

A.   Fair.

Q.   When did you start working at Leidos?

A.   Time and date, like -- or how long ago I've worked there?

Q.   However you wanna respond.

A.   I guess -- well, not guess.  Four years.  A little over the four years now.

Q.   So you started around February 2019?

A.   I think I started in 2017 as a temp, and then I was hired on in 2019 as a full-time employee.  I don't know the exact numbers.

Q.   When you were a temp, which company were you working through?

A.   They were called -- I honestly can't remember.

Q.   When you were a temp, what was your job title?

A.   Material specialist.

Q.   Where was his work station?

A.   It was right next -- it's connected into the warehouse, but it's been -- it's gated off.

Q.   Did Mr. Baird start before -- sorry, strike that.

Did you start at Leidos before or after Mr. Baird?

A.   Before.

Q.   And when Mr. Baird first started, did he replace another employee, or was that an open position, as far as you know?

MR. DEDDEH:  Objection; speculation.

You can answer.

THE WITNESS:  I don't know for sure.

Q.   (BY MR. MYONG)  Did he take over someone's work station, or did they set up a new work station for him?

A.   The work station was already there prior to him.

Q.   Was someone else using that work station before Mr. Baird?

A.   I don't know.  Before him, I don't remember who was there.

Q.   When Mr. Baird started, how often did you interact with him?

A.  Daily.

Q.  How much time per day?

A.  Maybe 30 minutes to an hour a day.

Q.  Were those interactions professional, friendly?

A.  Friendly.

Q.  Did you have any complaints about Mr. Baird when he first started?

A.  No.

Q.  Did you ever have any complaints about Mr. Baird while he was working at Leidos?

A.  No.

Q.  Did your interactions with Mr. Baird ever change from friendly to something else?

A.  No.

Q.  Did they ever -- strike that.

    Did Mr. Baird ever discuss politics with you?

A.  Yes.

Q.  How often?

A.  Not daily but maybe like once a week, I would say, at least.

Q.  What types of discussions did you have?

A.  Mostly right wing and left wing, you know, basic politics that you hear today.

Q.  Was he pro left wing, pro right wing?

JOB NO. 536415

Mr. Arroyoavila?

A.   On the daily.

Q.   And how much time did you usually interact with him on a daily basis?

A.   I would say, spread out through the day, at least an hour, because he worked directly with us too in the same vicinity.

Q.   How often did you --

A.   Sorry, my screen timed out real quick.

Sorry about that.

Q.   Did you ever observe Mr. Arroyoavila and Mr. Baird interact?

A.   Yes.

Q.   How often did you observe them interacting?

A.   Maybe once a week.

Q.   Based on your observations, what kind of relationship did they have?

A.   Just a -- sometimes it could be friendly, sometimes it could be not friendly.

Q.   When you say "he," who are you referring to?

A.   Steve Baird and Ian Arroyoavila.

Q.   When you say "not friendly," what do you mean?

A.   Well, they were both very politically inclined, and Steve Baird was on the right, Ian was on the left,

and so they obviously had their differences towards political outputs.

Q. Did their interactions ever look like it might turn violent?

A. No.

Q. Would you say that they just had lively conversations?

A. Yes.

Q. Did Mr. Arroyoavila ever complain to you about Mr. Baird?

A. He's -- yes.

Q. How often?

A. Not very often.

Q. Would you say daily, weekly, monthly?

A. I mean, if I had to put a number on it, once a month.

Q. And what type of complaint would Mr. Arroyoavila make?

A. Just, you know, that Steve Baird was right wing and, you know, just didn't like his political views, thought he was wrong.

Q. Any other complaints?

A. No, not really.

Q. Did he ever complain that Mr. Baird was violent towards him?

A.  No.

Q.  Did he ever complain that Mr. Baird was making discriminatory remarks?

A.  No.

Q.  Did you hear Mr. Baird ever make any discriminatory remarks?

A.  No.

Q.  Did you ever hear Mr. Baird discuss Black Lives Matter?

A.  No.

Q.  Do you know if Mr. Baird and Mr. Arroyoavila ever discussed Black Lives Matter?

A.  I don't know for sure.  Possibly.

Q.  Did Mr. Arroyoavila ever complain that Mr. Baird was being racist?

A.  I believe I have.

Q.  Do you know why Mr. Arroyoavila believed that Mr. Baird was being racist?

A.  I'm not -- not for sure.  I don't know why.

Q.  Do you recall any details about Mr. Arroyoavila's complaints about racism?

A.  No.

Q.  Do you know if Mr. Arroyoavila ever reported Mr. Baird to Leidos?

A.  No.

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.  Did you ever hear Mr. Arroyoavila complain to anyone at Leidos about Mr. Baird and racism?

A.  No.

Q.  How do you know Mr. Arroyoavila was left wing?

A.  He's -- by the way he would support, you know, the opposite candidates and just -- you know, he's told me that he's left wing, and you can definitely tell by his beliefs and his -- the way he talks and speaks that he's left wing.

Q.  Was he equally as enthusiastic about left wing as Mr. Baird, or were one of them more enthusiastic about it?

MR. DEDDEH:  Objection; vague and ambiguous, compound.

THE WITNESS:  So, yes, I would say that Ian was very left wing as much as Steve Baird was very right wing.  They're very on opposite ends of the spectrum.

Q.  (BY MR. MYONG)  Did you think that Mr. Arroyoavila's left-wing comments were ever offensive?

A.  No.

Q.  Did you ever complain about Mr. Arroyoavila?

A.  No.

Q.  Do you know if Leidos has any types of policies

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

regarding political speech in the office?

A.  I am not aware of them.

Q.  Do you know if you had any training regarding political speech in the workplace?

A.  No.  I mean, the only -- I guess the closest training we have is to be -- you know, to be diverse and inclusive.  I don't know if that would fall into the politics realm.

Q.  How often do you receive diversity training?

A.  I believe it's once a year, if not -- yeah, I believe it's once a year.  If it's not, then it's twice a year.

Q.  Do you remember the last time you completed diversity training?

A.  I believe it was in November, 'cause we had a deadline by the end of November to complete all of our training, including, like, sexual harassment and other various forms of training.

Q.  When you complete the training, do you receive any type of certificate?

A.  Not a physical one, but, yes, we do receive, like, I guess, a digital certificate saying that we have completed our training and looks, like, overall, you know, vitals intranet to -- and HR to know that we have completed the training.

Mr. Arroyoavila against Mr. John Sim.

A.   Yeah, he's -- that's Ian Arroyoavila, right?

Q.   Yes.

A.   Yeah.  And I'm sure I answered this already, haven't I?

Q.   Did Mr. Arroyoavila have any complaints about Mr. Sim?

A.   Oh, Sim.  Sorry.  No.

Q.   Do you know what Mr. Sim's political beliefs were?

A.   I do not.

Q.   Did you ever see Mr. Sim and Mr. Baird discussing politics?

A.   No.

Q.   And why would you characterize Mr. Baird and Mr. Sim's relationship as professional?

A.   'Cause it looked professional, and Mr. Sim is his boss, so I guess he would keep it professional.

Q.   Did you ever see Mr. Baird and Mr. Sim joking together?

A.   No.

Q.   Did you ever see Mr. Baird and Mr. Sim discussing politics?

A.   No.

Q.   Did you see anything in Mr. Baird's work

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

station that would show his political beliefs?

A. No.

Q. Anything on his vehicle?

A. No.

Q. Did he ever wear anything that showed his political beliefs?

A. No.

Q. You're familiar with the event that took place in Washington, D.C. on January 6th?

A. Was that the -- how you say -- insurrection?

Q. Insurrection.

A. Yes, I am familiar with it somewhat.

Q. Did you ever hear Mr. Baird say he was going to attend the insurrection?

A. He did mention that he would like -- would like to, I guess.

Q. What do you recall Mr. Baird saying about attending the insurrection?

A. That he would like to be there and be a part of it.

Q. Be a part of it how?

A. Just to be there, I guess, you know, to be there and do what everyone else is doing.

Q. At the time did you think it was more of a rally, or did you have some sort of understanding that

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

it was supposed to be some sort of riot?

A.   At the time -- honestly, I'm not very political, so I didn't really care.

Q.   Based on Mr. Baird's statements, did you understand that it was supposed to be some sort of rally, or some sort of a riot or revolt?

MR. DEDDEH:   Objection; speculation.

THE WITNESS:   I guess based on his statements, I would say that it was supposed to be like a political stance, like a rally.

Q.   (BY MR. MYONG)   Do you know if Mr. Baird attended the insurrection?

A.   I do not know.

Q.   Do you know any other co-workers that were pro right wing at Leidos?

A.   No.

Q.   Do you know anyone else that was pro left wing at Leidos?

A.   Speculating, I'm saying I'm sure a lot of people do.  It seems like California is a very left wing state, so...

Based on that, yes, I'm sure there are more left wing people.

Q.   Do you know anyone that's told you that they hold strong left wing political views at Leidos?

A.  Not anyone that's told me.  I just heard that this person is left wing.

Q.  Who?

A.  I know his name is Mark.  I don't know his last name.  Jeff Lingo, I think.  And that's about it.

Q.  Do you remember who told you that Mark was pro left wing?

A.  I've heard it from various people.

Q.  Do you remember who told you that Jeff was pro left wing?

A.  Various people.

Q.  Do you remember when Cooper Garner started working at Leidos?

A.  I can't -- I can't -- either very -- right prior -- like, right before COVID or during COVID.  At the beginning of COVID, I think.

Q.  So around --

A.  I'm not entirely -- yeah, around COVID.  I'm not entirely sure, though.

Q.  So around 2020?

A.  Yes.

Q.  Do you know if he was a temp employee or a direct hire?

A.  He was a temp.

Q.  Do you remember which company he worked for?

Q.   Did Mr. Baird ever complain about Mr. Garner?

A.   Yes.

Q.   What complaints did Mr. Baird have about Mr. Garner?

A.   Just saying that he's young and kind of a know-it-all or a -- someone that's -- how would you say -- very hot-tempered or thinks, like, they're a lot bigger than what they think they are.  You know, a lot more important than what they think they are, I guess I should say.

Q.   Did you think that Mr. Garner was hot-tempered?

A.   I think he could be, yes.

Q.   Did you ever see an example where Mr. Garner lost control of his temper?

A.   No.

Q.   Did you think that Mr. Garner thought he was more important than he really was?

A.   I thought he was a young kid that, you know, any young 20-year-old would hold himself to be.

Q.   Do you remember that there was a fight or some sort of physical altercation between Mr. Garner and Mr. Baird?

A.   I do remember.

Q.   Did you observe the altercation?

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  I do not know the exact details.

Q.  (BY MR. MYONG)  Generally, what are the details?

A.  I think just -- I don't know -- I never read the rules towards it, but I can speculate that, you know, separate the people and to get upper management or HR involved.

Q.  Did you get HR or upper management involved regarding the altercation between Mr. Baird and Mr. Garner?

A.  I did not.

Q.  Do you know if Mr. Wilson did?

A.  I don't know if he did or not.

Q.  Why didn't you report this to HR or upper management?

A.  From what I remember, Steve -- as soon as me and James broke it up, Steve said that he wanted Cooper to be terminated because he was pushed and that he was gonna go talk to his manager right away.

And I saw Steve go into the office, and there I assumed that he went to go talk to John Sim.

And then I believe James Wilson confronted his boss at the time, Craig Colmer, about the incident.

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.  Do you remember who was Mr. Garner's supervisor?

A.  James Wilson.

Q.  What was Mr. Craig Colmer's job title?

A.  I think he was called the manufacturing production -- manufacturing distribution production manager.

Q.  Is he still employed by Leidos?

A.  Yes.

Q.  Is his job title the same?

A.  No.

Q.  What's his current job title?

A.  I'm not entirely sure.

Q.  After you saw Mr. Baird go to Mr. Sim's office, what happened next?

A.  I went about my business, and I think James pulled Cooper aside to -- into either his area or to outside to, you know, calm him down.

Q.  Anything else?

A.  Nope, not that I know of.

Q.  Did Mr. Baird finish his workday?

A.  I'm not entirely sure.

Q.  Do you know if Mr. Garner finished his workday?

A.  I'm not entirely sure.

AARON VALERA                                                    JOB NO. 536415
FEBRUARY 21, 2023

MR. DEDDEH:  Objection; speculation.

THE WITNESS:  Could you repeat the question?

Q.  (BY MR. MYONG)  Do you know if there was any investigation of the altercation between Mr. Baird and Mr. Garner?

A.  I believe there -- I believe there was, yes.

Q.  Why do you believe there was an investigation?

A.  'Cause I heard that -- from what I heard, they talked to Ian -- Mr. Ian Arroyoavila, and also I believe they talked to Michael Veneracion.  That's all I've heard.

Q.  Who told you that?

A.  I think I heard it from various people.  And maybe Ian might have said something.  I think Mike -- Michael Angelo might have said something.

Q.  Did they ever speak with you?

A.  No.

Q.  Did you ever provide any type of report regarding the altercation?

A.  No.

Q.  Did you provide any type of written statement regarding the altercation?

A.  No.

Q.  Did you ever discuss the altercation with

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

regarding the altercation?

A.  No.

MR. DEDDEH:  Objection; attorney-client privilege.

Q.  (BY MR. MYONG)  Did anyone from HR ever talk to you about the altercation?

A.  No.

Q.  Did anyone from HR ever talk to you about Mr. Baird's political beliefs?

A.  No.

Q.  Do you believe that Mr. Arroyoavila was biased against Mr. Baird?

A.  I could see that.  I can believe that.

Q.  Do you know if anyone else was terminated from Leidos based on their political beliefs?

A.  No.

Q.  Do you know if anyone else was fired from Leidos for a physical altercation?

A.  No.

Q.  Did you ever hear that Mr. Baird had been written up before that termination?

MR. DEDDEH:  Objection; legal conclusion, speculation.

THE WITNESS:  No.

Q.  (BY MR. MYONG)  Did you hear any complaints

in the workplace?

A. Maybe weekly or monthly. He didn't go out of his way to talk to you about them.

Q. Did you find any of Mr. Baird's political beliefs offensive?

A. No.

Q. Did he ever threaten anyone regarding his political beliefs?

A. No.

Q. Did he ever threaten violence?

A. No.

Q. Was he usually just pro right wing, or did he make derogatory comments about the left wing?

A. He was just pro right wing. And I guess he would say, like, the left wing people are stupid or just wrong.

Q. Did he ever threaten violence against left wing political belief holders?

A. No.

Q. Did you ever hear Mr. Baird threaten to shoot President Biden?

A. No.

Q. Do you know if anyone else ever reported that Mr. Baird threatened to shoot Mr. Biden -- President Biden?

AARON VALERA
FEBRUARY 21, 2023

JOB NO. 536415

Q.   Did Mr. Baird's political speech ever interfere with his job duties?

MR. DEDDEH:   Objection; speculation.

THE WITNESS:   I guess if you're trying to go out of your way to argue with someone else, debate someone else about their political stance, I guess that can -- that would get in the way of your job duties.

Q.   (BY MR. MYONG)   How long did Mr. Baird and Mr. Arroyoavila have these discussions?

A.   At a time, how long?

Q.   Let me try and rephrase.

Usually how long did the political discussions between Mr. Baird and Mr. Arroyoavila last?

A.   They can probably last from just for a few minutes to maybe up to 10, 10 minutes, maybe 15 minutes, at the most.

Q.   Did you ever hear that Mr. Baird was not completing his work tasks based on spending too much time talking to his co-workers?

A.   I did not hear that.

Q.   Was it normal for co-workers to spend about one to ten minutes conversing throughout the workday?

MR. DEDDEH:   Objection; speculation.

THE WITNESS:   Like I said, it's somewhat normal to converse about various things, you know, whether it's

work or life or whatever.

Q.   (BY MR. MYONG)   Do you know if Leidos had any meetings or sent out any emails about employees spending too much time conversing during the workday?

A.   No.

Q.   Did Leidos send out any emails or hold any meetings regarding productivity declining based on co-workers spending too much time conversing?

A.   No.

Q.   Did you ever get the feeling that Mr. Baird was spending too much time discussing politics in the workplace and it was affecting his work?

A.   No.

Q.   Did Mr. Baird ever say that he was behind on his job duties because he was spending too much time conversing regarding politics during his workday?

A.   No.

Q.   Did Mr. Sim ever mention that Mr. Baird was not meeting his work duties?

A.   No.

Q.   Did Mr. Sim ever mention that Mr. Baird was falling behind on his deadlines?

A.   No.

Q.   Did Mr. Sim ever complain that Mr. Beard was spending too much time conversing with other

AARON VALERA                                                          JOB NO. 536415
FEBRUARY 21, 2023

Q.   (BY MR. MYONG)  And why do you believe Mr. Baird filed a claim for wrongful termination?

MR. DEDDEH:  Objection; legal conclusion and speculation.

THE WITNESS:  I guess I would say why he feels that way is because he felt physically assaulted, and so I guess he feels like he shouldn't have been fired for being physically pushed.

Q.   (BY MR. MYONG)  Do you know if Mr. Garner filed a lawsuit against Leidos?

A.   I do not.

Q.   Do you think that Mr. Garner should have been fired for the altercation?

A.   Yes.

MR. DEDDEH:  Objection; legal conclusion.

Q.   (BY MR. MYONG)  Why do you believe Mr. Garner should have been fired?

A.   Because he --

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  Because he physically assaulted someone.

Q.   (BY MR. MYONG)  Do you believe Mr. Baird should have been fired for the altercation?

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  No.

Q.   (BY MR. MYONG)  Do you think Leidos performed an adequate investigation regarding the altercation?

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  I guess.

Q.   (BY MR. MYONG)  Do you think they should have interviewed you regarding the altercation?

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  Yes.

Q.   (BY MR. MYONG)  If they should have interviewed you but they didn't, then why would the investigation be fair?

MR. DEDDEH:  Objection; legal conclusion.

THE WITNESS:  I don't know.

Q.   (BY MR. MYONG)  Do you believe Leidos should have interviewed you regarding Mr. Baird's termination?

A.   I believe they should have interviewed me regarding the incident that happened between Steve Baird and Cooper Garner.

Q.   Did Mr. Arroyoavila witness the incident?

A.   No.

Q.   Do you think it's strange that they interviewed Mr. Arroyoavila regarding the altercation even though he didn't witness it?

A.   Yes.

Q.   Did Mr. Veneracion witness the incident?

A.   No.

Q.   Do you think it's strange that they -- Leidos interviewed Mr. Veneracion regarding the altercation?

A.   Yes.

Q.   Did Mr. Arroyoavila ever tell you why Leidos interviewed him for the altercation?

A.   No.

Q.   Did Mr. Veneracion ever tell you why Leidos interviewed him for the altercation?

A.   No.

Q.   Do you know if anyone else was interviewed for the altercation?

A.   I do not.

Q.   Do you know if Mr. Wilson was interviewed for the altercation?

A.   I do not.

Q.   Do you know if Mr. Sim was interviewed for the altercation?

A.   I do not.

Q.   Did Mr. Veneracion and Mr. Baird have a friendly, professional, or hostile working relationship?

A.   Friendly for the most part.

Q.   What do you mean by "the most part"?

REPORTER'S CERTIFICATE

I, Christine Bemiss, a Certified Shorthand Reporter of the State of California and Arizona, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings were made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:   MARCH 6, 2023

_____
Christine Bemiss, RPR,
CA CSR No. 10082
AZ CR No. 50073

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
------------------------------------------x
STEVEN BAIRD, an individual,

                       Plaintiff,

               Case No: 3:22-cv-00060-LL-BGS

        -against-

LEIDOS, INC., a Delaware Corporation;
and DOES 1-99, inclusive

                     Defendants.

------------------------------------------x

                 February 23, 2023
                 11:00 a.m.

     DEPOSITION of the Defendant, LEIDOS,

INC., by ROBERT ATHING, by Plaintiff,

before Christine Cutrone, a Shorthand

Reporter and Notary Public.

  A P P E A R A N C E S :


ROMERO LAW, APC
Attorneys for Plaintiff
     251 S. Lake Avenue,
     Suite 930
     Pasadena, CA 91101-4873

BY:   JESSICA FLORES, ESQ.
PHONE NO:  (626) 788-8916



OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Attorneys for Defendant
     4370 La Jolla Village Drive
     Suite 990
     San Diego, CA 92122

BY:   ANDREW J. DEDDEH  ESQ.


Also Present:  PAUL KEHOE, ESQ.
               (Leidos' General Counsel)

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that filing sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any Notary Public with the same force and effect as though signed and sworn to before this Court.

THE REPORTER: The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.  Do you agree to proceed?

MS. FLORES:  Yes.

MR. DEDDEH:  Yes.

R O B E R T   A T H I N G, having been first duly sworn by a Notary Public was examined and testified under oath as follows:

EXAMINATION

BY MS. FLORES:

Q.   Good morning.  My name is Jessica Flores, and I'm counsel for Plaintiff, Steven Baird.

Can you please state and spell your name for the record?

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

A.    No.

Q.    Who is your current employer?

A.    Leidos Corporation.

Q.    When did you begin working with them?

A.    2008.

Q.    What is your current position?

A.    Corporate investigator, insider threat team.

Q.    How long have you held that position?

A.    Since 2008.

Q.    So you had the same position since 2008?

A.    Yes.

Q.    What are your job responsibilities?

A.    Insider threat, workplace violence issues, inappropriate behavior issues in the workplace.

Q.    So other than investigating these issues, do you have any other responsibilities?

A.    I wouldn't say there's a policy, but I know what to do from my 40 years experience where to start.

Q.    So what did you do next?

A.    I tried to identify witnesses that may have information to be helpful towards my investigation.

Q.    How did you do that?

A.    Talked to people onsite; such as, the manager, as well as the reporting source that reported this to HR.

Q.    Did you go to Vista, California?

A.    No, I did not.

Q.    How did you communicate with the people onsite?

A.    By telephone, which was beneficial, because I received extensive training in telephone interviewing.

Q.    How long did it take you to identify witnesses?

A.    I couldn't give you a fair estimate on that.  I just know that I did.

also important, but it was very important that I at least ask those questions; did you see something?  If they did, I followed up on it.  If they didn't, I documented that they didn't see anything.

Q.    Do you recall approximately how many witnesses you identified?

A.    I want to say maybe five or six people involved to include Mr. Baird and Mr. -- what was his name -- Cooper Garner.  A total, I think, of six.

Q.    So do you recall who you interviewed first?

A.    I do not recall who I interviewed first.

Q.    Do you recall interviewing Mr. Baird?

A.    Yes.  Now, he would be my last.

Q.    What do you recall from your interview of Mr. Baird?

A.    I already -- I believe I already had my assessment of Mr. Baird as provided by some of the employees who he was described as a bully.  He used vulgar

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

language in the workplace. When you want to interview somebody, you get a little bit of background on them first, which is best.  In reading it, employees described him as a bully, foul mouth, antagonistic, confrontational.  So when I interviewed him, I was very, I'd say, guarded.  I was listening.  You always want to listen. So I was listening of his version of event.

Q.    Do you recall what his version of events were?

A.    For the most part, he told me that he greeted one of the co-workers, Cooper Garner.  He has a habit of greeting people -- gives them nicknames and such, and I believe that he called him Home Alone guy.  Like Joe Pesci wore the hat.  I don't know if you know that movie, but there's -- Joe Pesci played a part in Home Alone.

Q.    Yes.

A.    And Cooper is a young kid, probably 21 years of age.  That's how he would greet -- how Mr. Baird would greet

people.  Other people I think I recall somebody else was a fan of the Denver Broncos, so he would come in the morning and say hello Denver Bronco.

Q.    Yes.

A.    And Mr. Baird then told me that he was in Cooper's work area and Cooper assaulted him, pushed him.  He did not sustain any injuries.  I asked that question, if he sustained any injuries.  He said he had not.

Q.    Do you recall anything else from interviewing him?

A.    No, I don't recall anything that was relevant to the workplace violence concern.  I didn't -- those are the highlights.  He did provide me a statement, too, of the situation.

Q.    You said the employees described him as a bully who used vulgar language in the workplace.

Do you recall which employees said that?

A.    I want to say all of them.

Q.    You believe that all of the

She's a workplace relations investigator. She had -- we kind of segregated what we do here, the investigations. And I sat in as a witness where she -- where Katie interviewed Mr. Baird about his inappropriate -- allegation of inappropriate comments in the workplace, about politics, and wanting to shoot the President, and illegal aliens across the border, immigration, things along those lines.

Q.    When was this?

A.    Close in proximity to following my investigation, interview of Mr. Baird.

Q.    A few days --

A.    I can't --

Q.    -- after --

A.    It was a day or two weeks, but it was shortly thereafter.

Q.    Before he was terminated?

A.    Oh, yes, it was definitely before he was terminated.

Q.    What did he say in your presence regarding illegal aliens in the

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

country?

A.    Well, he denied -- well, first off he denied saying he was going to shoot the President of the United States in the head.  As far as conversation or comments about political point of view, I don't recall what he said to Katie about that.  It wasn't my task or responsibility to document those things.

Q.    What was the difference between your responsibility and the responsibility of Katie Ries?

A.    Well, mine's workplace relations and her's is workplace performance and such.

Q.    And you said she was investigating the comments?

A.    Yeah, the comments shooting the President of the United States in the head.  About his -- Mr. Baird's comments about illegal immigrants coming across the border and politics in general.

Q.    What do you mean that you sat in on the interview between Katie --

A.    It was a conference call between myself, Katie and Mr. Baird.

Q.    How long was that conference call approximately?

A.    I'd say an hour.

Q.    Who alleged that Mr. Baird made a comment about wanting to shoot the President?

A.    I believe it was a guy named Ian.

Q.    Anyone else?

A.    Not that I recall.

Q.    What was the investigation finding regarding the allegation that Mr. Baird made a comment that he wanted to shoot the President?

A.    I don't think that was substantiated.  I know that my immediate manager has an obligation as well as I do, from her former career as a United States secret service agent, that she notify the secret service of the comment, whether it's innocent or not, is still an obligation to report that to the United States secret service, which she did.  I

MS. FLORES:  Okay.  Let's go off the record.

(Discussion is held off the record.)

(Whereupon, a short break was taken).

MS. FLORES:  Back on the record.

Q.    Mr. Athing, you understand that you are still under oath?

A.    I do.

Q.    So in your interview of Cooper Garner, did Cooper Garner make any comments regarding the kinds of political statements that Steven Baird made?

A.    I don't recall that.

Q.    Did Cooper Garner say anything in his interview with regards to his belief about Mr. Baird's views on race?

A.    I don't recall who said it, but somebody said in that group that I interviewed, somebody said that Mr. Baird was a racist.

Q.    You say you don't recall who

difficult.  I was trying to accommodate him with the shipping of the tools, but he made it very hard on everyone, which supported my belief that he was a bully and he wasn't to be in our workplace.  So I felt very confident with the decision.

Q.    So you did not see a photo of him until after his termination?

A.    That sounds accurate, yep. That's the only reason I would have dug up a photo of him, a badge picture, a Leidos employee badge picture.

Q.    During your investigation, did you see Cooper Garner?

A.    No.

Q.    Were you aware whether anyone in the workplace shared Mr. Baird's political views?

A.    No.  I was not aware of anybody who had a like-mind.

Q.    During your investigation process, did anyone say to you that Steven Baird discussed the black lives matter movement?

A.    I remember hearing something

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

about that.  I don't recall who, whether it was during the course of an interview with Katie Reis and Mr. Baird and myself that I was a witness to, or somebody wrote it on one of the forms, the workplace interview forms.  I remember something along those lines.

Q.    Do you recall who would have said that?

A.    Well, it would have been somebody who filled out the forms or somebody who was interviewed on our interview list.

Q.    Do you recall what the alleged comment was?

A.    I did mention a few questions ago something along the lines about black lives matter.  I don't know what context.  I don't have any recollection of the context, whether it was for it or negative, I don't recall.

Q.    Did you take notes during your interviews?

A.    Did take notes.

Q.    Sorry?

A.    I did take notes in order to compile a report, yes.

Q.    What did you do with those notes after the interviews?

A.    Retained them for a while and then just got rid of them.

Q.    Were they handwritten or typed?

A.    My notes are handwritten.

Q.    Do you recall when you got rid of them?

A.    No.

Q.    Do you recall, approximately, how long you retained them?

A.    Could be six months --

(Court reporter asked for a repeat.)

A.    Six to eight months and then the case goes away.

Q.    What do you mean that a case goes away?

A.    I no longer have a need for them.  Resolved.

Q.    How long did it take to

with the exception of Mr. Baird.

Q.    Did you have reason to believe that anything that Cooper Garner said was untruthful?

A.    Not at all.

MS. FLORES:  Just a moment. I'm going to introduce an exhibit. Actually, before I do that, a few more questions.

Q.    So after you completed the witness interviews, what happened next?

A.    I compiled a report.  We include the witness statement.  I reported it -- put it into our system or document it into our system, our record system.  And then what we did was, we convened the CARC, the acronym C-A-R-C, which is Corrective Action Review Committee.  And at that opportunity, we present the facts and there's a committee compromised of manager, legal, workplace relations, HR.  And I present facts on this particular case. I present facts on the investigation, my findings, which was communicated for inappropriate workplace

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

behavior.

Q.    Sorry, what was that?

A.    Inappropriate workplace behavior, where there was the altercation between Mr. Baird and Cooper Garner.  And Mr. Baird was terminated for his involvement, and Mr. Garner was relieved from services -- he was a subcontractor. We also thought it was best to remove him from the environment.  We were fair.

Q.    How many people were present at this corrective action review committee gathering?

A.    Well, has to be legal.  Has to be workplace relations.  Has to be HR. Has to be a manager.  Has to be a regional director from the program, SDNA and me.  So I'd say five or six people. And I present the fact on my particular case and I don't make a decision.  I'm a fact gatherer.  I'm unbiassed as I mentioned before.  The findings are presented and then the members determine the appropriate level of discipline, which they deemed to be termination was

recall or seeing the allegations that she investigated were substantiated.

Q.    Sorry, can you say that again?

A.    If I recall correctly, when she presented her facts, they were substantiated -- there was a substantiated finding regarding his comments about the illegal aliens coming across the border, and there was something else that was an inappropriate comment, maybe politics.  Can't be certain on that part though.

Q.    Do you recall anything else about the findings that she presented or the facts that she presented?

A.    No.

Q.    What happened after both of you presented facts?

A.    The committee elected termination for Mr. Baird, and elected to remove Cooper Garner from our workplace as a subcontractor to us.

Q.    Did the committee give a reason for termination?

A.    Yes, for clear violation of our workplace violence policy.

Q.    Did they provide a further basis for how the workplace violence policy was violated?

A.    No.

Q.    Did anything else happen after that?

A.    What do you mean?

Q.    In that meeting after there was a decision to terminate Mr. Baird and to remove Mr. Garner as a subcontractor, was there any other conversation during that meeting?

A.    I believe what happened following the determination for termination removal for both termination for Baird and removal for Garner, would have been up to the HR business partner, and we always speak up in the meeting to -- who has that task, and get clarification that they're going to complete that task promptly.  And we also discuss security measures for this type of situation to ensure that Mr. Garner

Mr. Baird during the course of my investigation, is that your question?

Q.    Yes, and by him at any point during his employment?

A.    I don't recall that.

Q.    I think earlier you stated that Mr. Baird talked politics in a way that annoyed others.

MR. DEDDEH:  Objection.

Misstates prior testimony.  You can answer.

Q.    What do you mean by how he annoyed others?

A.    Well, they raised it to our attention, which would be indicative of somebody who was annoyed.  Nothing positive about it that they would raise. All's I heard was negative about Mr. Baird.

Q.    But what were the comments that were annoying?

A.    That he talked politics in the workplace.  It wasn't -- if I recall correctly, he wasn't supportive of the United States government, the current

administration, President Biden in his policy towards immigration.

Q.    How did he express that he wasn't supportive of the current administration other than his policies toward immigration?

A.    I'm not aware how he expressed those in the workplace.

Q.    Was it your understanding that the employees that you spoke with were supportive of the current administration?

MR. DEDDEH:  Objection. Irrelevant.

A.    I didn't ask them.

Q.    Was there anything else that Steven Baird did that you understood that other employees found annoying?

A.    No, other than calling somebody a pussy.  Challenging somebody to a fight.  Inappropriate comments in the workplace about politics.  I remember there was something about black lives matter, but I don't know what context.  I think that's about it that I can recall

JOB NO. 529017

that correct?

A.    Yes.

Q.    Do you recall approximately how long this interview was?

A.    No.

Q.    Is it your understanding that Ian Arroyoavila interacted with Steven Baird before the incident between Steven Baird and Cooper Garner?

A.    I can't answer that.  I'd have to read this.

Q.    Go ahead and read it and let me know when you're done.

A.    Okay.  I finished reading this paragraph.

Q.    Okay.  Is there anything about it that is inaccurate?

A.    Nothing that I see.

Q.    Is it your understanding that there was an interaction between Ian Arroyoavila and Steven Baird before the incident between Steven Baird and Cooper Garner?

A.    Yes.

Q.    Do you know how much time

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

there was between the time of the

interaction between Steven Baird and Ian

Arroyoavila and the incident between

Cooper Garner and Steven Baird?

A.    No, I don't recall the

timing in between the two issues, no.

Q.    Are you aware as to whether

Ian Arroyoavila was a witness to the

incident between Steve Baird and Cooper

Garner?

A.    He heard the arguing, but he

didn't have a visual on it.  But he saw

Mr. Wilson get in between them, which

validates what Mr. Wilson said.

Q.    Are you aware as to whether

there was any investigation into Ian

Arroyoavila's statement to Steve Baird

said he could go back to Canada?

A.    No, I didn't conduct an

investigation about that.  Although, he

does say -- he does admit saying that.

Q.    Are you aware as to whether

he received any discipline for that?

A.    No, I'm not aware.  I would

have recommended somebody reviewed that.

paragraph?

A.   No.

Q.   Are you aware as to whether it was substantiated that Steven Baird ever said a new civil war is coming, white versus black, you better be ready and have weapons?

A.   No, I'm not aware if that was substantiated or not.

Q.   Did you find Ian Arroyoavila to be a credible witness?

A.   I did.

Q.   On what basis did you find him to be a credible witness?

A.   He was free with information, which I thought --

(Court reporter asked for a repeat.)

A.   He was free with information.  I found him to be truthful. The information that he provided was consistent with what other people said; such as, his visual of the altercation, and that he was able to see Mr. Wilson intervene.  I found him to be credible.

ROBERT ATHING
FEBRUARY 23, 2023

JOB NO. 529017

Q.    Please go ahead and read this paragraph regarding the interview with James Wilson and let me know when you're finished.

A.    Yes. Okay.  I've completed it.

Q.    Is there anything in this paragraph that you find to be inaccurate?

A.    No.

Q.    What is your understanding of this line here where it says about Wilson observed from the chest level down, Steve Baird and Cooper Garner very close to each other, chest to chest?

A.    Mm-hmm. What's your question?

Q.    What is your understanding of that line in terms of how close they were to each other?

A.    Very close as it's written to each other, chest to chest.  Very close.

Q.    Does that mean chest bumping?

A.    Well, I think that could

happen, yes, very close.  Close

proximity.

Q.    If you could just read this paragraph regarding your interview of John Sim and just let me know when you are finished.

A.    Okay.

Q.    So this second line, Sim stated that Baird had difficulty separating work from outside factors which were politically centered.

What do you recall about what Sim meant by that?

A.    Well, as I wrote, it says, Sim provided an example of such in late 2019 or early 2020.  Tim counselled Baird about making an inappropriate comment about non-U.S. persons crossing the southern boarder.  And that was brought to his attention by Efron Ricardo who reported his concern of being offended in the workplace by Baird's comment.  Ricardo requested anonymity reporting his concern to Sim. Sim gave Baird an oral counselling about the comment and Baird

seemed to be contrite and apologetic. And Sim let it go. Sim did not memorialize the counselling in an e-mail or a file. Sim has never heard Baird make any comments about black, white, civil war, travel to D.C., capital riots, or shooting President Biden.

Q.   Do you recall that Sim gave other reasons other than those described in this paragraph as to how Steven Baird would have had difficulty separating work from outside factors which were politically centered?

A.   No, I don't recall any other examples.

Q.   With regards to the CARC meeting, did anyone else bring any documents to that meeting?

A.   I don't recall, but typically not.

Q.   Did Katie Ries also provide her report for the committee to review before the meeting?

A.   I don't know.

Q.   Do you know if the people

C E R T I F I C A T E

I, CHRISTINE CUTRONE, Shorthand Reporter and a Notary Public, do hereby state:

That the witness whose examination is herein before set forth has duly acknowledged that such an examination is a true record of the testimony given by such a witness.

I further state that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of March, 2022.

*Christine Cutrone*

CHRISTINE CUTRONE